FILED IN CAMERA AND UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA, *EX REL.*
ACADEMY HEALTH CENTER, INC.
PLAINTIFF

V.                                         CIVIL ACTION NO. 3:10cv552
HTW-LRA

HYPERION FOUNDATION, INC. d/b/a
OXFORD HEALTH & REHABILITATION CENTER;
ALTACARE CORPORATION;
HP/ANCILLARIES, INC.; LONG TERM CARE SERVICES, INC.;
SENTRY HEALTHCARE ACQUIRORS, INC.;
HP/MANAGEMENT GROUP, INC.; HARRY McD. CLARK;
JULIE MITTLEIDER; DOUGLAS K. MITTLEIDER;
and JOHN DOES 1-200
DEFENDANTS

---

### SECOND AMENDED QUI TAM COMPLAINT

---

COMES NOW Relator Academy Health Center, Inc. f/k/a Adventist Health Center, Inc. ("AHC") by and through its counsel, and brings this its Second Amended Qui Tam Complaint on behalf of the United States of America against Defendants Hyperion Foundation, Inc. d/b/a Oxford Health & Rehabilitation Center ("Hyperion"); AltaCare Corporation; HP/Ancillaries, Inc.; Long-Term Care Services, Inc.; HP/Management Group, Inc.; Sentry Healthcare Acquirors, Inc. ("the Mittleider companies"); Harry McD. Clark; Julie Mittleider; Douglas K. Mittleider; John Does 1-200, and for other relief, and in support thereof would show unto the Court the following:

### JURISDICTION & VENUE

Page 1 of 53

FILED IN CAMERA AND UNDER SEAL

1.

This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants under the Federal Medicare and Medicaid Programs. This action arises from a violation of 31 U.S.C. Section 3729, *et seq.* (popularly known as the False Claims Act). This Court has subject matter jurisdiction over this False Claims Act claim under 31 U.S.C. §§ 3732(a) and 3730(b) as well as 28 U.S.C. §§1331 and 1345.

2.

Venue is proper in this Court pursuant to 28 U.S.C. Section 1391.

3.

Before or contemporaneously with the filing of this Amended Complaint, Relator AHC provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Mississippi a copy of this Amended Complaint.

4.

Relator is a corporate citizen of the United States and is incorporated in the State of Mississippi. At all times relevant hereto, Relator was the owner of the nursing home facility located in Mississippi and more particularly described below. AHC brings this action based upon its direct, independent and personal knowledge and upon information and belief. AHC is an original source of the information voluntarily provided to the Government before or contemporaneously with the filing of this action.

PARTIES

5.

**FILED IN CAMERA AND UNDER SEAL**

Relator AHC is a non-profit corporation organized under the laws of the State of Mississippi. AHC brings this action on behalf of the United States of America.

6.

AHC is the Owner and Lessor of certain nonresidential real property currently being operated by Lessee Defendant Hyperion Foundation, Inc., d/b/a Oxford Health & Rehabilitation Center ("Hyperion"), which consists of a 120-bed skilled nursing facility located at 6428 U.S. Highway 11, Lumberton, Mississippi, together with all personal property, fixtures, equipment, certificates of need, licenses, and Medicare and Medicaid numbers used in connection with the operation of the nursing facility (collectively referred to herein as the "Facility"). The Facility participates in both Medicare and Medicaid programs and operates under Medicare Provider Number 25-5157 and Medicaid Provider Number 00023002. The Facility is licensed by the Mississippi Department of Health under License # 351 which authorizes the Facility to operate 120 skilled nursing facility beds.

7.

Hyperion Foundation, Inc. d/b/a Oxford Health and Rehabilitation Center (hereinafter "Hyperion") is a foreign non-profit corporation organized under the laws of the State of Georgia. Hyperion Foundation, Inc. is currently doing business in the State of Mississippi and may be served with process by serving its agent for service of process, C T Corporation, at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232, or its registered agent Evelyn Brown, 5895 Windward Parkway, Suite 200,

**FILED IN CAMERA AND UNDER SEAL**

Alpharetta, Georgia, 30022. This Court has personal jurisdiction over this Defendant pursuant to 28 U.S.C. §§ 157 and 1334.

8.

Defendant AltaCare Corporation is a foreign corporation organized under the laws of the State of Georgia and doing business in the State of Mississippi. AltaCare manages and/or operates at least 34 long-term care nursing facilities throughout the United States. AltaCare Corporation may be served with process by serving its agent for service of process, Evelyn Brown, at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005, or its CEO, CFO, and Secretary Douglas K. Mittleider at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005.

9.

HP/Ancillaries, Inc. is a foreign corporation organized under the laws of the State of Georgia. HP/Ancillaries, Inc. is currently doing business in the State of Mississippi and may be served with process by serving its agent for service of process, C T Corporation, at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232; or its agent for service of process, Evelyn Brown, at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005; or its CEO, CFO, and Secretary Douglas K. Mittleider at 5174 McGinnis Ferry Road, Suite 126, Alpharetta, Georgia 30005.

10.

Long Term Care Services, Inc. is a foreign corporation organized under the laws of the State of Georgia and is currently doing business in the State of Mississippi. It may be served with process by serving its agent for service of process, Evelyn Brown, at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005; or its CEO, CFO, and

**FILED IN CAMERA AND UNDER SEAL**

Secretary Douglas K. Mittleider at 5174 McGinnis Ferry Road, Suite 126, Alpharetta, Georgia 30005.

## 11.

Sentry Healthcare Acquirors, Inc. is a foreign corporation organized under the laws of the State of Georgia and is currently doing business in the State of Mississippi. It may be served with process by serving its agent for service of process, Evelyn Brown, at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005; or its CEO, CFO, and Secretary Julie Mittleider at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005.

## 12.

HP/Management Group, Inc. is a foreign corporation organized under the laws of the State of Georgia. HP/Management Group, Inc. is currently doing business in the State of Mississippi and may be served with process by serving its agent for service of process, C T Corporation, at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232; or its agent for service of process, Evelyn Brown, at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005; or its CEO, CFO, and Secretary Douglas K. Mittleider at 5174 McGinnis Ferry Road, Suite 126, Alpharetta, Georgia 30005.

## 13.

Defendant Harry McD. Clark is an adult resident citizen of the State of Alabama who is currently doing business in the State of Mississippi. He is the President and sole director of Hyperion. He may be served with process at 710 South Mobile Street, Fairhope, Alabama 36532.

**FILED IN CAMERA AND UNDER SEAL**

14.

Defendant Julie Mittleider is an adult resident citizen of the State of Georgia who is currently doing business in the State of Mississippi and is listed as the President, Treasurer, and Director of Hyperion Foundation, Inc. with the Mississippi Secretary of State. She is the CEO, CFO, and Secretary of Sentry Healthcare Acquirors, Inc. She may be served with process at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005.

15.

Defendant Douglas K. Mittleider is an adult resident citizen of the State of Georgia who is currently doing business in the State of Mississippi. He is the CEO, CFO, and Secretary of AltaCare Corporation, Long Term Care Services, Inc., HP/Ancillaries Inc., and HP/Management Group, Inc. Mittleider may be served with process at 5895 Windward Parkway, Suite 200, Alpharetta, Georgia 30005; or at 5174 McGinnis Ferry Road, Suite 126, Alpharetta, Georgia 30005.

16.

John Does 1-200 are individuals and/or corporations or other business entities that may be owned or under the control of the Defendants and who may be liable for the allegations herein, may have received benefits from the fraudulent submission of claims to the government and/or may be involved in the scheme to defraud that are currently unknown to Relator.

17.

**FILED IN CAMERA AND UNDER SEAL**

From its knowledge and business dealing with the defendants, Douglas K. Mittleider is the de facto owner, operator, manager, officer, or shareholder in Hyperion and each of the corporate entities identified herein or other entities unknown to AHC. Mittleider controls the management and operation of the Facility and other entities. Relator has had no dealings with anyone other than Mittleider with respect to the operation of the facility. Each of these entities are the alter ego of Defendant Mittleider and/or each other, and/or other individuals and entities unknown to AHC. Defendant Mittleider exercises such control over the business and operations of these entities that this Court should disregard the corporate formalities of separate existence. Each of the individuals and/or entities identified have been unjustly enriched through participation in a scheme in which false or fraudulent records or statements were submitted to the government to obtain funds under the Medicare and Medicaid programs.

## PROCEDURAL BACKGROUND

### 18.

On October 5, 2005, Hyperion entered into a Lease Agreement with AHC. As part of the terms, conditions and provisions of the Lease Agreement, Hyperion assumed the operations of the Facility and all rights and authorities to operate the Facility and receive and accept payments (including Medicare and Medicaid payments) on behalf of the Facility and its residents for services rendered to those residents. At that time, and until June 29, 2008, Hyperion's President and Chairman of the Board of Directors was listed as Julie Mittleider.

### 19.

**FILED IN CAMERA AND UNDER SEAL**

This matter began with Hyperion's breach of the Lease Agreement by failure to pay rent to AHC. The breach of the Lease Agreement prompted AHC to conduct an investigation into whether Hyperion as a tenant and operator of the Facility was actually providing the level of care essential to maintaining the Facility and to properly provide for its residents as required by statute and regulation. Upon its initial investigation, AHC determined that defendants could not or would not provide the requisite level of care for the residents. As a result, AHC began its string of attempts to terminate the lease and evict the tenant.

20.

On July 15, 2008, AHC filed a Motion and/or Affidavit to Remove Tenant in the Justice Court of Lamar County, Mississippi in an effort to evict the Debtor from the premises and terminate their relationship. The Motion sought to remove Debtor as tenant on August 1, 2008, 35 days after the first notice of termination was sent. An eviction hearing was scheduled for July 31, 2008 in this matter; however the hearing was continued at Debtor's request until August 6, 2008. On August 5, 2008, the Debtor filed its Petition under Chapter 11 of the United States Bankruptcy Code before the U.S. Bankruptcy Court for the Southern District of Mississippi, seeking the protection of that court to elude eviction. During the bankruptcy proceeding, AHC filed numerous pleadings to terminate the Lease Agreement and to evict Hyperion, all of which were denied.

21.

On September 30, 2009, Relator filed its original Qui Tam Complaint and Other Relief in the bankruptcy proceeding, under seal, pursuant to Title 11, 28 U.S.C. §§ 157

**FILED IN CAMERA AND UNDER SEAL**

and 1334 (a) and (b). Relator provided the Attorney General of the United States and the United States Attorney for the Southern District of Mississippi a copy of the Complaint and a Confidential Disclosure Statement of all material evidence and information as required by the False Claims Act.

22.

On October 1, 2009, Hyperion filed in the bankruptcy proceeding, a Motion to Compel Settlement of AHC's claim for unpaid rent. Bankruptcy Judge Neil P. Olack entered a Memorandum Opinion and Order Granting Motion to Compel Settlement on October 27, 2009.

23.

On November 20, 2009, Relator filed its First Amended Qui Tam Complaint and Other Relief, under seal, in order to allege new information and facts in support of the cause of action. The amended complaint was provided to the Attorney General of the United States and the Untied States Attorney for the Southern District of Mississippi.

24.

On March 22, 2010, U.S. Bankruptcy Judge Neil P. Olack granted the United States Trustee's Motion to Dismiss Hyperion from bankruptcy due to Hyperion's failure to submit a disclosure report and failure to file all monthly operating statements with the court.

25.

**FILED IN CAMERA AND UNDER SEAL**

As a result of the dismissal of the bankruptcy action, a Motion to Transfer Venue and an Agreed Order to Transfer Venue was submitted to the bankruptcy court on September 20, 2010.  The Order was entered by Judge Ellington and the cause of action was transferred to this court.

26.

On or about May 14, 2010 AHC brought a separate cause of action in the County Court of Lamar County, Mississippi, styled Academy Health Center, Inc., f/k/a Adventist Health Center, Inc. v. Hyperion Foundation, Inc. and Altacare Management Corporation, cause number Co10-0553A. This action sought termination of the Lease Agreement and damages based upon the defendant's failure to provide proper care to its residents and failure to follow state and federal regulations, all being a violation of the Lease Agreement.  On May 18, 2010, the defendants removed this action to the United State District Court for the Southern District of Mississippi, Hattiesburg Division, Civil action number 2:10cv123-KS-MTP.  On November 19, 2010, AHC amended the Complaint to name additional defendants and to allege additional breaches of the Lease Agreement, including the defendant's failure to abide by the bankruptcy Order requiring Hyperion to pay rent and settlement payments.

27.

**FILED IN CAMERA AND UNDER SEAL**

AHC has learned through its personal and direct knowledge and actual business dealings with Defendants that all Defendants have engaged in certain fraudulent conduct as set forth more fully below.

## STATUTORY AND REGULATORY BACKGROUND

### 28.

The Social Security Act mandates that facilities participating in the Medicare and Medicaid programs meet certain requirements to qualify for participation. Long term care facilities are required to provide nursing services that meet the needs of residents. 42 CFR §483, *et. seq.* Implicit in the right of a provider to receive payment for the care of a resident is that the resident is to be treated with dignity and respect. 42 CFR §483.15(a). Each facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care. 42 C.F.R. § 483.30. There must be adequate staff to provide nursing care to all residents in accordance with resident care plans. 42 C.F.R. §483.30(a)(1). The residents must be provided with a safe and clean "homelike environment". 42 C.F.R §483.70(h). It is incumbent upon each facility to ensure that preventive measures, treatments, medications, diet and other health services prescribed are properly carried out. 42 C.F.R. §483.1 *et seq.*

## COST REPORT SUBMISSION

### 29.

Medicaid and Medicare pay nursing home providers payment for services rendered to the residents in the programs. Hyperion participates in the Medicare and

**FILED IN CAMERA AND UNDER SEAL**

Medicaid programs. In order to participate in the Medicare program, Hyperion is required to enter into a Participation Agreement with the Center for Medicare and Medicaid Services ("CMS") whereby it certifies that in return for receiving federal funds, it will provide services to each resident in accordance with the laws and regulations governing the program. 42 C.F.R. §489.10 *et seq*. A Medicare provider must comply with the Conditions of Participation codified at 42 C.F.R. §483 *et seq*. Providers such as Hyperion are paid certain rates for each resident which is meant to cover the expenses of all necessary treatment given to each patient. These rates are calculated and adjusted based upon claims submitted and providers must submit cost reports to accurately reflect that funds received from the program were properly expended for the care of the residents. Therefore, those reports constitute a claim or a statement in support of a claim under the Civil False Claims Act.

30.

Hyperion also participates in the Mississippi Medicaid program, as administered by the State of Mississippi Division of Medicaid. Hyperion is paid on a per diem rate, calculated and adjusted in part on the basis of cost reports submitted by the provider. Therefore, those reports constitute a claim or a statement in support of a claim under the Civil False Claims Act. Medicaid payments to Hyperion are funded by both federal and state monies. Federal funding for Mississippi equals approximately 70% of Mississippi Medicaid expenditures.

**STANDARD OF CARE**

31.

**FILED IN CAMERA AND UNDER SEAL**

42 U.S.C. § 1396r, mandates that a nursing facility "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."42 U.S.C. § 1396r(b)(1)(A). The facility must operate and provide services in compliance with all applicable federal and state laws and regulations and with "accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. §1396r(d)(4)(A); *see also* 42 C.F.R. §483.1 *et seq.*

32.

Nursing facilities must "provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care", that "describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met." 42 U.S.C. § 1396r(b)(2)(A); see also 42 C.F.R. §483.15 and §483.25.

33.

Each facility must fulfill the residents care plans by providing, or arranging for the provision of nursing and related services and medically related social services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.  42 U.S.C. § 1396r(b)(4)(A)(i-iv); see also, 42 C.F.R. §483.30.

## COUNT I - WORTHLESS SERVICES

34.

Plaintiff realleges and adopts by reference each and every allegations contained in the paragraphs set forth above.

35.

**FILED IN CAMERA AND UNDER SEAL**

The defendants are individuals, corporations, partnerships or other organizations which have assumed the responsibility for the care of the residents. The defendants submitted false claims to the government for the provision of grossly substandard care in violation of their statutory and regulatory duty under the Medicare and Medicaid programs as well as regulatory obligations under Mississippi law. They have abused the residents of the Facility by engaging in the willful or negligent infliction of physical pain, injury or mental anguish on the residents and/or the willful deprivation of services which are necessary to maintain the mental and physical health of the residents. The defendants exploited the residents of the Facility by receiving federal funds intended for care of the residents and willfully failing to utilize those funds toward resident care as follows:

1.     The defendants have financially abandoned the facility by diverting funds intended for resident care to entities controlled by Douglas Mittleider. Such financial abandonment has resulted in the rationing of items and supplies necessary for the basic care and needs of the residents, including towels, oxygen bottles, garbage bags, laundry bags, and medical tubing, among other items and supplies. Upon information and belief, the rationing of laundry and garbage bags requires staff at the facility to use bags for multiple rooms, potentially spreading infections and placing residents at risk. Upon information and belief, defendants have caused false and improper documentation to be prepared at the Facility to hide the existence of supply shortages and short-staffing at the Facility.

2.     Such financial abandonment also has resulted in Hyperion asking facility staff on multiple occasions to hold their paychecks, as Hyperion did not have sufficient funds in its bank accounts to cover the amounts of the paychecks. Such actions contributed to the short staffing of the facility, adversely impacting the care of residents.

3.     The facility is chronically short-staffed, with some nurses being responsible for providing direct care to over 30 residents.

4.     The "200 Hall" of the facility is closed leaving the 120 bed facility with only 90 operational beds. The equipment and furniture in the 200 Hall is being used to scavenge parts and for storage.

**FILED IN CAMERA AND UNDER SEAL**

5.      The pattern of substandard care exhibited by the defendants at the facility has led physicians in the area served by the facility to recommend to patients and their families that they not send their loved ones who need skilled nursing care to the facility, resulting in a declining census at the facility and further damaging the facility's reputation in the community. The facility is licensed for 120 beds and it is reported that the current resident census is approximately 65-68.

36.

Defendants have failed to provide adequate care and basic necessities to the residents of the Facility. As stated above, the breach of the Lease Agreement prompted AHC to conduct an investigation into whether Hyperion as a tenant and operator of the Facility was actually providing the level of care essential to maintaining the Facility and to properly provide for its residents as required by statute and regulation. Upon its initial investigation, AHC determined that defendants were not providing the requisite level of care for the residents and that the condition of the facility had deteriorated. As a result, AHC began its string of attempts to terminate the lease and evict the tenant. An evaluation of the Facility conducted at AHC's direction in September 2008 found as follows:

1.      The Nursing Home Administrator was absent from the Facility for most of the day, and Hyperion failed to provide an assistant administrator. *See Exhibit A, September 8-9, 2008 Evaluation of Facility, p.* 3.

2.      Hyperion also failed to provide a Certified Dietary Manager from at least April 2008 through September 2008. *Id. p. 4.*

3.      At least one of the laundry dryers was inoperative. Several areas of the Facility (the courtyard, activity room, bathrooms) had widespread mold that went untended for months. Many of the bathrooms had tile with a strong smell of urine, suggesting infrequent cleaning. *Id. p. 4.*

**FILED IN CAMERA AND UNDER SEAL**

      4.      All showers at the facility had missing tile on the floors and walls and were covered with mold and mildew. *Id.* Showers were open to the room with no privacy curtains and broken floor stand dividers.

      5.      The furniture in the Facility is old and mismatched. *Id.*

      6.      The Online Survey Certification and Reporting (OSCAR) report compiled for the Facility along with this evaluation on September 8 showed further evidence that Hyperion was not providing proper care, as for 2008, the Facility had already received 5 Life Safety Code violations at survey; the average number of such deficiencies for nursing homes in Mississippi at that time was 1.2, and in the nation was 4.0. *Id.*

      7.      These *findings* were reported to defendants.

37.

The State survey agency completed a survey and inspection of the Facility on February 27, 2009 and found the Facility was still not in substantial compliance with several federal conditions of participation, including the following:

      1.      An astounding 20 out of 20 female residents surveyed who stated that "there were not enough shower stalls for everybody to shower in and that there was *no shower curtains in place* to provide privacy while showering. The facility had a few screens, but not enough, and that there were not enough screens to provide full privacy from every angle. The practice of the staff members was to bring in several females at a time to the shower area and *undress and completely disrobe them in the shower areas in groups.* They stated that *they did not want to be nude in front of others and did not want to see others nude."* (See excerpts from 2/27/09 survey attached hereto as "Exhibit B"; emphasis added).

38.

A second survey by AHC found that on March 19, 2009 the Facility was still not being operated in compliance with Federal and state regulation. Even in the wake of the February survey, the Facility still had inadequate equipment, old, worn and mismatched furniture, unsecured sprinkler heads, "three of four shower areas were closed to residents", and the 200 wing was still being used for scavenged parts and storage. Many of the toilets in the 200 Hall had no connection to the wall or broken

Page 16 of 53

**FILED IN CAMERA AND UNDER SEAL**

flush handles, making it impossible to flush dirty toilets. There were widespread

moisture and mold problems, roaches in the 200 Hall, and many of the 200 Hall rooms

were missing mattresses and had broken air conditioning units.  These finding were

reported to the defendants. *See,* Exhibit "A-1."

39.

The State survey agency completed a complaint survey of the facility on

November 24, 2009 that found the facility still not in substantial compliance with several

federal conditions of participation.  *See Exhibit C.*  The survey concluded that the facility

under defendant's operation had not developed and implemented policies and procedures

that prohibit mistreatment, neglect, and abuse of residents and misappropriation of

resident property. The survey reported as follows:

> 1.      One resident suffered a fall during a transfer from a wheelchair to
> his bed because a Certified Nurse Assistant transferred the patient to the bed
> without aide. This occurred even though the orders for the resident required that
> any transfer occur only by using a mechanical lift with two person assistance.
> The resident suffered a sprained right ankle.  The resident stated that there had
> been several occasions when only one staff member assisted him in such a
> transfer.

> 2.      The facility failed to thoroughly investigate and report the
> incident, failed to prepare comprehensive care plans, and failed to ensure the
> resident environment remained as free of accident hazards as possible.

40.

The March 25, 2010 survey of the facility shows that the neglect of the facility

and its residents on the part of the defendants, at the direction and control of Douglas

Mittleider, Julie Mittleider, and/or Harry Clark, has placed the residents at risk of

physical and mental harm from snakes, rats, insects, and other vermin due to the lack

of maintenance and housekeeping at the facility.  *See Exhibit D.*  That survey shows

the following:

**FILED IN CAMERA AND UNDER SEAL**

1.      A *snake* entered the facility and was found in a bed-ridden resident's bed.  The snake was discovered when a staff member investigated the resident's complaint of leg pain.  When she pulled back the covers, a snake jumped out at her from the area of the residents legs while the resident was still in the bed.

2.      The resident's room where the snake was discovered showed evidence of lack of maintenance, namely eroded wallboard in the bathroom with five areas noted with holes.

3.      The facility's administrator recounted an incident in which surveyors saw a poisonous snake, a water moccasin, underneath bushes just outside the facility.

4.      The administrator also told surveyors that facility staff members had previously discovered a snake in the sitting area in the front of the facility.

5.      Another resident stated she had spiders around her window until a hole was plugged and then had ants on the wall across from her bed.  The resident stated that she just laid in the bed and watched them.

6.      Other residents had sticky paper mouse traps in their rooms, and one resident stated she had recently noticed a mouse run under her bedside table. Another resident noted that staff members had caught two mice in her room. The floor was soiled and a gouged out area of the wall was visible under the heater.

7.      The survey noted numerous holes and chipped or soiled tiles in several rooms in the facility.

8.      A visitor to the facility told surveyors he had heard of snakes in the facility, that one snake was found in a resident's bed, and that he had killed a roach in the hallway and saw roaches often.

41.

On April 30, 2010, the State survey agency conducted a recertification survey at the Facility.  *See Exhibit E.*  The survey found that the Facility was out of substantial compliance with approximately 20 federal conditions of participation, including being at an *"Immediate Jeopardy"* level for "Administration" and "Accidents & Supervision."  Immediate Jeopardy is defined as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely

**FILED IN CAMERA AND UNDER SEAL**

to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. §489.3.

The survey found as follows:

      1.    Hyperion failed to ensure that a resident received adequate supervision to prevent that resident from leaving the facility without staff knowledge. On March 30, 2010, a passerby informed staff that a resident was noted approximately 0.6 miles south of the facility on Highway 11. The affected resident had a known wandering behavior. This failure by Hyperion placed the resident at risk for serious injury, harm, impairment, and/or death and was deemed an Immediate Jeopardy level of noncompliance. *See Exhibit E, April 30, 2010 Survey of Facility, pp. 1, 11-28.*

      2.    Hyperion also received a citation at an Immediate Jeopardy level for the facility's failure to be administered in a manner to attain or maintain the highest well-being of each resident as it relates to substandard quality of care and immediate jeopardy. *Id. p. 1.*

      3.    Hyperion failed to ensure sufficient staff was available on a 24-hour basis for six of fourteen days. *Id. p. 3.*

      4.    Hyperion failed to maintain an infection control program to provide a safe and sanitary environment, and 24 of 110 active employees had no documented evidence of tuberculosis testing. *Id. p. 7.*

      5.    Hyperion failed to ensure that staff demonstrated competent skills and techniques in providing personal bathing care to a resident. *Id. p. 9.*

      6.    A staff member at the facility failed to change into a clean pair of gloves when cleaning a gastric tube site on a resident. That staff member also cleaned the site with water only rather than soap and water as was proper. *Id. p. 10.*

      7.    Hyperion failed to label medications according to physician dose instructions. *Id. p. 28.*

      8.    Hyperion did not maintain accurate clinical records for nine of 24 records reviewed. *Id. p. 31.*

      9.    Hyperion did not ensure the physical environment of the kitchen was clean and sanitary for four of five days of survey. *Id. p. 44.*

42.

A finding of Immediate Jeopardy, by its definition, evidences immediate harm

to the residents. The fact that one of the requirements cited at this highest level is for

**FILED IN CAMERA AND UNDER SEAL**

Administration, which requires that a facility "be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well being of each resident" (*see* 42 C.F.R. §483.75), directly evidences that the Defendant (s) are not operating the Facility in compliance with the law.

43.

As a result of the April survey, on May 7, 2010, CMS published notice of its intent to terminate the Facility's participation in the Medicare and Medicaid programs in the *Hattiesburg American* newspaper. *See Exhibit E-1*. Upon information and belief, after two attempts, the defendants were able to resolve the Immediate Jeopardy issue and CMS decided not to terminate the Facility's participation.

44.

A revisit by the state agency took place on May 17 and 18, 2010. The purpose was to determine whether the Facility had removed the Immediate Jeopardy identified on April 30, 2010. *See, Exhibit E-2*. The survey found that the non-compliance continued but the scope and severity level was reduced. The findings, in part, are as follows:

> 1.    The Facility failed to ensure personal privacy by leaving a resident naked from the waist down and uncovered while the Certified Nurse Assistant left to go to the bathroom to obtain soap. This occurred with two residents.

> 2.    Eleven of twelve patients complained of not getting enough to eat. The Facility failed to provide prompt efforts to resolve the complaint. Resident were told by staff members when asking for more food "that's all we have." Five of the twelve had lost weight over a three month period although not determined to be significant amounts of loss. The Activity Director informed the agency that residents asked him/her for more food and he/she would buy them snacks with his/her own money.

**FILED IN CAMERA AND UNDER SEAL**

     3.      Housekeeping and maintenance requirements (483.15(h)(2)) were not met. The Facility failed to maintain a clean and homelike environment for two of five survey days. As found in previous survey, there were strong urine odors, loose baseboards, loose air vents, and peeling paint.

     4.      The Facility failed to ensure that 10 of 24 residents had care plans consistently developed and revised by interdisciplinary team.

     5.      The services provided or arranged by the Facility did not meet professional standards of quality.  For example, the Facility failed to ensure physician orders were implemented for one resident.

     6.      The Facility failed to ensure that sufficient staff was available on a twenty four hour basis for six of the thirteen day of employee staffing reviewed.

     7.      The Facility failed to properly label medications according to physician's dosage instruction and medications were not administered as ordered. Drugs were not properly administered or stored as required by state and federal law.

     8.      The Facility failed to maintain an infection control program to provide a safe and sanitary environment. Staff failed to change gloves, failed to properly handle soiled linen, and failed to document Tuberculosis Testing Results for employees.

     9.      The Facility failed to ensure the physical environment in the kitchen was kept clean and sanitary. Vents and ceiling tiles were stained and dirty.

     10.      The Facility failed to maintain an effective pest control program so that the facility was free of pests and rodents. Residents complained of the presence of mice, rats, spiders, and insects throughout the facility and there was no evidence of pest control.  See, Exhibit "E-1."

45.

The Facility is being operated with a bare minimum of funds, resulting in repeatedly falling out of compliance with federal and state requirements. As shown above, defendants have been able to bring the Facility to the minimum of compliance by indicating that various deficiencies would be corrected. However, the survey

**FILED IN CAMERA AND UNDER SEAL**

histories show a pattern of repeated periods of failure to comply with the participation requirements. This pattern demonstrates that Hyperion and/or the other defendants are receiving funds to care for the residents but do not provide the Facility with the necessary resources to operate the Facility in compliance with federal and state requirements. Despite the results of the surveys mentioned above and the obvious failure of defendants to expend funds to properly care for the residents, AHC has recently received two substantial offers from Hyperion, through its counsel, to purchase the Facility, indicating that it had sufficient funds or access thereto to do so.

46.

Inadequate care, inadequate staffing, and inadequate supervision have resulted in pressure ulcers, poor hydration, poor nutrition, and falls, all of which indicate defendants have provided worthless services (or worse, no services at all) to the residents of the Facility. Douglas Mittleider, Julie Mittleider, Harry Clark, Hyperion, the Mittleider companies, and/or John Does 1-200 billed these services to the Medicare and Medicaid programs, and knowingly submitted false claims to the government or submitted those claims (and continue to do so) with deliberate ignorance or reckless disregard for their truth or falsity.

47.

Recent incidents further evidence the overall lack of care at the facility. In January, 2011, a patient was transferred to another local nursing facility. The patient's lack of hygiene was such that the new facility was required to scrub clean the resident immediately upon admission. Another resident was transferred in January because of bed sores and wounds that were left unhealed. This is evidence of lack of staff and

nutrition. Local physicians have complained about the status of the facility and have reported that they will not refer patients.

48.

In January, 2011, the security system was stripped from the facility wall (apparently repossessed), leaving a large unrepaired hole, and staff is required to stand guard at the doors to prevent elopements.

49.

The defendants in control of the facility failed to properly account for, safeguard, and dispose of prescription drugs.  Upon information and belief, the facility administrator accessed narcotics and reportedly disposed of them out of compliance with the applicable regulations.

50.

As a result of defendant's provision of substandard care and neglect of the residents, residents of the Facility have suffered injuries and filed suit against AHC as owner of the facility. *See Exhibit F.* One resident sued AHC for injuries due to inadequate staffing, substandard care following a fall, failure to properly bathe and provide hygienic care, and numerous other claims. Another resident sued AHC for injuries due to inadequate care and staffing that resulted in chronic dehydration and pressure ulcers that required surgery. Another resident's family told AHC that their resident family member suffered from a persistent pressure ulcer that was not being properly treated.

FILED IN CAMERA AND UNDER SEAL

51.

Further, all the aforementioned actions and omissions of Douglas Mittleider, Julie Mittleider, Harry Clark, Hyperion, the Mittleider companies, and/or John Does 1-200 indicate that the Defendants have failed to provide a safe, clean, comfortable and homelike environment in violation of the Federal condition of participation found at 42 C.F.R. § 483.15(h)(1).

52.

The federal regulations require continued, rather than cyclical compliance with the Conditions of Participation. *See* State Operations Manual, Chapter 7, Section 7000. Under the operation of these defendants, Oxford Health & Rehab has been a "yo-yo" facility. The Mississippi State Department of Health, Division of Licensure and Certification, on its behalf and as agent for CMS cite the Facility for deficiencies and defendants then present a façade of compliance for CMS and the State long enough to maintain or re-attain certification. Defendants in control of the Facility then allow the Facility to fall out of compliance, resulting in the same deficiencies. Such failure to maintain compliance for any significant period of time places the Facility's residents at immediate risk of irreparable harm while the Defendants are receiving payment from Medicare and Medicaid.

**FALSE CLAIMS**

53.

Douglas Mittleider, Julie Mittleider, Harry Clark, Hyperion, the Mittleider companies, and/or John Does 1-200 as parties to a government contract knowingly and willfully or with deliberate ignorance or reckless disregard charged the Medicare and Medicaid programs for worthless services, i.e. performance of services that are so

**FILED IN CAMERA AND UNDER SEAL**

deficient that for all practical purposes it is the equivalent of no performance at all. Thus, Douglas Mittleider, Julie Mittleider, Harry Clark, Hyperion, the Mittleider companies, and/or John Does 1-200 have perpetrated a fraud on the government that may be pursued under the False Claims Act.

54.

The claims submitted by defendants for resident care at the facility were fraudulent because the services purportedly provided were worthless in that they were not provided or were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the residents, and were of a quality that failed to meet professionally recognized standards of health. Relying upon defendant's false certifications of compliance, the United States, or its fiscal intermediaries, disbursed funds to defendants despite their noncompliance.

55.

As stated above, Hyperion holds the licensed authority to operate the Facility. However, it is apparent that there is no one within Hyperion that has any authority to make decisions on behalf of the entity. According to the testimony of the original President, Chief Executive Officer, Chief Financial Officer, and Chairman of the Board of Directors, Julie Mittleider, she was the wife of Douglas Mittleider when she was appointed to these positions of responsibility within the corporation. Julie Mittleider was never told of her appointment by her husband and never attended a board meeting. Julie Mittleider knew absolutely nothing of the operations of Hyperion from its inception in 2004 until July 29, 2008, when she allegedly resigned in favor of Defendant Harry M. Clark.

**FILED IN CAMERA AND UNDER SEAL**

56.

According to the testimony of defendant Harry M. Clark, he was asked by Mittlieder to become the President of Hyperion on or about July 29, 2008.  Clark did not know if he was appointed or had been elected.  Clark testified on September 9, 2009 that he was not aware of the Lease Agreement between Hyperion and AHC, even though the matter had been in litigation since 2008. Clark was not aware that Hyperion was over $500,000 in arrears to AHC for the lease payments.  Clark was not aware that AltaCare was providing management services to the Facility nor was he aware that Hyperion was paying management fees to AltaCare.  Clark testified that he had no knowledge of any aspect of the business of the Facility even though he was the sole officer and director.

57.

AHC has had no dealings with any person other than Doug Mittleider since the inception of the Lease Agreement. There is no person with control or authority over the entity that holds the license to operate the Facility.  The licensed entity, Hyperion, has no control over the Facility and there is no authority to prevent the diversion of funds from the Facility to defendants. Hyperion has abandoned the Facility and as shown herein, has failed to operate it within the federal and state laws governing the Medicaid and Medicare programs, while at the same time, it has extended offers to purchase the Facility through its counsel.

**RESIDENT ABUSE**

58.

**FILED IN CAMERA AND UNDER SEAL**

Upon information and belief, the physical and mental health needs of the residents of the Facility are not being met, placing those patients at risk. The substandard care described herein and provided by Hyperion under the direction and control of Douglas Mittleider, Julie Mittleider, Harry Clark, the Mittleider companies, and/or John Does 1-200 amounts to resident abuse. Hyperion's submission of claims for this substandard care to Medicare and Medicaid perpetrates a fraud on the government.

## NATIONWIDE PATTERN OF CONDUCT

59.

Upon information and belief, Hyperion's inadequate staffing, failure to maintain facilities, neglect of residents, and provision of substandard care at the Facility under the direction and control of Douglas Mittleider, Julie Mittleider, Harry Clark, the Mittleider companies, and/or John Does 1-200 is not an isolated occurrence among the entities controlled by Douglas Mittleider.

60.

One example of this pattern of neglect and abuse is almost factually identical to that at the Facility. *See, Exhibit K attached hereto.* A Massachusetts judge appointed a receiver for Governor Winthrop Nursing Home in Winthrop, Massachusetts, due to inadequate staffing, insufficient supervision, and patient neglect. Douglas Mittleider and several entities he controlled owned stakes in the nursing home. The home only had one working shower, and its washing machine would not reach the temperature necessary to prevent the spread of infection. The home also had significant unpaid debts. Also, as a result of the above abuses, Douglas Mittleider and the Mittleider

FILED IN CAMERA AND UNDER SEAL

entities involved were excluded from owning or operating a long term care facility in Massachusetts for ten (10) years. The factual similarity of the Massachusetts instance to the situation at the Facility is evidence that such neglect and abuse are commonplace among the facilities managed by Douglas Mittleider, Julie Mittleider, and/or the various Mittleider entities.

61.

A Tennessee facility operated and managed by Mittleider and Defendant AltaCare Corporation also has a history of resident abuse and neglect. A resident at Cambridge House nursing home in Bristol, Tennessee died from complications from a broken leg she suffered when a hammock sling used by staff to lift her from a bed to a wheelchair snapped. Former Cambridge House employees stated administrators of the home, at the direction of Mittleider and AltaCare, had staff at the facility use slings and other equipment that were worn and in disrepair. The employees stated that new equipment was displayed for state surveyors while the worn equipment that was in daily use was hidden. After surveyors left, the newer items were put away until the next state surveyor visit. *See, Exhibit H.*

62.

Douglas Mittleider and Defendant AltaCare have exhibited a tendency to financially abandon facilities that they operate and manage. A Connecticut nursing home, the George and Sally Tandet Center, has experienced financial problems and strikes due to the financial abandonment of that facility by AltaCare and Douglas Mittleider. Workers at the facility went on strike in 2010 to protest cuts in their health care insurance and bounced paychecks. In July of 2009, every paycheck bounced, and

**FILED IN CAMERA AND UNDER SEAL**

afterward between two and twelve checks bounced every month. Upon information and belief Douglas Mittleider and AltaCare habitually funnel funds needed for the operation of facilities under their control and for the care of the residents of those facilities away from the facilities to entities under the control of Mittleider, neglecting the care of the residents and unjustly enriching Douglas Mittleider and/or the other defendants. *See,* Exhibit I.

63.

Upon information and belief, the substandard care exhibited by Hyperion, Douglas Mittleider, AltaCare, and the other Defendants is their standard operating procedure, neglecting the care of residents while diverting funds intended for their care to entities owned by Mittleider.

64.

The defendants have been collecting management and other fees from the Mississippi facility, and, upon information and belief, earning a profit while resident care suffers. Rather than utilize funds from the operation of facility to pay vendors or to adequately staff and provide the necessary standard of care for the residents, fees were paid to the defendants from the facility account to support defendants and related entities.

65.

## COUNT II — VIOLATION OF THE MISSISSIPPI VULNERABLE PERSONS ACT

66.

Plaintiff realleges and adopts by reference each and every allegation set forth above.

FILED IN CAMERA AND UNDER SEAL

67.

The residents of the Facility are persons whose ability to perform the normal activities of daily living or to provide for their own care or protection from abuse, neglect, exploitation or improper sexual contact are impaired due to mental, emotional, physical or developmental disabilities or dysfunctions, or brain damage or the infirmities of aging. They are also residents or patients in a care facility. Thus, under the Mississippi Vulnerable Persons Act, the residents of the Facility fall within the definition of vulnerable adults. *See,* Miss. Code Ann. § 43-47-1. *et. seq.*

68.

Hyperion, Douglas Mittleider, Julie Mittleider, Harry Clark, the Mittleider companies, and/or John Does 1-200 are individuals, corporations, partnerships or other organizations which have assumed the responsibility for the care of the residents. The allegations set forth herein are evidence that the defendants exploited the residents of the Facility by receiving federal funds intended for care of the residents and willfully failing to put those funds toward resident care. *Id.*

69.

Hyperion, Douglas Mittleider, Julie Mittleider, Harry Clark, the Mittleider companies, and/or John Does 1-200 failed and continue to fail to provide essential services to the residents of the Facility. Essential services are those social work, medical, psychiatric or legal services necessary to safeguard the residents' rights and resources and to maintain the physical or mental well-being of the residents, including but not limited to, the provision of medical care for physical and mental health needs, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, protection from health and safety hazards, protection from physical

mistreatment and protection from exploitation. Upon information and belief, defendants have preyed upon the residents' status as beneficiaries of federal and state healthcare programs to profit from funds paid by those programs that were intended for care of the residents.

## COUNT III - OVERALL SCHEMES TO DEFRAUD

### A. DEFRAUDING FEDERAL HEALTH CARE PROGRAMS, RESIDENTS, LANDLORDS, VENDORS, & CREDITORS

70.

Plaintiff realleges and adopts by reference each and every allegation set forth above.

71.

The allegations set forth herein and below illustrate an overall failure of the Defendants to operate the facility and others in compliance with Federal and State Regulations and provide further support for Relator's assertions that the Defendants systematically drain the funds from the facilities and have been and continue to be unjustly enriched by this conduct.

72.

Upon information and belief, Relator asserts that Douglas Mittleider and all other Defendants have planned and implemented a broad scheme to defraud Medicare and Medicaid by siphoning money to various entities owned and controlled by him through Hyperion from the Facility. The following paragraphs set forth the facts and evidence known to Relator and upon which Relator relies in bringing this action.

73.

Upon information and belief, Hyperion is merely a sham corporation and the alter ego of Douglas Mittleider, Julie Mittleider, the Mittleider companies, and/or John

**FILED IN CAMERA AND UNDER SEAL**

Does 1-200. Hyperions submits claims for worthless services to Medicare and Medicaid and diverts funds paid by Medicare and Medicaid to the Mittleider companies as payment for alleged services provided to the facility.

74.

Douglas Mittleider serves as CEO, CFO, and/or Secretary of the other Mittleider companies and upon information and belief of John Does 1-200. Douglas Mittleider, however, installed first Julie Mittleider as a figurehead officer and director of Hyperion and later installed Harry Clark, an individual excluded from participation in federal healthcare programs, as the sole officer and director of Hyperion. AHC has had no dealings with any person other that Douglas Mittleider throughout the term of the Lease Agreement and the litigation identified herein.

75.

Douglas Mittleider, Julie Mittleider, the Mittleider companies, and John Does 1-200 use Hyperion to funnel federal healthcare funds intended for the care of the residents of the Facility to themselves, neglecting the Facility and more importantly neglecting the basic care and needs of the residents of the Facility as set forth in the paragraphs above (which are incorporated by reference herein as if copied in full).

76.

Douglas Mittleider is the CEO, CFO, and Secretary of Defendant AltaCare Corporation. AltaCare serves as manager/accountant of Hyperion and is a creditor of Hyperion. Under AltaCare's management, Hyperion was forced filed Chapter 11 bankruptcy due to an inability to pay its debts, the largest of which was owed to Relator for rent. The total debts listed upon filing the bankruptcy amounted to of $1,507,501.99. Additional debts accrued in the amount of $794,509.21 (see copy of Hyperion's July

Page 32 of 53

FILED IN CAMERA AND UNDER SEAL

2009 Monthly Operating Report, attached hereto as *Exhibit J,* p. 3), for debts totaling over $2,302,011.20. Some of those debts were owed to AltaCare itself. As part of this scheme, AltaCare manages Hyperion and is paid for worthless services to the residents, constituting claims fraudulently submitted and funds fraudulently obtained from Medicare and Medicaid.

### 77.

Julie Mittleider has knowingly and willfully conspired with her husband Doug Mittleider, Harry Clark, and the Mittleider companies to defraud the Medicare and Medicaid programs. Hyperion has made false claims and fraudulent disclosures to obtain payment from Medicare and Medicaid, which Hyperion has then illegally funneled at the direction of the Mittleiders to the Mittleider companies, including Sentry Healthcare, which is owned and operated by Julie Mittleider.

### 78.

Upon information and belief, Harry McD. Clark has knowingly and willfully conspired with Doug Mittleider, Julie Mittleider, and the Mittleider companies to defraud the Medicare and Medicaid programs.

### 79.

Other creditors of Hyperion are HP/Ancillaries, Inc., Long Term Care Services, Inc., and HP/Management Group, Inc. Douglas Mittleider is the CEO, CFO, and Secretary of each of those corporations. See, copies of Georgia Secretary of State business information, attached hereto as *Exhibit L.* These companies are part of the

**FILED IN CAMERA AND UNDER SEAL**

scheme to defraud Medicare and Medicaid, as they are the companies which are being unjustly enriched through money received from fraudulent claims.

80.

During the bankruptcy proceeding, Hyperion as managed by AltaCare continued to pay out large sums of money to Doug Mittleider's and Julie Mittleider's companies. Hyperion's Medicaid cost report for FY2008 also shows that Hyperion claimed costs of $358,993 for AltaCare's management fees and accounting fees. *Exhibit M,* pp. 9, 14. Upon information and belief, Hyperion continues to pay AltaCare $2,732.00 for accounting fees and $27,089.00 for management fees every month (see June 2009 Monthly Operating Report, attached hereto as *Exhibit G,* as a sample). Hyperion also claimed $1,608.00 in costs to HP/Ancillaries, Inc., another of Doug Mittleider's companies, on the 2008 Medicaid cost report. *Exhibit M,* pp. 9, 14.

81.

Long Term Care Services, Inc., which is owned and operated by Douglas Mittleider, received $672,300 in "cash transfers" from Hyperion in May, June, and July 2009 alone. See copies of excerpts from Hyperion's Monthly Operating reports attached hereto as *Exhibit N.* It is unclear as to what services this entity allegedly provided.

82.

Sentry Healthcare Acquirors, Inc., which is owned and operated by Julie Mittleider, received $50,000 in "cash transfers" from Hyperion in June 2009 alone. See *Exhibit N.* It is unclear what services this entity allegedly provided.

83.

As stated above, the bankruptcy court entered an Order compelling settlement of the claims asserted by Relator for past due rent. Hyperion was past due in an amount exceeding $500,000. The settlement required Hyperion to pay a reduced sum of $325,000

**FILED IN CAMERA AND UNDER SEAL**

in one installment of $125,000 and the remainder in 18 monthly installments of $6,944.44. Hyperion was also to continue paying monthly lease fees in the amount of $36,000 as contracted in the Lease Agreement.  The monthly installments were to be paid by the 5th day of each month and no later than the 15th day of each month. Should Hyperion fail to timely pay the Court ordered settlement and lease payments by the 15th, the Lease Agreement was to automatically terminate.

84.

The payments described above were to be wire transferred into Relator's account. The payments were properly and timely transferred by wire from March until May of 2010. On May 14, 2010, a representative of Defendants improperly delivered two checks to Bass Memorial Academy ("Bass") for the payments due.  Bass Academy was not a party to the bankruptcy proceeding or settlement agreement but is a nursing school affiliated with ACH.  These checks were written on the account of Hyperion Foundation, Inc., DBA Oxford Health & Rehab CTR, Chap 11 Debtor in Possession Case 09-51228 ("Bankruptcy Account") *See Exhibit O,* check # 1582 and #1583.   Although the bankruptcy case had been dismissed on March 22, 2010, Defendants continued to write checks on the bankruptcy account misrepresenting to all payees that Hyperion was still protected by the bankruptcy laws and that the case was still open. In addition, the checks once deposited, were returned for insufficient funds. Relator then learned that on May 18, 2010 the funds had been wire transferred into its account.  The wire transfer is believed to have been transferred from an account in the name of Long Term Care Services, Inc.

85.

**FILED IN CAMERA AND UNDER SEAL**

Hyperion and/or the defendants hand delivered checks with the knowledge that there were insufficient funds in the bankruptcy account, all in an attempt to deceive AHC and the Court that the payments were timely made.

86.

Hyperion again hand delivered checks drawn on the bankruptcy account for the August 2010 payments and stopped payment on the checks. AHC learned that funds were later wired into the AHC account from yet another account controlled by Douglas Mittleider. Such action is evidence that Hyperion delivered payment with knowledge that funds did not exist in the account and attempted to deceive AHC. The October payments were also improperly delivered by check and were returned for insufficient funds. Once again, funds were wire transferred to AHC to cover the bad checks.

87.

Although the total sum due to Relator was compromised by Order of the Bankruptcy Court, Hyperion claimed on its Cost Report that it paid the full amount of the lease payments due. This claim is fraudulent and in violation of state and federal law.

88.

Relator asserts that this conduct is further evidence of the defendants inability to manage and operate the facility and its propensity to defraud and deceive its creditors and the court. The commingling of funds from various accounts owned by Hyperion, Long Term Care Services, Inc., and others, is evidence that Douglas Mittleider controls all of

**FILED IN CAMERA AND UNDER SEAL**

the defendant entities and funds from the operation of other facilities is being used to pay

the debts of Hyperion.

## COUNT IV - APPOINTMENT OF AN EXCLUDED INDIVIDUAL AS OFFICER/DIRECTOR

89.

Plaintiff realleges and adopts by reference the allegations contained in each of the

previous paragraphs.

90.

Harry McD. Clark is the sole officer and director of Hyperion and upon

information and belief, has remained in that position since on or about July 28, 2008.  Mr.

Clark is the only person identified with authority to act on behalf of Hyperion. Mr. Clark,

as the sole officer and director is in a legal position of control over Hyperion, the entity

holding the license and provider agreements with the Medicare and Medicaid programs.

91.

Harry McD. Clark is excluded from participating in the Medicare and Medicaid

programs. Mr. Clark was convicted of a program-related crime and excluded under

Section 1128(a)(1) of the Social Security Act, codified at 42 U.S.C. Section 1320a-

7(a)(1). The exclusion was entered on October 25, 2005, and remains in effect.

92.

Upon information and belief, Mr. Clark's responsibility includes review of

financial reports as well as cost reports which involve reimbursement from federal and

state healthcare programs. Mr. Clark's knowing and willful acceptance of his position

FILED IN CAMERA AND UNDER SEAL

with Hyperion despite his excluded status is a violation of Section 1128(b)(8) of the Social Security Act, codified at 42 U.S.C. Section 1320a-7(b)(8) and may subject the facility to fines and penalties

93.

As an excluded individual, Mr. Clark is in violation of his exclusion. As the only person with any control of the licensed facility (Hyperion), he is essentially exercising control of the furnishing items or services for which Federal health care program payment is sought to Federal program beneficiaries. Mr. Clark is subject under 42 C.F.R. Section 1003.103 and Section 1128A of the Social Security Act to civil monetary penalties for each item or service furnished during the period he was excluded. Mr. Clark is also subject to treble damages for the amount claimed for each item or service.

94.

As a result of his exclusion from Federal health care programs, under 42 C.F.R. § 1001.1901(b)(1) no payment may be made by any Federal health care program for any items or services furnished, ordered, or prescribed by Mr. Clark. As a result of this prohibition, no payment may be made to any person or entity that employs or contracts with the excluded person regardless of who submits the claims.

95.

Hyperion submits claims to Medicare and Medicaid for services rendered to residents and has received payments from Medicare and Medicaid for those services. Upon information and belief and in view of the facts cited above, claims submitted by Hyperion under the direction of Mr. Clark are false claims submitted knowingly or with

deliberate ignorance or reckless disregard for the truth or falsity of the information in violation of 31 U.S.C. Section 3729.

96.

Hyperion knew or should have known that Mr. Clark was and is excluded from participation in federal healthcare programs. Hyperion offered the officer and director positions to Mr. Clark when it knew or should have known of his exclusion. As such, Hyperion is subject to exclusion and/or civil money penalties because it contracted with Mr. Clark, an excluded individual, for the provision of items or services reimbursable under a federal healthcare program.

97.

The exclusion of Harry Clark from participation in federal health care programs and the exclusion of Douglas Mittleider and the Mittleider entities from participation in a state healthcare program may also provide a basis for the Mississippi Division of Medicaid to deny or revoke enrollment in the Mississippi Medicaid Program to Mittleider, Clark, and any Mittleider entities under Mississippi Code Annotated Section 43-13-121(7). AHC should not have to contract further with Hyperion due to the substandard care Hyperion provides to the residents of the Facility and for fear of exposing itself to liability for receiving rental payments from funds which Hyperion, the Mittleiders, Harry Clark, the Mittleider entities, and/or John Does 1-200 obtained by knowingly submitting false claims to the government or by submitting those claims with deliberate ignorance or reckless disregard for their truth or falsity and by knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

**FILED IN CAMERA AND UNDER SEAL**

## COUNT V –

## FAILURE TO DISCLOSE PERSON WITH OWNERSHIP OR CONTROL INTEREST

98.

Plaintiff realleges and adopts by reference the allegations contained in each of the previous paragraphs.

99.

Hyperion, as a provider of health care services, has an affirmative obligation under federal and state law to disclose all persons who have an ownership, financial, or control interest in it. Under 42 U.S.C. Section 1320a-3(a)(1), a provider of services for which payment may be claimed by the provider under any plan or program established pursuant to Title V of the Social Security Act or under a state Medicaid plan approved under Title XIX of the Act must disclose to the Department of Health and Human Services the identify of each person who has an ownership or control interest in the provider. The Code of Federal Regulations also requires the same disclosure in 42 C.F.R. Section 420.206. Skilled nursing facilities must disclose all changes in persons with an ownership or control interest to the state agency that regulates such facilities at the time of change under 42 C.F.R. Section 483.75(p).

100.

As provided in 42 U.S.C. Section 1320a-3(a)(3)(B) and 42 C.F.R. Section 420.201, Mr. Clark, as sole director and officer of Hyperion, is a person who has an ownership, financial, or control interest in Hyperion. He gained this control interest on July 29, 2008. A copy of the resolution naming Mr. Clark as President and Director is attached hereto as *Exhibit P.*

**FILED IN CAMERA AND UNDER SEAL**

101.

Upon information and belief, Hyperion has failed to disclose this required information about Mr. Clark's control interest and his exclusion status to Medicare or Medicaid and is in violation of the federal and state authorities mentioned hereinabove. This information constitutes a false record or statement for the purpose of obtaining payment from a Federal program. Upon information and belief, these claims were and continue to be submitted knowingly or with deliberate ignorance or reckless disregard for the truth or falsity of the information.

## COUNT VI - FAILURE TO MAKE REQUIRED DISCLOSURES ON MEDICAID COST REPORT

102.

Plaintiff realleges and adopts by reference the allegations in each of the paragraphs above.

103.

Hyperion has a duty under both federal and Mississippi law to fully and truthfully disclose information on its Medicaid cost reports. 42 U.S.C. Section 1320a-3(a)(1); Miss. Code Ann. Section 43-13-121. This information includes accurate statements of costs incurred and certain disclosures regarding ownership and/or control interests.

104.

The Instructions for Filing Long-Term Care Facility Cost Report require each provider to complete the applicable section of Form 16 to the cost report for their type of ownership. These instructions also require the provider to list all officers and all members of the Board for the cost report period. The Instructions also state that a separate Form 15 must be completed for each owner or officer listed on Form 16,

**FILED IN CAMERA AND UNDER SEAL**

whether or not any compensation is claimed on the cost report. See, Instructions, *Exhibit Q*.

105.

Hyperion failed to make the required disclosures in its cost reports as related to at least its officers and directors, as Hyperion did not disclose Mr. Clark as its sole officer and director on its 2008 cost report filed May 26, 2009. A copy of forms 15 and 16 from the 2008 Medicaid cost report are attached hereto as collective *Exhibit R.*

106.

Hyperion's Statement of Financial Affairs filed in its earlier bankruptcy proceeding, indicates that prior to July 29, 2008, Hyperion's officers were listed as Julie Mittleider, president, and Deborah Hoover, secretary. Its Board of Directors was listed as Julie Mittleider, Deborah Hoover, and Joan Sauls Clark. A copy of the Statement of Financial Affairs is attached hereto as *Exhibit S.* After July 29, 2008, Harry Clark is listed as the sole officer and sole board member. *Id.* On Hyperion's Medicaid cost report for January 1 through December 31, 2008, no officers were listed or named on Form 16, and the only person listed on Form 15 as an owner, officer, or director of Hyperion was Julie Mittleider. *See Exhibit R.*

107.

Hyperion also failed to disclose any individual as an officer or director on its 2009 cost report filed May 7, 2010. A copy of Forms 15 and 16 from the 2009 Cost Report are attached hereto collectively as *Exhibit R-1.*

108.

Upon information and belief, these omissions were attempts to conceal the actual officers/directors from the Division of Medicaid.

FILED IN CAMERA AND UNDER SEAL

109.

The cost report for each year was filed by Douglas Mittleider as president of AltaCare Corporation. *See, e.g., Exhibit M,* p. 3. Mr. Mittleider knew of the positions of Deborah Hoover, Joan Sauls Clark, and Harry Clark as evidenced by the Statement of Financial Affairs, yet he failed to include them on this cost report. In addition, on Hyperion's Medicaid cost report for January 1 through December 31, 2009, Mr. Mittleider failed to identify any person as an officer on Form 16, and failed to identify any person as an owner, officer, or director of Hyperion on Form 15. Such failures by Hyperion, through Douglas Mittleider, constitute attempts to conceal the actual officers and directors from the Division of Medicaid in violation of the state and federal authorities mentioned hereinabove.  By signing the Cost Report, Mittleider certified that it had been completed in accordance with the law and the applicable instructions.

110.

Upon information and belief, Douglas Mittleider submitted these false records to obtain payment for false or fraudulent claims paid or approved by the government. Accordingly, these records were submitted knowingly or with deliberate ignorance or reckless disregard for the truth or falsity of the information they contained. Douglas Mittleider knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government in violation of the False Claims Act.

## NATIONWIDE SCHEME TO SUBMIT FALSE CLAIMS

111.

Upon information and belief, the scheme to defraud Medicare, Medicaid, and AHC outlined in the foregoing paragraphs is but a small part of a broad nationwide

### FILED IN CAMERA AND UNDER SEAL

scheme carried out by Douglas Mittleider, Julie Mittleider, and the Mittleider companies to defraud the Medicare and Medicaid programs. Douglas Mittleider has formed a web of over 150 companies *(see Exhibit T attached hereto),* including but not limited to the Mittleider companies that are the subject of this action, for the purpose of defrauding Medicare, Medicaid, and the companies' creditors.

112.

Douglas Mittleider is the CEO, CFO, and Secretary of over 150 entities. Defendant AltaCare Corporation manages and/or operates at least 34 long-term care homes throughout the United States. Upon information and belief Douglas Mittleider used and continues to use the aforementioned entities to funnel Medicare and Medicaid program funds intended for resident care at skilled nursing facilities with which Mittleider entities contract through other Mittleider entities to companies owned and controlled by himself and/or his wife Julie Mittleider in an attempt to defraud the Medicare and Medicaid programs along with creditors of the Mittleider companies. To the Relator's knowledge, the Defendants use at least three scams as part of their scheme to defraud the Government, creditors, and residents. Those scams are set out in the following paragraphs.

113.

### **The Nursing Home Operator Scam**

A Mittleider entity often will contract with a skilled nursing facility to lease and/or provide management or operations services to that facility. For example, Defendant Hyperion contracts with AHC to lease the facility. Then Hyperion contracts with AltaCare or other Mittleider companies to manage and/or operate the Facility. Upon information and belief, Defendant AltaCare Corporation manages and/or operates a

Page 44 of 53

FILED IN CAMERA AND UNDER SEAL

number of long-term care facilities throughout the United States.  Then, as in the case of Hyperion, the Mittleider entity will contract with one or more different Mittleider companies for a variety of management services.  For example, Defendant AltaCare contracted to provide management services to Defendant Hyperion then Defendant AltaCare contracted with Defendants Long Term Care Services, Inc., HP/Ancillaries, Inc., HP/Management Group, Inc., and/or Sentry Healthcare Acquirors, Inc. for various services. Douglas Mittleider and/or Julie Mittleider show preferences to Mittleider companies which may or may not be providing services to the facility and funnel Medicare and Medicaid funds intended for resident care to those companies to the detriment of the residents of the facilities. Upon information and belief, the Defendants engage in this scam in nursing facilities managed by Mittleider entities across the United States.

114.

### The Landlord/Tenant Scam

A Mittleider entity will often lease existing nursing home facilities from the owners of those facilities, as is the case with Hyperion and AHC, in exchange for payment of rent by the Mittleider entity. That entity purportedly will operate the leased facility as a skilled nursing facility. The Mittleider entity fails to make the agreed-upon rent payments, prompting the lessor to initiate costly litigation. The Mittleider entity, at the direction and control of Douglas Mittleider, Julie Mittleider, the Mittleider companies, and/or John Does 1-200 will vexatiously draw out litigation, eventually forcing settlement for a lesser amount than what is owed. By engaging in litigation or seeking the protection of bankruptcy for these purposes, the Defendants use the judicial

**FILED IN CAMERA AND UNDER SEAL**

system to perpetrate their fraudulent scams. The following cases are illustrative of this

abuse of the judicial process:

| CASE | LandAmerica Onestop, Inc. v. Douglas K. Mittleider et al.; Civil Action No. I:09-CV0562-TWT in the Northern District of Georgia |
|---|---|
| **CAUSE OF ACTION** | Plaintiff was landlord and lessor of space which Defendant Healthprime, Inc. leased. Defendant Healthprime, Inc. failed to pay any rental payments at all. Notable allegations —Defendant Douglas Mittleider treated his companies and himself as a single unit, transferring funds to disguise cash deficits. |
| **DISPOSITION** | Pending |
| **TOTAL AMOUNT IN CONTROVERSY** | $253,718.82 plus late fees and interest |

| CASE | NH Texas Properties, L.P. vs. HP/Texas Properties, Inc. et al.; Civil Action No. H-034384 in Southern District of Texas |
|---|---|
| **CAUSE OF ACTION** | Plaintiff leased certain space to Defendants to operate a nursing home. Defendants failed to pay rent to Plaintiff. |
| **DISPOSITION** | Settled pursuant to Joint Stipulation of Settlement for $525,969.53 and Agreed Order of Judgment against Defendants for $102,340.86. |
| **TOTAL AMOUNT IN CONTROVERSY** | Complaint not accessible, but in excess of settlement amount. |

| CASE | NH Texas Properties, L.P. vs. HP/Texas Properties, Inc., HealthPrime, Inc., & Douglas K. Mittleider; Civil Action No. 4:06-03466 in the Southern District of Texas |
|---|---|
| **CAUSE OF ACTION** | Plaintiff leased certain space to Defendants. HealthPrime guaranteed the lease. Mittleider guaranteed the lease. Defendant HP/Texas Properties failed to pay the rent and taxes as agreed under the lease. HealthPrime and Mittleider failed to pay the rent and taxes due as guarantors. |
| **DISPOSITION** | Final Judgment entered May 9, 2007, against HP/Texas Properties for $605,468.43 and against Douglas Mittleider for $490,158.02 (later reduced to $209,823.12 upon stipulation of the parties). |
| **TOTAL AMOUNT IN CONTROVERSY** | $712,245.66 plus interest and fees. |

**FILED IN CAMERA AND UNDER SEAL**

| CASE | Hyperion Foundation, Inc. v. Academy Health Center, Inc.; Adversary Proceeding No. 09-05043-NPO in the Bankruptcy Court for the Southern District of Mississippi |
|---|---|
| CAUSE OF ACTION | AHC leased the Facility to Defendant Hyperion. Defendant Hyperion failed to pay the rent **under** the lease. |
| DISPOSITION | Bankruptcy Court compelled settlement, thereby amending the lease agreement and ordering Defendant Hyperion to pay $350,000. |
| TOTAL AMOUNT IN CONTROVERSY | $560,890.55 plus interest and fees. |

115.

### The Vendor Scam

The Mittleider entity also contracts with one or more vendors of healthcare items or services (e.g., therapy, pharmaceutical, etc.) to provide services in skilled nursing facilities managed or operated by that Mittleider entity. The contracted vendors will provide items or services under the agreement, triggering the Mittleider entity's obligation to pay for the items or services. The Mittleider entity submits claims to Medicare and/or Medicaid for the costs for the services rendered by the vendors. The Mittleider entity then receives reimbursement by Medicare and/or Medicaid for services provided by the contracted vendors **but fails or refuses to remit such funds to the vendors.** For example, Health Prime and AltaCare Corporation, both Mittleider entities, left vendors holding unpaid bills for pharmacy, consulting, and services after they relinquished control of Glen Valley Care Center, a nursing home in Colorado. *See Exhibit U.*

**FILED IN CAMERA AND UNDER SEAL**

116.

As part of this scam, Douglas Mittleider, Julie Mittleider, Harry Clark, Hyperion, the Mittleider companies, and/or John Does 1-200 abuse the judicial process by gaming the system and engaging in vexatious litigation. A vendor or creditor of a Mittleider entity will bring suit on an outstanding account owed by the Mittleider entity. The Mittleider entity, at the direction of Douglas Mittleider, will draw out the litigation, eventually entering into a confidential settlement with the vendor or creditor. Mittleider entities then usually settle the litigation for amounts that are only a portion of the amounts owed to their vendors and/or creditors.

117.

The funds for these settlements often come from amounts paid by Medicare and Medicaid. Douglas Mittleider, Julie Mittleider, Hyperion, the Mittleider companies, and/or John Does 1-200 receive funds from Medicare and Medicaid, fail to remit portions of those funds to pay obligations to vendors and creditors, engage in litigation regarding those obligations, and eventually settle the litigation for less than the total obligations owed, profiting first from defrauding Medicare and Medicaid and second from abusing the judicial process to settle their obligations for only a portion of the total amount owed. The following cases are illustrative of this abuse of the judicial process:

| CASE | Kindred Rehab Services, Inc. et al. v. HP/Texas Properties, Inc. et al.; Civil Action No. 1:03-CV-1495-.10F in the Northern District of |
|---|---|

**FILED IN CAMERA AND UNDER SEAL**

| | |
|---|---|
| **CAUSE OF ACTION** | Plaintiffs provided respiratory therapy services to residents of nursing homes owned, operated, or managed by Defendants. Defendants failed to pay for such services. Medicare paid for such services based on false representations by Defendants that they had paid Plaintiffs for such services. |
| **DISPOSITION** | Agreed Order of Judgment of **$1 million** against Healthprime (a Mittleider company) pursuant to settlement of this case and Case No. 3:02-0534 Middle District of Tennessee — Kindred Rehab Services, Inc. et al. v. HP/Operations Group, Inc. et al. |
| **TOTAL AMOUNT IN CONTROVERSY** | In both cases $1,165,840.52 |

| | |
|---|---|
| **CASE** | **Continental Cas. Co. et al. v. HealthPrime, Inc. et al.; Civil Action No. 1:97-CV-2512 in the Northern District of Georgia** |
| **CAUSE OF ACTION** | Plaintiffs contracted with Defendants to provide insurance coverage for Defendants' liabilities under the workers' compensation and employers liability statutes of various states and to service claims submitted for coverage under the various policies. Defendants failed to pay amounts due under the contracts after 2003. Notable allegations — Defendant HealthPrime ceased operations and transferred its assets to one or more of Defendant Douglas Mittleider's other corporations or to Mittleider individually. |
| **DISPOSITION** | Pending |
| **TOTAL AMOUNT IN CONTROVERSY** | $3,438,874 |
| **CASE** | **Rehabeare Group East, Inc. v. HCC Healthcare of Birmingham, LLC et al; Civil Action No. 1:09-CV-1675-GET in the Northern District of Georgia** |
| **CAUSE OF ACTION** | Plaintiff provided therapy services (physical, occupational, speech) at skilled nursing facilities operated by Defendants. Defendants failed to pay for the services provided by Plaintiff. Notable allegations — Defendants Douglas & Julie Mittleider paid themselves excessive compensation, bonuses and other payments and favored certain creditors (other Mittleider entities) over others |
| **DISPOSITION** | Pending |
| **TOTAL AMOUNT IN CONTROVERSY** | Unspecified |

| | |
|---|---|
| **CASE** | **RehabCare Group East, Inc. v. HealthPrime, Inc. et al.; Civil Action No. 1:05-CV02450-TCB in Northern District of Georgia** |

**FILED IN CAMERA AND UNDER SEAL**

| CAUSE OF ACTION | Plaintiff provided therapy services (physical, occupational, speech) at skilled nursing facilities operated by Defendants. Defendants failed to pay for the services provided by Plaintiff. Medicare paid for such services based on false representations by Defendants that they had paid Plaintiffs for such services. |
|---|---|
| **DISPOSITION** | Dismissed pursuant to settlement agreement, terms not disclosed |
| **TOTAL AMOUNT IN CONTROVERSY** | $106,623.69 |

## DAMAGES

### 118.

Plaintiff realleges and adopts by reference each of the previous allegations contained hereinabove.

### 119.

The Facility provides services to Medicaid and Medicare residents. AHC believes that most, if not all, residents of the Facility are Medicaid or Medicare beneficiaries. AHC seeks recovery of the total amount reimbursed to the Facility provided by law for each year Hyperion and/or the Mittleider defendants operated the Facility and other facilities under their control. AHC estimates that the Facility may have received in excess of $4,000,000 for each year of operation by the defendants. AHC also seeks treble damages as allowed under the False Claims Act as well as an additional $10,000 in civil money penalties per fraudulent claims submitted for payment by defendants as authorized by the False Claims Act.

## PRAYER

### 120.

**WHEREFORE, PREMISES CONSIDERED,** Relator AHC, who brings this action on behalf of the United States of America, requests that this Court render judgment in its favor and against Defendants and prays for the following relief:

**FILED IN CAMERA AND UNDER SEAL**

1) that this Court enter a judgment against Defendants in an amount equal to actual payment received by defendants in addition to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act in furtherance of the Defendants' overall scheme to defraud and as a result of Defendants' violations of the False Claims Act with regard to the Facility;

2) that this Court enter a judgment against Defendants for a civil monetary penalty of $10,000 per claim for each of Defendants' violations of the False Claims Act in furtherance of the Defendants' overall scheme to defraud and as a result of Defendants' violations of the False Claims Act with regard to the Facility;

3) that Relator AHC recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

4) that Relator AHC be awarded all reasonable attorneys' fees in bringing this action;

5) that in the event the United States Government proceeds with this action, Relator AHC be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

6) that in the event the United States Government does not recognize AHC as a Relator, that this Court will declare that a portion (to be determined by the Court) of any funds recovered by the United States Government from the Defendants will be transferred to AHC to assist AHC in returning the Facility to the condition it was in prior to the lease of the Facility to Hyperion;

7) that Hyperion shall be required to voluntarily relinquish and forfeit its right to License Number 351 effective immediately, and simultaneously that the MSDH,

**FILED IN CAMERA AND UNDER SEAL**

Division of Licensure and Certification, issue to AHC or its designee a new license to operate the Facility;

8)   that this Court assess against Defendants all statutory penalties provided under the Mississippi Vulnerable Adults Act; and for such general and further relief as the Court deems proper.

Respectfully submitted, this the _____ day of February, 2011.

ACADEMY HEALTH CENTER, INC.
f/k/a ADVENTIST HEALTH CENTER,
INC.

By: _____
Randall E. Day, III (MS. Bar No. 9722)
Julie Bowman Mitchell (MSB # 10064)
Matthew T. Biggers (MSB # 103325)

Of Counsel:
MITCHELL DAY HEALTH LAW FIRM, PLLC
618 Crescent Boulevard, Suite 203
Ridgeland, Mississippi 39157
Telephone: (601) 707-4036
Facsimile: (601) 213-4116

**FILED IN CAMERA AND UNDER SEAL**

## CERTIFICATE OF SERVICE

I, Randall E. Day, III, do hereby certify that I have on this date caused service to be made of the foregoing document by sending a true and complete copy, via United States mail, postage prepaid, to:

> Edward O. Pearson, Assistant Unites States Attorney
> 188 E. Capitol Street, Suite 500
> Jackson, Mississippi  39201

This, the _____ day of February, 2011.

_____
RANDALL E. DAY, III

Of Counsel:
Julie Bowman Mitchell (MSB # 10064)
Randall E. Day, III (MSB # 9722)
Matthew T. Biggers (MSB # 103325)
MITCHELL DAY HEALTH LAW FIRM, PLLC
618 Crescent Boulevard, Suite 203
Ridgeland, Mississippi 39157
Telephone: (601) 707-4036
Facsimile: (601) 213-4116

COUNSEL FOR ACADEMY HEALTH CENTER,
INC., f/k/a ADVENTIST HEALTH CENTER, INC.