IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                                            PLAINTIFF
*ex rel.* ACADEMY HEALTH CENTER,
INC. f/k/a ADVENTIST HEALTH
CENTER, INC.

vs.                                        CIVIL ACTION NO. 3:10-CV-552-CWR- LRA

HYPERION FOUNDATION, INC.,
d/b/a OXFORD HEALTH &
REHABILITATION CENTER;
ALTACARE CORPORATION;
HP/ANCILLARIES, INC.; LONG
TERM CARE SERVICES, INC.;
SENTRY HEALTHCARE
ACQUIRORS, INC.;
HP/MANAGEMENT GROUP, INC.;
HARRY McD. CLARK; JULIE
MITTLEIDER; DOUGLAS K.
MITTLEIDER; and JOHN DOES 1-                                      DEFENDANTS
200,

MEMORANDUM OPINION AND ORDER

Pending before the Court is a series of motions, including a Motion to Dismiss the United

States' Complaint in Intervention, Docket No. 66; a Motion to Dismiss Academy's Second

Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State A Claim,

Docket No. 68; a Motion for Leave to Amend the Complaint, Docket No. 79; and a Motion to

Strike the Affidavit of Melvin Eisele, Docket No. 84. After careful consideration of the briefs

and the record, the Court is ready to rule. The Defendants' Motion to Dismiss the United States'

Complaint in Intervention will be DENIED. The Motion to Dismiss Academy's Second

Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State A Claim will be

GRANTED IN PART and DENIED IN PART. The Motion for Leave to Amend the Complaint

will be DENIED. The Motion to Strike the Affidavit of Melvin Eisele will be GRANTED.

# I. PROCEDURAL HISTORY

This case arises out of a *qui tam* action brought by relator Academy Health Center, Inc., frequently known as Adventist Health Center, Inc. (hereinafter "AHC"), on behalf of the United States ("Relator").  AHC is a health care provider which, as part of its business, owns and leases skilled nursing facilities to other health care companies to manage them.  On October 5, 2005, Hyperion Foundation, Inc. (hereinafter "Hyperion") entered into a lease agreement with AHC to manage the Oxford Health and Rehabilitation Center (hereinafter "Oxford" or "the Facility"), a skilled nursing facility in Lumberton, Mississippi.  In turn, Hyperion entered into a management agreement with defendant AltaCare Corporation (hereinafter "Altacare") to manage the facility. As part of the terms, conditions and provisions of the lease agreement, Hyperion assumed the operations of Oxford and all of the rights and authority to operate Oxford and receive and accept payments, including those from Medicare and Medicaid, on behalf of the facility and its residents for services rendered to those residents.

The Relator AHC claims that this case began when Hyperion failed to pay the rent due to AHC, in violation of the lease agreement.   AHC performed an initial investigation and determined that the Defendants could not or would not provide the requisite level of care for the residents.  As a result, AHC took steps to terminate the lease and evict Hyperion as a tenant.

On July 15, 2008, AHC filed a Motion and/or Affidavit to Remove Tenant in the Justice Court of Lamar County, Mississippi, in an effort to evict Hyperion from the premises and terminate the relationship.  The Motion sought to remove Hyperion as tenant by August 1, 2008, but Hyperion requested to continue the eviction hearing until August 6, 2008.  On August 5, 2008, Hyperion filed a petition under Chapter 11 of the United States Bankruptcy Code before

the U.S. Bankruptcy Court for the Southern District of Mississippi.  As a result of the bankruptcy filing, the eviction proceeding could not go forward.  *See* 11 U.S.C. § 362(a).

On September 30, 2009, Relator AHC filed its original Qui Tam Complaint and Other Relief in the bankruptcy proceeding, under seal, pursuant to Title 11, 28 U.S.C. §§ 157 and 1334(a)-(b).  AHC provided a copy of the complaint and a confidential disclosure statement of all material evidence and information to the Attorney General of the United States and the U.S. Attorney for the Southern District of Mississippi, as required by the False Claims Act.  *See* 31 U.S.C. § 3730(b)(2).  On November 20, 2009, Relator AHC filed its First Amended Qui Tam Complaint and Other Relief, under seal, to allege new information and facts in support of its cause of action.  The Relator duly provided the Complaint to the Government.  On March 22, 2010, the bankruptcy court granted the United States Trustee's Motion to Dismiss Hyperion from bankruptcy due to Hyperion's failure to submit a disclosure report and its failure to file all monthly operating statements with the court and retained jurisdiction over the settlement agreement between Hyperion and AHC.    On October 4, 2010, the bankruptcy court entered an agreed order transferring the *qui tam* proceeding originally brought in the bankruptcy action to this court.  Docket No. 1[1]

On December 3, 2012, after extensive investigation, the Government filed a Notice of Election to Intervene in Part and to Decline in Part in this action.  The Government notified the Court of its decision to "intervene[] in that part of the action which alleges that defendants Hyperion, AltaCare, Long Term Care Services, Inc. ("LTCS") and Douglas K. Mittleider, made, caused to be made, and/or conspired to make false claims and false statements material to false

---

[1] On or about May 14, 2010, AHC brought a separate cause of action in state court against Hyperion and AltaCare in which it sought termination of the lease agreement with Hyperion and damages based on upon the defendants' failure to provide proper care to its residents and failure to follow state and federal regulations, in violation of the lease agreement.  On May 18, 2010, the defendants removed that action to the federal district court, *see* 2:10cv123-KS-MTP.

claims to Medicare and Medicaid, for nursing home services at the Oxford Health & Rehabilitation Center facility in Lumberton, Mississippi."  Notice of Election, Docket No. 32 at 2.  The Government declined to intervene in the remainder of the Complaint.

AHC filed its Second Amended Complaint (hereinafter "Complaint") on February 11, 2011.  Docket No. 7.  The Complaint alleges that, from October 5, 2005 through at least May 1, 2012, Defendants made or caused to be made false or fraudulent claims and statements to the federal Medicare program and the federal-state Mississippi Medicaid program, for nursing home services purportedly provided to residents of Oxford which services were in fact non-existent, grossly deficient, materially substandard and/or worthless.  Below is a summary of the allegations related to AHC's claims.

## II.  FACTUAL BACKGROUND[2]

### A.  Relator's Complaint

#### 1.  Count I: Worthless Services and Resident Abuse

The Complaint alleges that "[t]he defendants exploited the residents of the Facility by receiving federal funds intended for care of the residents and willfully failing to utilize those funds toward resident care."  It contends that the defendants have "abused the residents of the Facility by engaging in the willful or negligent infliction of physical pain, injury or mental anguish on the residents and/or the willful deprivation of services which are necessary to maintain the mental and physical health of the residents."  SAC, ¶ 35.  AHC alleges "financial abandonment," in that the Defendants have diverted funds intended for resident care to entities controlled by Douglas Mittleider.  That mismanagement includes rationing items and supplies needed for the basic care of the residents, including reusing towels, oxygen bottles, garbage and

---

[2] As will be explained more fully below, the recitation of facts are the plaintiff's version as set out in the SAC and the Government's Complaint in Intervention and have been accepted as true.

laundry bags, and medical tubing, increasing the risk of infection through repeated use. Hyperion has also had to hold paychecks to its employees because it did not have sufficient funds in its bank accounts to cover them; kept the Facility chronically short-staffed to lower costs; and closed part of the Facility, leaving the 120-bed facility with only 90 operational beds. *Id.*

AHC conducted an evaluation of the Facility in September 2008.  The AHC evaluation found that Hyperion failed to provide a nursing home administrator or certified dietary manager for much of the period of evaluation; at least one laundry dryer was inoperative; several areas of the Facility had widespread mold and mildew; the bathroom tiles had a strong smell of urine, which indicated infrequent cleaning; old and mismatched furniture; and all of the showers had missing tiles, mold and mildew, and no privacy curtains or dividers.  The Facility had received five Life Safety Code violations, while the average number of deficiencies for nursing homes in Mississippi at that time was 1.2, and the nation was 4.0.  AHC indicates that these findings were reported to the Defendants.  SAC, ¶ 36.

A state survey agency completed a survey and inspection of the Facility in February 2009, and found that the Facility was still not in substantial compliance with several conditions of participation.  For example, during the February survey, "an astounding 20 out of 20 female residents surveyed" stated there were still no shower curtains or screens to provide privacy, and that "[t]he practice of the staff members was to bring in several females at a time to the shower area and undress and completely disrobe them in the shower areas in groups."  The women surveyed stated that "they did not want to be nude in front of others and did not want to see others nude."  SAC, ¶ 37.

A second AHC evaluation dated March 19, 2009, found that the Facility was still out of compliance with federal and state regulations.  The Facility still had "inadequate equipment, old, worn and mismatched furniture, unsecured sprinkler heads, 'three of four shower areas were closed to residents,' and the 200 wing [of the building] was still being used for scavenged parts and storage."  The evaluation found that many of the toilets in the 200 wing of the building had no connection to the wall or broken handle, making it impossible to flush dirty toilets.  There were also "widespread moisture and mold problems, roaches in the 200 Hall, and many of the 200 Hall rooms were missing mattresses and had broken air conditioning units."  These findings were reported to the Defendants.  SAC, ¶ 38.

A state survey dated November 24, 2009, found that the facility was still not in substantial compliance.  The survey reported that a resident suffered a fall during a transfer from a wheelchair to his bed because a certified nurse assistant transferred the resident to the bed without aid, despite the fact that the resident's orders required that any transfer required a mechanical lift with two-person assistance.  The resident suffered a sprained right ankle; he indicated that he had been moved on several occasions by only one staff member.  The  facility failed to thoroughly investigate and report the incident, failed to prepare  comprehensive care plans, and failed to ensure the resident environment remained as free of accident hazards as possible.  The report concluded that the Facility had not developed or implemented policies and procedures that prohibit mistreatment, neglect, and abuse of  residents and misappropriation of resident property.  SAC, ¶ 39.

A state survey dated March 25, 2010, indicated that the Defendants failed to maintain an effective pest control program so that the facility was free of pests and rodents.  Their neglect of the Facility has "placed the residents at risk of physical and mental harm from snakes, rats,

insects, and other vermin due to the lack of maintenance and housekeeping at the facility."  SAC,

¶ 40.  The survey reported the following incidents:

- A snake entered the facility and was found in a bed-ridden resident's bed. The snake was discovered when a staff member investigated the resident's complaint of leg pain.   When she pulled back the covers, a snake jumped out at her from the area of the resident's legs while the resident was still in the bed.
- The resident's room where the snake was discovered showed evidence of a lack of maintenance, namely eroded wallboard in the bathroom with five areas noted with holes.
- The facility's administrator recounted an incident in which surveyors saw a poisonous snake, a water moccasin, underneath bushes just outside the facility.
- The administrator also told surveyors that facility staff members had previously discovered a snake in the sitting area in the front of the facility.
- Another resident stated that she had spiders around her window until a hole was plugged and then had ants on the wall across from her bed.  The resident stated that she just laid in the bed and watched them.
- Other residents had sticky paper mouse traps in their rooms, and one resident stated she had recently noticed a mouse run under her bedside table.  Another resident noted that staff members had caught two mice in her room.  The floor was soiled and a gouged out area of the wall was visible under the heater.
- The survey noted numerous holes and chipped or soiled tiles in several rooms in the facility.
- A visitor to the facility told surveyors he had heard of snakes in the facility, that one snake was found in a resident's bed, and that he had killed a roach in the hallway and saw roaches often.

The Mississippi State Department of Health conducted a recertification survey at the

Facility on April 30, 2010.  It found that the Facility was out of compliance with about twenty

federal conditions of participation, including its status as at an "Immediate Jeopardy" level for

"Administration" and "Accidents and Supervision."  SAC, ¶ 41.  Immediate Jeopardy is defined

as "a situation in which the provider's noncompliance with one or more requirements of

participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a

resident."  42 C.F.R. § 489.3.  The survey findings include the following:

- Hyperion failed to ensure that a resident received adequate supervision to prevent that resident from leaving the facility without staff knowledge.  On March 30, 2010, a passerby informed staff that a resident was noted approximately 0.6 miles south of the facility on Highway 11.

- The affected resident had known wandering behavior.  This failure by Hyperion placed the resident at risk for serious injury, harm, impairment, and/or death and was deemed an Immediate Jeopardy level of noncompliance.
- Hyperion also received a citation at an Immediate Jeopardy level for the facility's failure to be administered in a manner to attain or maintain the highest well-being of each resident as it relates to substandard quality of care and immediate jeopardy.
- Hyperion failed to ensure sufficient staff was available on a 24-hour basis for six of fourteen days.
- Hyperion failed to maintain an infection control program to provide a safe and sanitary environment, and 24 of 110 active employees had no documented evidence of having been tested for tuberculosis.
- Hyperion failed to ensure that staff demonstrated competent skills and techniques in providing personal bathing care to a resident.
- A staff member at the facility failed to change into a clean pair of gloves when cleaning a gastric tube site on a resident.  That staff member also cleaned the site with water only rather than soap and water as was proper.
- Hyperion failed to label medications according to physician dose instructions.  Hyperion did not maintain accurate clinical records for nine of 24 records reviewed.
- Hyperion did not ensure the physical environment of the kitchen was clean and sanitary for four office days of survey.

As a result of the April 2010 survey, the Centers for Medicare and Medicaid Services ("CMS") published notice of its intent to terminate the Facility's participation in Medicare and Medicaid programs.  The Complaint alleges, however, that the Defendants were able to resolve the Immediate Jeopardy issue after two attempts.  Shockingly enough, CMS decided not to terminate the Facility's participation.

A revisit by the state took place on May 17-18, 2010, to determine whether Oxford had removed the Immediate Jeopardy identified on April 30, 2010.  The survey found continued non-compliance, but that the scope and severity level had been reduced.  The survey found in part the following:

- The Facility failed to ensure personal privacy by leaving a resident naked from the waist down and uncovered while the certified nurse assistant left to go to the bathroom to obtain soap.  This occurred with two residents.
- Eleven of twelve patients complained of not getting enough to eat.  The Facility failed to provide prompt efforts to resolve the complaint.  When

asking for more food, residents reported that staff members told them, "That's all we have."  Five of the twelve had lost weight over a three-month period although not determined to be significant amounts of loss.  The Activity Director informed the agency that residents asked him/her for more food and he/she would buy them snacks with his/her own money.

- The Facility failed to maintain a clean and homelike environment, in violation of federal housekeeping and maintenance requirements, *see* 42 C.F.R. § 483.15(h)(2), for two of five survey days.   As found in the previous surveys, there were strong odors of urine, loose baseboards, loose air vents, and peeling paint.
- The Facility failed to ensure that ten of 24 residents had care plans consistently developed and revised by the interdisciplinary team.
- The services provided or arranged by the Facility did not meet professional standards of quality.  For example, the Facility failed to ensure physician orders were implemented for one resident.
- The Facility failed to ensure that sufficient staff was available on a twenty-four hour basis for six of the thirteen days of employee staffing reviewed.
- The Facility failed to properly label medications according to physician's dosage instruction and medications were not administered as ordered.  Drugs were not properly administered or stored as required by state and federal law.
- The Facility failed to maintain an infection control program to provide a safe and sanitary environment.  Staff failed to change gloves and failed to properly handle soiled linen.
- The Facility failed to ensure the physical environment in the kitchen was kept clean and sanitary. Vents and ceiling tiles were stained and dirty.

The Relator alleges that evidence which surfaced in 2011 demonstrates a continued lack of care at the facility.  They allege the following:

- In January 2011, a patient was transferred to another local nursing facility; the new facility had to scrub the resident clean immediately upon admission because she had received very poor hygiene care at Oxford.
- That same month, another resident was transferred because of bed sores and wounds that were left unhealed, which is the result of a lack of nutrition.
- Local physicians have complained about the status of the Facility and have reported that they will not refer patients to it.
- In  January 2011, the security system was stripped from the facility wall (apparently repossessed), leaving a large unrepaired hole, and staff is required to stand guard at the doors to prevent elopements.
- Staff failed to properly safeguard, account for, or dispose prescriptions drugs; Relator alleges and indicated that the facility administrator accessed narcotics and disposed out of them out of compliance with applicable regulations.
- Residents of the Facility have filed suit against AHC as the Facility's owner for injuries involving inadequate staffing, substantial care following a fall, and failure to perform hygienic care, along with other claims.

In short, Relator alleges that this repeated failure to comply with Medicaid participation requirements indicates a pattern that Hyperion and/or the other Defendants have received funds to care for the residents, but operate Oxford at the bare minimum and do not provide it with the necessary requirements to operate in compliance with federal and state law.  "Inadequate care, inadequate staffing, and inadequate supervision have resulted in pressure ulcers, poor hydration, poor nutrition, and falls, all of which indicate Defendants have provided worthless services (or worse, no services at all) to the residents of the Facility."  SAC, ¶ 46.  AHC indicates that it has received two "substantial offers" from Hyperion to purchase the Facility, which the Relator alleges indicates that Hyperion has sufficient funds or access to funds to operate the Facility in compliance, but has chosen not to do so.  *Id.*

### a) False Claims

Relator alleges that Hyperion and/or other Defendants have billed Medicare and Medicaid for worthless services, and have submitted false claims knowingly or with "deliberate indifference or reckless disregard for their truth or falsity."  *Id.*  According to the Relator, Hyperion holds the licensed authority to operate the Facility, but no one within Hyperion has any authority to make decisions on behalf of the entity.  According to her testimony, Julie Mittleider was the wife of the Douglas Mittleider when she was appointed the original president, chief executive officer, chief financial officer, and chairman of the board of directors for Hyperion.[3] Julie Mittleider, however, was never told of her appointment by her husband and never attended a board meeting.  According to the Relator, she knew nothing of the operations of Hyperion from

---

[3] *See* SAC, ¶ 55; *see also Hyperion Found., Inc. v. Academy Healthcare Ctr., Inc.*, No. 1:09-ap-09-05043 (Bankr. S.D. Miss.) (Docket No. 23 (Notice of Deposition – Julie Mittleider)).  Given the reference in the SAC, the Court presumes that the Relator is referring to testimony that Julie Mittleider gave in a deposition in the bankruptcy proceeding.

its inception in 2004 until July 24, 2008, when she allegedly resigned in favor of Defendant Harry M. Clark.

According to the testimony of defendant Harry M. Clark, he was asked by Mittleider to become the president of Hyperion on or about July 29, 2008.  Clark did not know if he was appointed or had been elected.  Clark testified that he had no knowledge of any aspect of the business of the Facility, even though he was the sole officer and director.[4]  The Relator, AHC, claims that it has not had dealings with any person other than Douglas Mittleider since the inception of the lease agreement, and that there is "no person with control or authority over the entity that holds the license to operate the facility."  SAC, ¶ 57.  Hyperion does not control the Facility and it cannot prevent the diversion of funds from Oxford to the Defendants.  The Relator contends that Hyperion has abandoned the facility and failed to operate it in compliance with federal and state laws and regulations governing Medicaid and Medicare programs.

### b) Nationwide Pattern of Conduct

The Relator contends that its allegations of inadequate staffing, failure to maintain facilities, neglect of residents and provision of substandard care at Oxford also hold true at other facilities controlled by Douglas Mittleider.  The Relator has provided the following instances:

- _Massachusetts:_ Douglas Mittleider and several Mittleider entities which he controlled owned stakes in Governor Winthrop Nursing Home, a facility in Winthrop, Massachusetts.  In that case, a judge appointed a receiver to oversee the facility due to the same issues. The court also prevented Douglas Mittleider and his entities from owning or operating a long-term care facility in Massachusetts for ten years.

---

[4] Clark testified that he was not aware of the Lease Agreement between Hyperion and AHC, even though the matter had been in litigation since 2008.  Clark was not aware that Hyperion was over $500,000 in debt to AHC for the lease payments.  Clark was not aware that AltaCare was providing management services to the Facility nor was he aware that Hyperion was paying management fees to AltaCare.  SAC, ¶ 56.  The Court presumes that the Relator is referring to testimony that Clark gave in a deposition in the bankruptcy proceeding.  _See_ Docket No. 68, Ex. 10 (Testimony of Harry Clark) (excerpt of deposition dated August 9, 2009 with the same style and case number as the underlying bankruptcy action); _Hyperion Found., Inc. v. Academy Healthcare Ctr., Inc.,_ No. 1:09-ap-09-05043 (Bankr. S.D. Miss.) (Docket No. 25 (Notice of Deposition – Harry Clark)).

- *Tennessee:* Douglas Mittleider and AltaCare operated and managed Cambridge House in Bristol, Tennessee, where a resident died from complications from a broken leg she suffered when a hammock sling used by staff to lift her from a bed to a wheelchair snapped. Former Cambridge House employees stated administrators of the home, at the direction of Mittleider and AltaCare, had staff at the facility use slings and other equipment that were worn and in disrepair. The employees stated that new equipment was displayed for state surveyors while the worn equipment that was in daily use was hidden. After surveyors left, the newer items were put away until the next state surveyor visit.

- *Connecticut:* The George and Sally Tandet Center has experienced financial problems and strikes due to the financial abandonment of that facility by AltaCare and Douglas Mittleider. Workers at the facility went on strike in 2010 to protest cuts in their health care insurance and bounced paychecks. In July 2009, every paycheck that it issued bounced, and afterward between two and twelve checks bounced every month.

The Relator alleges that the management of these facilities is part of a broader pattern; Douglas Mittleider and AltaCare "habitually funnel funds needed for the operation of facilities under their control and for the care of the residents of those facilities away from the facilities to entities under the control of Mittleider, neglecting the care of the residents and unjustly enriching Douglas Mittleider and/or the other defendants." SAC, ¶ 62. They allege that the Defendants have collected management fees from Oxford and "earn[ed] a profit while resident care suffers." SAC, ¶ 64.

### 2. *Count II: Violation of Mississippi Vulnerable Persons Act*

The Relator alleges that the Defendants violated the Mississippi Vulnerable Persons Act, Miss. Code Ann. § 43-47-1, in that they "exploited the residents of the Facility by receiving federal funds intended for care of the residents and willfully failing to put those funds toward resident care." SAC, ¶ 68. According to the Relator, the "defendants have preyed upon the residents' status as beneficiaries of federal and state healthcare programs to profit from funds paid by those programs that were intended for care of the residents." SAC, ¶ 69. The Relator further alleges that the residents of Oxford fall within the definition of vulnerable adults under

the Act because their "ability to perform the normal activities of daily living or to provide for their own care or protection from abuse, neglect, exploitation or improper sexual contact are impaired due to mental, emotional, physical or developmental disabilities or dysfunctions, or brain damage or the infirmities of aging."  SAC, ¶ 67.

### 3.  Count III: Overall Schemes to Defraud

The Relator has alleged a scheme by which the Defendants have defrauded health care programs, residents, landlords, vendors and creditors.  According to the Relator, the Defendants fail to operate Oxford and other facilities in compliance with federal and state regulations in order to "systemically drain the funds from the facilities" and they have been "unjustly enriched by this conduct."  SAC, ¶ 71.

A number of other entities and individuals assisted with the management of Oxford. These entities include HP/Ancillaries, Inc.; Long Term Care Services, Inc.; Sentry Healthcare Acquirors, Inc.; HP/Management Group Inc.; Harry McD. Clark; Julie Mittleider; and Douglas K. Mittleider.  The Relator contends that Douglas Mittleider and all the other Defendants have siphoned money from Oxford through Hyperion to various entities owned and controlled by Mittleider.  Hyperion submits claims for worthless services to Medicare and Medicaid and diverts funds paid by these programs to Mittleider companies as payment for alleged services provided by Oxford.  Thus, Hyperion is a "sham corporation" and the alter ego of Douglas Mittleider, Julie Mittleider, and the other Defendants, which are mostly Mittleider-controlled companies. SAC, ¶ 73.

The Relator alleges that Douglas Mittleider serves as CEO, CFO, and/or Secretary of the other Mittleider companies.  Douglas Mittleider, however, installed first his wife, Julie Mittleider, as a figurehead officer and director of Hyperion and later installed Harry Clark, an

individual excluded from participation in federal healthcare programs, as the sole officer and director of Hyperion. Douglas Mittleider is also the CEO, CFO, and secretary of AltaCare. Corporation. AltaCare serves as manager/accountant of Hyperion and is a creditor of Hyperion. Under AltaCare's management, Hyperion was forced to file for Chapter 11 bankruptcy due to an inability to pay its debts, the largest of which was owed to the Relator for rent.

The Relator also contends that Julie Mittleider knowingly and willfully conspired with her husband Douglas Mittleider, Harry Clark, and the Mittleider companies to defraud the Medicare and Medicaid programs. Hyperion has allegedly made false claims and fraudulent disclosures to obtain payment from Medicare and Medicaid, which Hyperion has then illegally funneled at the direction of the Mittleiders to the Mittleider companies, including Sentry Healthcare, which is owned and operated by Julie Mittleider. In the same way, Harry M. Clark has also allegedly conspired with the Defendants to defraud Medicare and Medicaid programs.

During the bankruptcy proceeding, Hyperion, as managed by AltaCare, continued to pay out large sums of money to Douglas and Julie Mittleider's companies. Hyperion's Medicaid cost report for fiscal year 2008 also shows that Hyperion claimed costs of $358,993 for AltaCare's management fees and accounting fees.[5] Hyperion also claimed $1,608.00 in costs to HP/Ancillaries, Inc., another of Douglas Mittleider's companies, on the 2008 Medicaid cost report. Hyperion made "cash transfers" to LTCS, which is owned and operated by Douglas Mittleider, totaling $672,300 in three months – May, June, and July 2009 – alone. Sentry Healthcare Acquirors, Inc., which is owned and operated by Julie Mittleider, received $50,000 in "cash transfers" from Hyperion in June 2009 alone. The Relator states that it is unclear what services either of these entities provided.

---

[5] Relator also alleges that Hyperion continues to pay AltaCare $2,732.00 for accounting fees and $27,089.00 for management fees every month.

Relator AHC has also raised allegations related to the bankruptcy proceeding between itself and Hyperion. The bankruptcy court entered an order compelling settlement of the Relator's claims for past due rent. Hyperion was past due in an amount exceeding $500,000. The settlement required Hyperion to pay $325,000, a reduced sum, in one installment of $125,000 and then in eighteen monthly installments of $6,944.44. Hyperion was also to continue paying monthly lease fees of $36,000 per the lease agreement. The monthly installments were to be paid by the fifth day of each month and no later than the fifteenth day of each month. The court order provided that, should Hyperion fail to timely pay the Court ordered settlement and lease payments by the fifteenth day, the Lease Agreement was to automatically terminate. The payments were to be transferred by wire into the Relator's account.

The payments were properly and timely paid from March until May of 2014. On May 14, 2010, a representative of Defendants improperly delivered two checks to Bass Memorial Academy ("Bass") for the payments due. According to the Relator, Bass is a nursing school affiliated with AHC, and it was not a party to the bankruptcy proceeding or settlement agreement. These checks were drawn on the account of Hyperion Foundation, Inc., DBA Oxford Health & Rehab CTR, Chap 11 Debtor in Possession Case 09-51228 ("Bankruptcy Account"). The Relator alleges that, although the bankruptcy action had been dismissed on March 22, 2010, Defendants continued to write checks on the Bankruptcy Account in an effort to misrepresent to payees that Hyperion was still protected by the bankruptcy laws and that the case was still open.

After the checks were deposited, they were returned for insufficient funds. The Relator then learned that, on May 18, 2010, the funds had been wire transferred into its account; the wire transfer was allegedly in the name of LTCS. In August 2010, Hyperion again hand delivered checks drawn on the Bankruptcy Account and stopped payment on the checks. Again, the funds

were later wired into the AHC account from another account controlled by Douglas Mittleider. The October 2010 payments were also delivered by check, in violation of the settlement terms, and were returned for insufficient funds.  Funds were again transferred by wire to AHC to cover the bad checks.

The Relator alleges that Hyperion and/or the Defendants hand delivered the checks knowing that there were insufficient funds in the Bankruptcy Account in an attempt to deceive AHC and the bankruptcy court that the payments had been timely made.  The Relator also asserts that this conduct is further evidence of the Defendants' inability to manage and operate the facility and its propensity to defraud and deceive its creditors and the court.  The commingling of funds from various accounts owned by Hyperion, LTCS, and others, is evidence that Douglas Mittleider controls all of the Defendant entities and funds from the operation of other facilities is being used to pay the debts of Hyperion.

Finally, although the total sum due to Relator was compromised by the order of the bankruptcy court, Hyperion claimed on its cost report that it paid the full amount of the lease payments due.  The Relator contends that this claim is fraudulent and in violation of state and federal law.

### 4. Count V: Failure to Disclose Person With Ownership or Control Interest[6]

---

[6] Count IV of the Relator's Complaint alleges that Clark was excluded from participating in Medicaid and Medicare programs under the Social Security Act, 42 U.S.C. § 1320a-7(a)(1), for a program-related crime.  His exclusion was entered October 25, 2005, and remains in effect.  *See* Docket No. 68, Ex. 9 ("HHS-OIG Program Exclusions Not., 70 Fed. Reg. 61,136 (Oct. 20, 2005)").  The Relator alleged that Clark's knowing and willful acceptance of his position with Hyperion despite his excluded status could subject Oxford to fines and penalties.  Clark may also be subject to civil monetary penalties for each item or service furnished during the period he was excluded, under 42 C.F.R. § 1003.103 and the Social Security Act.  In addition, Clark is subject to treble damages for the amount claimed for each item or service.  After filing the Complaint, the Relator agreed to voluntarily dismiss Harry M. Clark from this action.  Docket No. 92.  The United States has consented to the dismissal, provided that it is "expressly made without prejudice to the United States."  Docket No. 93.  Given the parties' concurrence with the dismissal, the Court recognizes Clark's dismissal and holds that it is made without prejudice to the United States.

The Relator alleges that Hyperion has failed to disclose this required information about Harry Clark's control interest and his exclusion status to Medicaid and is in violation of the federal and state authorities which give Hyperion an "affirmative obligation" to disclose all persons who have an ownership, financial or control interest in it.[7]  The Relator contends that this information constitutes a false record or statement for the purpose of obtaining payment from a federal program.

### 5. *Count VI: Failure to Make Required Disclosures on Medicaid Cost Report*

According to the Relator, Hyperion failed to make the required disclosures in its cost reports as related to at least its officers and directors, as Hyperion did not disclose Mr. Clark as its sole officer and director on its 2008 cost report filed May 26, 2009.[8]  Hyperion also failed to disclose any individual as an officer or director on its 2009 cost report filed May 7, 2010.  The Relator alleges that these omissions were attempts to conceal the actual officers and directors from the Division of Medicaid, and that the records were submitted in violation of the False Claims Act.

#### a) *Nationwide Scheme to Submit False Claims*

The Relator contends that Douglas Mittleider, Julie Mittleider and the Mittleider companies have developed a nationwide scheme intended to defraud Medicare and Medicaid programs, and that Douglas Mittleider has formed a "web" of more than 150 companies, including but not limited to the companies subject to this action, in an effort to defraud Medicare,

---

[7] These authorities include 42 U.S.C. § 1320a-3(a)(1), which requires that a provider of services for which payment may be claimed under any plan covered under Title V of the Social Security Act or a state Medicaid plain must disclose to the U.S. Department of Health and Human Services ("HHS") the identity of each person who has an ownership or control interest in the provider.  The Code of Federal Regulations requires the same disclosure in 42 C.F.R. § 420.206.  Skilled nursing facilities must disclose all changes in persons with an ownership or control interest to the state agency that regulates such facilities at the time of change under 42 C.F.R. § 483.75(p).

[8] Hyperion's Statement of Financial Affairs filed in its earlier bankruptcy proceeding, indicates that, prior to July 29, 2008, Hyperion's officers were listed as Julie Mittleider, president, and Deborah Hoover, secretary. Its Board of Directors included only Julie Mittleider and two non-defendants.  Statement of Financial Affairs, Docket No. 7, Ex. S.  After July 29, 2008, Harry Clark is listed as the sole officer and sole board member.

Medicaid, and the companies' creditors.   Defendant AltaCare Corporation manages and/or operates at least 34 long-term care homes throughout the United States.  The Relator alleges that the Defendants used "at least three scams as part of their scheme to defraud the Government, creditors, and residents."  The methods that the Relator has alleged are as follows:

### i.  Nursing Home Operator Allegations

In the Complaint, the Relator describes a typical scheme that the Mittleider entities use to commit fraud involving nursing homes.  According to the Relator, a Mittleider entity often will contract with a skilled nursing facility to lease and/or provide management or operations services to that facility.  For example, Defendant Hyperion contracts with AHC to lease Oxford.  Then, Hyperion contracts with AltaCare or other Mittleider companies to manage and/or operate the Facility.  Defendant AltaCare Corporation manages and/or operates a number of long-term care facilities throughout the United States.  Then, as in the case of Hyperion, the Mittleider entity will contract with one or more different Mittleider companies for a variety of management services.   For example, Defendant AltaCare contracted to provide management services to Defendant Hyperion then Defendant AltaCare contracted with Defendants LTCS, HP/Ancillaries, Inc., HP/Management Group, Inc., and/or Sentry Healthcare Acquirors, Inc. for various services.   Douglas Mittleider and/or Julie Mittleider give preference to Mittleider companies, which may or may not be providing services to the facility, and funnel Medicare and Medicaid funds intended for resident care to those companies to the detriment of the residents of the facilities.  The Defendants have allegedly used this scheme in other nursing facilities that Mittleider manages across the United States.

### ii.  Landlord/Tenant Allegations

According to the Complaint, in this scheme, a Mittleider entity will often lease existing nursing home facilities from the owners of those facilities, as is the case with Hyperion and AHC, in exchange for payment of rent by the Mittleider entity.  That entity purportedly will operate the leased facility as a skilled nursing facility.  The Mittleider entity fails to make the agreed-upon rent payments, prompting the lessor to initiate costly litigation.  The Mittleider entity, at the direction and control of Douglas Mittleider, Julie Mittleider, the Mittleider companies, and/or John Does 1-200 will "vexatiously draw out litigation, eventually forcing settlement for a lesser amount than what is owed."  The Relator alleges that, "[b]y engaging in litigation or seeking the protection of bankruptcy for these purposes, the Defendants use the judicial system to perpetrate their fraudulent scams."

The Relator provides examples of various cases in federal district courts around the country against Douglas Mittleider or one of his entities.[9]

### iii.  Vendor Allegations

In this scheme, a Mittleider entity allegedly contracts with one or more vendors of healthcare items or services (e.g., therapy, pharmaceutical, etc.) to provide services in skilled

---

[9] In summary, the litigation includes:
- *LandAmerica Onestop, Inc. v. Douglas K. Mittleider et al.*, Civil Action No. 1:09-CV0562-TWT, in the Northern District of Georgia.  In this action, the plaintiff was landlord and lessor of space which Defendant Healthprime, Inc. leased.  Defendant Healthprime failed to pay any rental payments at all.  According to the Relator, notable allegations included that "Defendant Douglas Mittleider treated his companies and himself as a single unit, transferring funds to disguise cash deficits."  The disposition is pending and the total amount in controversy is $253,718.82 plus late fees and interest.
- *NH Texas Properties, L.P. vs. HP/Texas Properties, Inc. et al.*, Civil Action No. H-034384, in the Southern District of Texas. Plaintiff leased certain space to Defendants to operate a nursing home, and Defendants failed to pay rent.  The parties entered into a settlement.  The Relator indicates that the complaint is "not accessible," but that the original amount in controversy was lower than the settlement amount.
- *NH Texas Properties, L.P. vs. HP/Texas Properties, Inc., HealthPrime, Inc., & Douglas K. Mittleider*, Civil Action No. 4:06-03466, in the Southern District of Texas.  Plaintiff leased certain space to Defendants. HealthPrime and Mittleider guaranteed the lease.  Defendant HP/Texas Properties failed to pay the rent and taxes as agreed under the lease, and HealthPrime and Mittleider failed to pay the rent and taxes due as guarantors.  The original amount in controversy was $712,245.66 plus interest and fees; the court entered a final judgment against HP/Texas Properties (presumably a Mittleider entity) for $605,468.43 and against Douglas Mittleider for $490,158.02.  The amount against Douglas Mittleider was later reduced to $209,823.12 upon stipulation of the parties.

nursing facilities managed or operated by that Mittleider entity. The contracted vendors will provide items or services under the agreement, triggering the Mittleider entity's obligation to pay for the items or services. The Mittleider entity submits claims to Medicare and/or Medicaid for the costs for the services rendered by the vendors. The Mittleider entity then receives reimbursement by Medicare and/or Medicaid for services provided by the contracted vendors but fails or refuses to remit such funds to the vendors. For example, Health Prime and AltaCare Corporation, both Mittleider entities, left vendors holding unpaid bills for pharmacy, consulting, and services after they relinquished control of Glen Valley Care Center, a nursing home in Colorado.

A vendor or creditor of a Mittleider entity will bring suit on an outstanding account owed by the Mittleider entity. The Mittleider entity, at the direction of Douglas Mittleider, will "draw out the litigation," eventually entering into a confidential settlement with the vendor or creditor. SAC, ¶ 116. Mittleider entities then usually settle the litigation for amounts that are only a portion of the amounts owed to their vendors and/or creditors. The funds for these settlements often come from amounts paid by Medicare and Medicaid. Douglas Mittleider, Julie Mittleider, Hyperion, the Mittleider companies, and/or John Does l-200 receive funds from Medicare and Medicaid, fail to remit portions of those funds to pay obligations to vendors and creditors, engage in litigation regarding those obligations, and eventually settle the litigation for less than the total obligations owed, profiting first from defrauding Medicare and Medicaid and second from abusing the judicial process to settle their obligations for only a portion of the total amount owed. The Relator provides examples of various cases in federal district courts around the country to illustrate the Defendants' "abuse of the judicial process."[10]

---

[10] In summary, the litigation includes:

In sum, AHC seeks recovery of the total amount reimbursed to the Facility provided by Medicare and Medicaid for each year Hyperion and/or the Mittleider Defendants operated the Facility and other facilities under their control. AHC estimates that the Facility may have received in excess of $4,000,000 for each year of operation by the Defendants.  AHC also seeks treble damages as allowed under the False Claims Act as well as an additional $10,000 in civil money penalties per fraudulent claims submitted for payment by defendants as authorized by the False Claims Act.

### B.  Government's Complaint in Intervention

On November 30, 2012, the United States filed a Notice of Election to Intervene in Part and Decline to Intervene in Part, notifying the Court of its intervention pursuant to the False Claims Act, 31 U.S.C § 3730(b)(2) and (4).  After an extensive investigation of the Relator's allegations, the United States filed a Complaint in Intervention (hereinafter "USA Complaint")

- *Kindred Rehab Services, Inc. et al. v. HP/Texas Properties, Inc. et al.*, Civil Action No. 1:03-CV-01495, in the Northern District of Georgia.  In this case, the plaintiffs provided respiratory therapy services to residents of nursing homes owned, operated, or managed by the defendants.  The defendants failed to pay for these services. Medicare paid for the services based on false representations by Defendants that they had paid the plaintiffs for the services. The court entered an agreed order of judgment for $1 million against Healthprime (a Mittleider company) pursuant to a settlement of this case and *Kindred Rehab v. HP/Operations Group, Inc., et al.*, Case No. 3:02-CV-0534 (M.D. Tenn.).  The amount in controversy in HP/Texas was $213,000 and $953,000 for HP/Operations.
- *Continental Cas. Co. et al. v. HealthPrime, Inc. et al.*, Civil Action No. 1:97-CV-2512, in the Northern District of Georgia.  Plaintiffs contracted with Defendants to provide insurance coverage for Defendants' liabilities under the workers' compensation and employers liability statutes of various states and to service claims submitted for coverage under the various policies. Defendants failed to pay amounts due under the contracts after 2003.  Notably, the plaintiffs alleged that Defendant HealthPrime ceased operations and transferred its assets to one or more of Defendant Douglas Mittleider's other corporations or to Mittleider individually. The case is pending and the amount in controversy is $3,438,874.
- *RehabCare Group East, Inc. v. HCC Healthcare of Birmingham, LLC, et al.*, Civil Action  No. 1:09-CV-1675-GET, in the Northern District of Georgia.  Plaintiff provided therapy services (physical, occupational, speech) at skilled nursing facilities operated by Defendants.  Defendants failed to pay for the services provided by Plaintiff.   The plaintiffs alleged, among other allegations, that Defendants Douglas & Julie Mittleider paid themselves excessive compensation, bonuses and other payments, and favored certain creditors (other Mittleider entities) over others.  The case remains pending.
- *RehabCare Group East, Inc. v. HealthPrime, Inc. et al.*, Civil Action No.1:05-CV02450-TCB, in the Northern District of Georgia.  In this case, the plaintiff provided therapy services (physical, occupational, speech) at skilled nursing facilities operated by Defendants.  Defendants failed to pay for the services provided by the plaintiff.  Medicare paid for such services based on false representations by Defendants that they had the Plaintiffs for such services.  The case was dismissed as part of a settlement agreement, and the terms were not disclosed; the amount in controversy was $106,623.69.

on February 28, 2013.  Docket No. 37 (hereinafter "USA Compl.").  The Government intervened "in that part of the *qui tam* action which alleges that defendants Hyperion, AltaCare, [Long Term Care Services] and Mittleider, made, caused to be made, and/or conspired to make false claims and false statements material to false claims to Medicare and Medicaid, for nursing home services at [Oxford; and (b) decline to intervene as to the remainder of the allegations in the *qui tam* action, including in any claims against defendants HP/Ancillaries, Inc., HP/Management Group, Inc., Sentry Healthcare Acquirors, Inc., Harry McD. Clark and Julie Mittleider."  USA Compl., ¶ 6.

The Government has asserted and the Relator has conceded that the Government's intervention has superseded AHC's False Claims Act claims against Hyperion, AltaCare, LTCS, and Mittleider relevant to the Government's intervention.  Thus, the Government shall control the prosecution of the claims in which it has intervened, subject to any rights afforded to AHC as the Relator under section 3730(c) of the FCA.[11]

The Government alleges that Douglas Mittleider caused Hyperion and other Defendants to enter into agreements which prohibited providing false information or claims to the United States and outlined the penalties available for such acts.  According to the USA Complaint, Douglas Mittleider caused Hyperion to enter into Medicaid and Medicare Provider Agreements, to execute other documents necessary for Hyperion to participate in those programs, and to take such other steps and execute such other documents as were necessary for Hyperion to conduct business and receive payments as a Medicaid and Medicare provider.  He caused his spouse, Julie Mittleider, to sign Medicaid and Medicare Provider Agreements on behalf of Hyperion. The Medicaid Provider Agreement contained the following certification: "I understand that any

---

[11] This section includes only new claims or information that the Relator did not include in its complaint related to the same claims.

omission, misrepresentation or falsification of any information contained in this application or contained in any communication supplying information to Medicaid to complete or clarify this application may be punishable by criminal, civil or other administrative actions." USA Compl., ¶ 24. Hyperion's Medicaid Provider Agreement also contained the following certification: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicaid and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.*, ¶ 25. Hyperion also executed an Electronic Data Interchange ("EDI") Enrollment Form in order to bill Medicare electronically. By executing the EDI Enrollment Form, a provider agrees to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful." *Id.*, ¶ 27. A provider also acknowledges that:

> [A]ll claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law.

*Id.*, ¶ 28. The Government alleges that Douglas Mittleider also signed Hyperion's cost reports, which also required acknowledging the penalties for submitting false claims.

The Government also contends that the Defendants violated rules that they were required to follow to participate in and receive payments under the Medicare and Medicaid programs. Under these programs, a nursing home must execute a Health Insurance Benefit Agreement, Form CMS-1561. *See* 42 U.S.C. § 1395cc. By doing so, a provider expressly agrees to conform with the applicable Code of Federal Regulations within Title 42, including the standard of care regulations that implement the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396r *et seq*. *See* 42 C.F.R. § 483. The Government asserts further that Douglas Mittleider caused Julie

Mittleider to execute the Health Insurance Benefit Agreement on behalf of Hyperion.   The Health Insurance Benefit Agreement expressly commits the provider to comply with federal regulations in order to receive payment:

> In order to receive payment under title XVIII of the Social Security Act [42 U.S.C. § 1395cc], [Name of the nursing home inserted here] as the provider of services, agrees to conform to the provisions of section of [sic] 1866 of the Social Security Act and applicable provisions in 42 CFR [which includes the regulations on care provided in nursing homes].

USA Compl., ¶ 33.   To receive reimbursement from Medicaid and Medicare, Hyperion was required to complete and submit a Minimum Data Set ("MDS") form to CMS for all residents. 42 C.F.R. § 483.315.  The MDS form is the basis upon which CMS determines the *per diem* reimbursement rate for each Medicare Part A beneficiary in a nursing facility.   CMS relies on the accuracy of the information the nursing facility provides on the MDS form.   According to the Government, from in or about October 2005 through in or about May 2012, Hyperion received aggregate payments from the Medicaid and Medicare programs of more than $30 million for claims for nursing home services provided, or purportedly provided, to Medicaid- and Medicare-eligible residents at Oxford.

The Medicaid and Medicare programs pay for a bundle of nursing home services, provided to eligible residents on a *per diem* basis under the so-called prospective payment system.  Based upon the MDS assessments that a nursing home submits to the government for each eligible resident, nursing homes are paid a *per diem* reimbursement for each day they provided the required nursing home care to such residents.   It is undisputed that, at all times relevant to this action, Oxford was a nursing facility as defined by the Nursing Home Reform

Act.[12]   The Act mandates that nursing facilities comply with federal and state requirements relating to the provision of services, and with professional standards and principles applicable to nursing facilities.[13]   Federal regulations mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment [of the resident] and plan of care."   42 C.F.R. § 483.25.   Federal regulations also require that the facility must ensure proper treatment for specific aspects of living at a nursing home, including managing pressure sores (or "bed sores"),[14] nutrition,[15] hydration,[16] activities of daily life,[17]   medication errors,[18]   administering unnecessary drugs,[19]   antipsychotic drugs,[20] accidents,[21] and urinary incontinence.[22]

---

[12] A "nursing facility" is an institution that:
　　(1) is primarily engaged in providing to residents –
　　　　(A) skilled nursing care and related services to residents who require medical or nursing care;
　　　　(B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
　　　　(C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases . . . .
42 U.S.C. § 1396r(a).

[13]   42 U.S.C. § 1396r(b); 42 U.S.C. § 1396r(d)(4)(A) ("A nursing facility must operate and provide services in compliance with all applicable federal, state and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility.").

[14] **Pressure sores**. Based on the comprehensive assessment of a resident, the facility must ensure that –
　　(1) A resident who enters a facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and
　　(2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.
42 C.F.R. § 483.25(c).

[15] **Nutrition**. Based on a resident's comprehensive assessment, the facility must ensure that a resident –
　　(1) Maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless the resident's clinical condition demonstrates that this is not possible; and
　　(2) Receives a therapeutic diet when there is a nutritional problem.
42 C.F.R. § 483.25(i).

[16] **Hydration**. The facility must provide each resident with sufficient fluid intake to maintain proper hydration and health.
42 C.F.R. § 483.25(j).

[17] **Activities of Daily Life**. Based on the comprehensive assessment of the resident, the facility must ensure that – A resident's abilities in activities of daily life do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable.  This includes the resident's ability to -
　　(1) Bathe, dress, and groom;
　　(2) Transfer and ambulate;

### 1. *Worthless Services Allegations*

The Complaint in Intervention makes many of the same worthless services allegation as the Relator's Complaint. The Government alleges that the Defendants "provided and billed the government for non-existent, grossly inadequate, materially substandard and/or worthless care to Oxford's residents." USA Compl., ¶ 56. In addition to the Relator's allegations, the Government contends that "Defendants failed to pay, or were consistently delinquent in paying, vendors of essential goods and services," including food and drink, supplies, service and maintenance. *Id.* As a result of Defendants' failure to pay vendors, either on time or not at all,

---

(3) Toilet;
(4) Eat; and
(5) Use speech, language or other functional communication systems.
42 C.F.R. § 483.25(a).
[18] **Medication Errors**. The facility must ensure that –
(1) It is free of medication error rates of five percent or greater; and
(2) Residents are free of any significant medication errors.
42 C.F.R. § 483.25(m).
[19] **Unnecessary Drugs**.
(1) General. Each resident's drug regimen must be free from unnecessary drugs. An unnecessary drug is any drug when used:
(i) In excessive dose (including duplicate therapy); or
(ii) For excessive duration; or
(iii) Without adequate monitoring; or
(iv) Without adequate indications for its use; or
(v) In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or
(vi) Any combinations of the reasons above.
42 U.S.C. § 483.25(l)(1)
[20] **Antipsychotic Drugs**. Based on a comprehensive assessment of a resident, the facility must ensure that –
(i) Residents who have not used antipsychotic drugs are not given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical records; and
(ii) Residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs.
42 C.F.R. § 483.25(l)(2).
[21] **Accidents**. The facility must ensure that –
. . . .
(2) Each resident receives adequate supervision and assistance devices to prevent accidents.
42 C.F.R. § 483.25(h).
[22] **Urinary Incontinence**. Based on the resident's comprehensive assessment, the facility must ensure that –
(1) A resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary; and
(2) A resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible.
42 C.F.R. § 483.25(d).

residents frequently lacked sufficient food and basic nursing supplies necessary for providing proper and adequate care to residents, such as incontinence briefs, wound care supplies, colostomy bags, urinary catheter drainage tubing, tube feeding supplies, wipes, and linens. The Oxford facility was in constant need of essential repairs, including to its roof, ceilings, heating and cooling units, and door alarms. The Government also raises more specific allegations related to the presence of vermin at Oxford, including that "[r]oaches were found on food trays and in the ice machine" and "[a] live rat was found in the bed of one resident." *Id.*, ¶ 60.

The Government alleges that the Defendants failed to devote necessary resources to the care of residents at Oxford at least in part because they diverted funds received by Hyperion from the Medicaid and Medicare programs: (i) to Mittleider and AltaCare, in the form of excessive administrative expenses; (ii) to LTCS, in the form of transfers from Hyperion, which left Oxford with inadequate resources to meet resident needs; and (iii) to other entities owned, operated or controlled by Mittleider, including nursing homes, to pay for their operations or debts. According to the Government, the Defendants were aware of the problems with insufficient resources at Oxford and the resulting adverse health effects on Oxford's residents, but recklessly disregarded them, were deliberately ignorant of them, and ultimately, failed to resolve them, or to do so in a timely fashion.

The Government provides examples of false and fraudulent claims for "non-existent, grossly inadequate and materially substandard, worthless, harmful care" that it has uncovered in its investigation. A summary of the examples are as follows:

- ***Resident #1:*** A 77 year-old woman was admitted to Oxford on or about December 7, 2007. She had a diagnosis of dementia, paranoia, possible psychosis, mild renal disease, mild anemia, and chronic back pain. She weighed 134 pounds and had no pressure ulcers when she was admitted to Oxford.
    In September 2008, she began a series of hospitalizations due to dehydration and overdoses on pain medication. Throughout Resident #1's stay at Oxford, the nursing staff

failed to administer her medication in accordance with her physician's orders. For example, Resident #1 had a medical order to receive 50 mg of Prolixin, an antipsychotic, once every three weeks. From September 24, 2008 through 30, 2008, Resident #1 received 50 mg of Prolixin every day, *seven times* the normal therapeutic dose. The side effects of Prolixin can exacerbate renal insufficiency; on October 1, 2008, Resident #1 was hospitalized for five days for chronic renal failure and dehydration. Throughout her stay at Oxford, her kidney disease worsened due to dehydration and malnutrition.

Starting in September 2008, she began to develop pressure ulcers on various parts of her body.  At each hospitalization, the hospital found that Oxford's adherence to a plan of care for the ulcers was "poor."  They became contaminated with feces and increased in toxicity and appearance, including some that exposed muscle and tendon.  She was urged to have both of her legs amputated, but refused.

In addition to its failure to provide wound care, Oxford failed to provide Resident #1 with basic hygiene care, such as showers, and oral care. Although Resident #1's care plan stated that she was to receive a shower three times a week, there were numerous instances where Resident #1 did not receive a shower or bath more than once or twice a month. There were also numerous instances of Resident #1 not receiving oral care for several days at a time.  Her record indicates that she was hospitalized more than two dozen times in less than five years, most of those visits due to dehydration and malnutrition, among other ailments. She also steadily lost more than twenty pounds.

For the worthless services provided to Resident #1 from December 7, 2007 to May 1, 2012, defendants knowingly submitted or caused to be submitted claims for payment to Medicare, and Medicare paid claims totaling $10,449.59.  For the same services and period of service, Medicaid paid claims totaling $249,889.38.

- ***Resident #2:*** A 65 year-old man was admitted to Oxford on or about January 20, 2009. His initial diagnosis upon admission included respiratory failure, end-stage renal disease, congestive heart failure, and hypertension. He was admitted with a feeding tube, otherwise known as a "PEG" tube, to provide nutrition, hydration, and medication directly into his stomach.

On numerous occasions throughout Resident #2's stay, Oxford failed to provide him with adequate hydration, resulting in frequent admissions to the hospital for dehydration. His PEG tube was regularly clogged and he did not regularly receive food and water.  His physician was often not informed when he stopped eating and his tube feedings were decreased.  In addition, Oxford failed to provide Resident #2 with basic hygiene and catheter care.  He experienced recurring urinary tract infections, and on January 28, 2012, a nurse noted that Resident #2 had a "markedly swollen penis" and that she was unable to retract the foreskin."  He was later admitted to the hospital and diagnosed with paraphimosis, an uncommon condition that results when the foreskin of an adult man's penis is retracted for examination, cleaning or catheterization, and is not reduced.  The hospital found that his catheter was "old and is poorly draining urine."  In another hospital visit a month later, the hospital chart noted that he had a tunneled infection around his Foley catheter.  In total, he was hospitalized at least thirteen times during his stay at Oxford.

For the worthless services provided to Resident #2 from January 20, 2009 to May 1, 2012, defendants knowingly submitted or caused to be submitted claims for payment

to Medicare, and Medicare paid claims totaling $62,806.53.  For the same period and service, Medicaid paid claims totaling $499,141.27.

- ***Resident #3:*** A 56 year-old woman was admitted to Oxford on January 31, 2007.  She was admitted with a Stage IV pressure ulcer on her coccyx[23] and several rib fractures.

  During her stay at Oxford, she developed other serious pressure ulcers.  Her wounds consistently went untreated, despite her physician's orders, and the ulcers became progressively worse.  On April 28, 2008, her chart noted that Resident #3 was complaining of pain to her left leg from a fall that happened two days prior. On June 18, 2008, she was transferred to the hospital for evaluation of pain in her left hip and back after her fall.  According to the notes, her family was not notified of her fall until July 1, 2008.  On June 26, 2008, she fell again and was hospitalized the same day.  There is no information in Oxford's records of the results of her evaluation or that Oxford undertook measures to prevent future falls.  On November 23, 2008, she suffered another fall; a medical order was given for her to follow up with an orthopedic surgeon for treatment of a humerus fracture in one week.  Oxford failed to take her for an appointment until four weeks later, by which time her humerus had healed in a misaligned state, resulting in permanent disfigurement and loss of function in her right arm.

  On August 24, 2009, she fell out of her bed and complained that she had hit her head.  A licensed practical nurse ("LPN") at Oxford determined that she had no apparent injuries.  On September 1, 2009, Resident #3's roommate found her on the floor besides her bed; Resident #3 stated that she had fallen out of bed.  Her chart noted that she was able to move all extremities and she had no complaint of pain. She was placed back in bed.  The next day, Resident #3 was found to be unresponsive with decreased oxygen saturation.  She was transferred to the hospital, where she died three days later, on September 5, 2009.

  For the worthless services provided to Resident #3 from January 31, 2007 to September 2, 2009, the Government alleges that Defendants knowingly submitted or caused to be submitted claims for payment to Medicaid, and Medicaid paid claims totaling $106,326.00.

- ***Resident #4:*** A 57 year-old man was admitted to Oxford on or about April 16, 2008 for rehabilitation following a fall that required hip replacement surgery.  Resident #4 had a medical history of congestive heart failure, obesity, hypothyroidism, diabetes, and mental retardation.  The hospital records state that he should be on a sodium-restricted, high-potassium diet.  He had a catheter and was continent of bowel and had no pressure ulcers when he was admitted to Oxford.

  Upon his admission to Oxford, the nursing staff and dietician failed to follow hospital orders for Resident #4 to be on a sodium-restricted diet.  Instead of restricting his sodium intake as ordered, Oxford gave Resident #4 a low *potassium* diet until at least April 29, 2008.  He developed three severe pressure ulcers while at Oxford.  On a hospital visit, his physicians ordered that he receive assistance to turn and reposition, that his sore be kept clean and dry, and that the dressings be changed every three days.  But throughout his stay, Oxford failed to provide him with basic hygiene care, including a shower or bed bath, on many occasions.  Oxford records indicate they failed to provide Resident #4 with a shower or bath, and failed to turn or reposition him for eleven days –

---

[23] The coccyx is "[t]he small bone at the end of the vertebral column"; it is also known as the tail bone.  *Steadman's Medical Dictionary* 402 (28th ed. 2006).

every day from April 25, 2008 through May 5, 2008.  On May 5, 2008, a urine culture indicated that he had a urinary tract infection with bacterial contamination of feces. During his stay, he also developed "facility-acquired bowel incontinence" because Oxford failed to give him toileting assistance.  Resident #4's ulcers became infected with bacteria and reached Stage IV levels of severity.  The ulcers became larger in length and depth, suggesting that Oxford had not followed the wound care plan ordered by the hospital.

In May 2008, Resident #4 was also treated for malnutrition; the hospital recommended "aggressive nutritional support."  USA Compl., ¶ 151.  On May 27, 2008, he was admitted to the hospital with "'extensive sacral decubitis' ulcers"[24]  and required immediate surgery.  He also required an intravenous infusion of potassium because of his low potassium level.  Resident #4's family refused to re-admit him to Oxford following the surgery.

The Government alleges that, for the worthless services provided to Resident #4 from April 16, 2008 to May 27, 2008, the Defendants knowingly made or caused to be made claims for payment to Medicaid, and Medicaid paid claims totaling $13,888.90.

- **Resident #5:** A 71 year-old man was admitted to Oxford on November 2, 2007 following treatment and surgical repair of a fractured hip.  Medical orders and admission notes indicate that he was incontinent, but did not identify any pressure ulcers.

Four days after his admission to Oxford, Resident #5 was admitted to the hospital with pneumonia, hyponatremia,[25] and confusion.  On November 20, 2007, Oxford's records indicate that he had a necrotic area[26] on his right heel.  Physicians recommended and his care plan indicated that topical ointment should be applied, his heels should be floated, and he should receive regular body and skin audits to check his progress.  Oxford did not consistently provide these services, or other wound treatments.  His condition worsened and he developed other ulcers on his buttocks.  He was referred to restorative nursing care to build his strength and endurance; there is no evidence that he was provided with restorative nursing care.  The ulcer on his heel eventually reached Stage IV status, with tendon and bone exposed.  He was not given showers or bed baths according to doctor's orders; for example, he was ordered to receive showers three times weekly during April 2008, but Oxford did not provide him any showers during that month. During June 2008, he also did not receive antibiotics, insulin or other medications ordered by his physician.

On or about June 20, 2008, Resident #5 was admitted to the medical center after suffering a left-sided stroke.  He did not return to Oxford following his stroke.

For the worthless services provided to Resident #5 from November 2, 2007 to

---

[24] Decubitus ulcers, also known as pressure ulcers or bedsores, "appear[] in pressure areas of skin overlying a bony prominence in debilitated patients confined to bed or otherwise immobilized, due to a circulatory defect." *Steadman's Medical Dictionary* 2061 (28th ed. 2006).  They can appear in the sacrum, which is a "shield-shaped bony structure that is located at the base of the lumbar vertebrae and that is connected to the pelvis," at the base of the spine at the buttocks.  *See Sacrum: Medline Plus Medical Encyclopedia Image*, Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/ency/imagepages/19464.htm (last updated Feb. 7, 2011).
[25] Hyponatremia involves "abnormally low concentrations of sodium ions in circulating blood." *Steadman's Medical Dictionary* 934 (28th ed. 2006).
[26] Necrotic area refers to a part of the body which is affected by necrosis, which is the "[p]athologic death of one or more cells, or of a portion of tissue or organ, resulting from irreversible damage." *Id.* at 1284.

June 26, 2008, Defendants submitted claims for payment to Medicare, and Medicare paid claims totaling $10,051.58.   For the same period and services, Medicaid paid claims totaling $25,848.07.

- ***Resident #6:***  A 73 year-old woman was admitted to Oxford on October 17, 2006.  Her diagnoses upon admission included hypertension, edema,[27] coronary atherosclerosis,[28] hyperlipidemia,[29] diabetes mellitus,[30] and dysphagia.[31]   She was continent and independent with activities of daily living, except for needing assistance getting in and out of the bathtub.

     Upon admission to Oxford, Resident #6 had physician orders to have her blood glucose levels checked before each meal and at bedtime, and to receive measured doses of insulin according to a sliding scale system up to four times a day.  From February to April 2007, Resident #6 either did not receive insulin in accordance with medical orders, received the wrong dose of insulin, or there was no documentation of the type of insulin administered.

     Starting in May 2009, she developed ulcers that went improperly treated.  It was noted that she had no dressing on her sacral decubitus ulcer and that her wound had become contaminated by feces due to incontinence. The hospital records state that Oxford's adherence to her physician's plan of care was "poor."  By August 3, 2009, the ulcer had increased in depth, with "tunneling," and emitted a foul odor with drainage.  She was given debridement[32] and a colostomy[33] and sent back to Oxford on August 10, 2009.  On August 24, 2009, she was treated at the hospital because her colostomy had become infected.  Her ulcers became worse and her physicians recommended that a wound VAC be performed on her.  Oxford never ordered a wound VAC,[34] despite doctor's orders, and the hospital noted that Oxford had not adhered to the plan of care.  Oxford records indicate that there were numerous instances when Resident #6 did not receive wound treatment as ordered by her physician.  On August 11, 2010, Resident #6's family removed her from Oxford.

     The Government alleges that, for such worthless services to Resident #6 from

---

[27] Edema refers to swelling.  *See id.* at 612.

[28] Coronary atherosclerosis refers to a hardening of the arteries in the heart, which often causes a limitation of blood flow.  *See id.* at 144 ("arteriosclerosis"), 174 ("atherosclerosis")

[29] Hyperlipidemia refers to elevated levels of lipids, or fat, in the blood plasma. *See id.* at 922.

[30] Diabetes mellitus is a "chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin" and can lead to many health complications in severe cases.  *Id.* at 529.

[31] Dysphagia is defined as "difficulty in swallowing."  *Id.* at 599.

[32] Debridement refers to the removal of dead tissue and foreign matter from a wound.  *See id.* at 496.

[33] A colostomy is a "surgical procedure that brings one end of the large intestine out through an opening (stoma) made in the abdominal wall.  Stools moving through the intestine drain through the stoma into a bag attached to the abdomen."   *Colostomy: Medline Plus Medical Encyclopedia*, Nat'l Insts. of Health, http://www.nlm.nih.gov/medlineplus/ency/article/002942.htm (last updated May 15, 2013).

[34] "Wound VAC" refers to vacuum-assisted closure, which is a form of wound closure therapy.  According to Wake Forest University, "[t]he V.A.C. treatment applies localized negative pressure to draw the edges of the wound to the center of the site.  The negative pressure is applied to a special dressing positioned within the wound cavity or over a flap or graft.  By applying pressure directly to the wound, [the user can] remove the fluid that causes swelling, stimulate cellular growth, increase blood flow, and promote an increased healing response." *Vacuum-Assisted Closure (V.A.C.) – Wound Care and Hyperbaric Center*, Wake Forest Baptist Health, http://www.wakehealth.edu/Plastic-Surgery/Vacuum-Assisted-Closure-(V-A-C-).htm (last updated Mar. 31, 2014).

November 2, 2007 to August 11, 2010, the Defendants knowingly made or caused to be made claims for payment to Medicaid, and Medicaid paid claims totaling $83,761.92. For the same period, Medicare paid claims totaling $1,937.65.

- **_Resident #7:_** A 62 year-old woman was admitted to Oxford on December 12, 2011. Her diagnoses upon admission included Guillain-Barre syndrome (a disease that causes paralysis beginning with the feet and hands and moving toward the trunk of the body and, in Resident #7's case, caused life-threatening respiratory complications), respiratory failure, hypertension, mental retardation, morbid obesity, malnutrition, and a bacterial infection.  At the time she was admitted, Resident #7 had a cuffed tracheostomy tube that had been recently inserted due to respiratory failure.

    Despite doctor's orders, Resident #7 was not provided proper treatment for respiratory failure.  Records indicate Resident #7 did not receive an assessment of her respiratory or airway status, despite her history of respiratory failure.  She was not provided with medically urgent breathing treatments for at least a week because Oxford reportedly did not have the proper equipment.  Additionally, records indicate Oxford did not properly insert intravenous infusion devices and then failed to infuse ordered drugs at a rate sufficient to protect her from adverse events; shortly after her admission to Oxford, she suffered such a reaction when an antibiotic she had been given for a rash was administered incorrectly and she became severely ill.

    Throughout her stay, records indicate that Oxford never changed Resident #7's tracheostomy collar and tubing, nor did they ever wash out her oxygen concentrator filter, as ordered by her physician, placing her at risk for worsening respiratory infection.  On December 25, an LPN at Oxford gave her oxygen through her nose, but she had a cuffed tracheostomy tube in place, which blocked airflow from her nose to her mouth, so the LPN's services could not have provided oxygen to her lungs.  Over the next two days, her oxygen saturation fluctuated due to a failure to proper oxygen flow and no suctioning of the tracheostomy was done to increase her oxygen saturation.

    On December 31, 2011, Resident #7's condition worsened.  Her breathing decreased and she became slightly blue around the mouth, with no pulse or respirations.  A registered nurse at Oxford waited for a crash cart[35] to arrive before beginning respirations.  An EMT came about twenty minutes later and took her to the hospital.  After arriving at the hospital, she was pronounced dead as a result of cardiac arrest.

    For such worthless services to Resident #7 from December 12, 2011 to December 31, 2012, defendants knowingly made or caused to be made claims for payment to Medicare, and Medicare paid claims totaling $7,782.39.

The Government has alleged that the examples above are "only examples of the non-existent, grossly inadequate, materially substandard, worthless care rendered to Oxford residents" which were the subject of the Defendant's false claims to Medicare and Medicaid between October 2005 to May 2012.  USA Compl. at 49.  It contends that it "has, and will

---

[35] A crash cart is a "movable collection of emergency equipment and supplies meant to be readily available for resuscitative effort.  It includes medication as well as the equipment for defibrillation, intubation, intravenous medication, and passage of central lines."  _Id._ at 456.

develop through discovery and further analysis, including expert analysis, additional evidence of defendants' false or fraudulent claims, representations and certifications, and the United States' resulting damages." *Id.*

### 2. Defendants' Knowledge and Evidence of Concealment

The Government asserts that the Defendants knew about the resident care at Oxford both through their direct operation and management of the facility, but also from various reports and events that affirmed this knowledge.  AltaCare's regional clinical director frequently visited Oxford, conducted reviews, and issued Facility Visit Reports recognizing numerous failure of care issues at Oxford, including, for example: poor resident hygiene; poor wound care; poor hydration; poor pain management; inadequate food and food shortages; lack of heating in the facility; leaks in the roof; problems with vendors due to non-payment; filthy conditions; and pests. These reports were circulated to defendants' top management, including Mittleider.  The Government also alleges that the Defendants had knowledge as a result of personal injury claims brought by former residents and their family members, including at least three claims resulting in litigation, and as the result of surveys by the Mississippi State Department of Health ("MSDH"), which resulted in civil monetary penalties for noncompliance with nursing home patient care requirements.

According to the USA Complaint, the Defendants also took "affirmative actions that caused and contributed to the making of false or fraudulent claims, representations and certifications," and attempted to conceal the evidence of their worthless services.  USA Compl., ¶ 248.  Nursing homes such as Oxford use medication administration records ("MARs"), treatment administration records ("TARs"), and activity of daily living ("ADL") sheets, to document resident care.  The MARs, TARs and ADL sheets created and maintained at Oxford

contained numerous blanks for extended periods of time, and at other times, contained demonstrably false entries, for example, purportedly documenting care provided to residents who were not even present in the facility on the dates of the purported care.  Moreover, at times, Oxford staff members were required to stay late into the evening on days before MSDH inspectors were scheduled to survey the facility, in order to falsify records that the inspectors would be examining.  The administrator of Oxford stated that he maintained two sets of records, one for the regulators and one for the management of Oxford.

In summary, the Government's Complaint in Intervention raises the following claims:

Count I: False Claims Act, 31 U.S.C. § 3729(a)(1) (claims up to and through
     May 19, 2009) and 31 U.S.C. 3729(a)(1)(A) (claims from and after May
     20, 2009)
Count II: False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
Count III: Payment by Mistake
Count IV: Unjust Enrichment

The Defendants have filed motions to dismiss the Relator's Complaint and the Government's Complaint in Intervention.  The  Court will address the issues raised in each motion.  Where the same issues are raised and the same law applies, the Court will analyze the issues together.  Any distinct issues will be analyzed separately.

## III.  LEGAL STANDARDS

### A.  False Claims Act

The False Claims Act imposes liability on "[a]ny person who—(1) knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)–(a)(2).

### B.  Rule 12(b)(6) Standard

According to Federal Rule of Civil Procedure 12(b)(6), a complaint is properly dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Motions made pursuant to Rule 12(b)(6) test the legal viability of a complaint.  A court reviewing such a motion must afford "the assumption that all the allegations in the complaint are true," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and determine whether the averments comprise a "plausible" right to recovery.  *Id.* at 570.

A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555 (citation omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  The alleged facts must "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

Once the court has accepted the well-pled factual allegations as true, it then turns to whether the claim is plausible.  *Iqbal*, 556 U.S. at 679.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a mere possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 678 (citations omitted).  Determining whether a plausible claim of relief has been adequately pled is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

### C. Rule 9(b) Standard

"[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b), which provides: 'In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'"  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)).  Whereas Rule 9(b) generally requires a plaintiff to plead the "time, place and contents of a false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby, the Fifth Circuit has held that this standard is not a straitjacket."  *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 533 (N.D. Tex. 2012) (quotation marks omitted) (citing *Grubbs*, 565 F.3d at 186, 190).  Therefore, in the context of a claim under the FCA presentment provision, "which makes liable any person who 'knowingly presents, or causes to be presented' a false claim to the Government,"  *Grubbs*, 565 F.3d at 188 (quoting 31 U.S.C. § 3729(a)(1)), "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted."  *Id.* at 190.

Lastly, "[t]he particularity requirements of Rule 9(b) apply to the [FCA's] conspiracy provision with equal force as to its 'presentment' and 'record' provisions."  *Id.* at 193.  Therefore, in order to sustain a claim for conspiracy to commit fraud, the plaintiff must "plead with particularity the conspiracy as well as the overt acts . . . taken in furtherance of the conspiracy."  *Id.* (citation omitted).

## IV.  DISCUSSION

### A.  Motion to Dismiss Relator's Complaint (Docket No. 68)

The Defendants have sought to dismiss Relator AHC's Complaint for lack of subject matter jurisdiction and failure to state a claim. Docket No. 68. The Defendants' primary argument is that this Court lacks jurisdiction to hear this case for two reasons. First, the Relator has litigated and settled claims against Hyperion twice before. The Defendants contend that the resolution of these earlier matters resulted in releases of claims against Hyperion that cover the allegations in this case (Counts I-VI). Second, the Defendants argue that the face of the Complaint and exhibits to it, among other disclosures, demonstrate that AHC has brought claims based upon public disclosures, of which Academy is not an original source (namely, Counts I & III-VI). The Defendants seek to dismiss these counts with prejudice under Rule 12(b)(l).

The Defendants also contend that the Complaint fails under Rules 12(b)(6) and 9(b) because Academy's FCA claims related to quality-of-care are superseded by the Government's complaint in intervention as to certain Defendants (Count I); there is no private right of action under the Mississippi Vulnerable Persons Act (Count II); and the Complaint fails as a matter of law to plead viable claims upon which relief may be granted and fails to plead fraud with the particularity required for an FCA action under Rule 9(b) (Counts I, III-VI).

### 1. *Release of Claims In Settlement*

The threshold issue is whether the Relator ever entered into a settlement agreement which included a release that encompassed the *qui tam* action. Defendants argue that AHC relinquished standing to bring this FCA action against Defendants when it released all claims against Defendants as part of settlement negotiations during two cases, the bankruptcy action and the eviction action. The Relator AHC contends that they did not enter into a settlement to release claims before the *qui tam* action, and that any post-*qui tam* release is unenforceable for the purposes of barring the *qui tam* action. Here, the Relator has the more persuasive argument.

a) *Bankruptcy Settlement*

On September 25, 2009, counsel for Hyperion made a settlement offer to AHC by telephone.  Settlement Offer, Docket No. 68, Ex. 1, at p. 9 of 48.  Counsel for AHC rejected the offer and made a counteroffer in writing to Hyperion to dismiss the pending litigation between the parties.  The September 25 letter offered in relevant part that "[a]ll claims between the parties will be dismissed with prejudice. . . . All the litigation goes away."  *Id.* at p. 10 of 48.  According to AHC, settlement discussions broke down when AHC's counsel believed that counsel for Hyperion had rejected the counteroffer and was making a new proposal on timing of payments.  By contrast, however, Hyperion's counsel believes that she accepted the offer; AHC also states that Hyperion's counsel understood the issues regarding the timing of payments to be issues of clarification.  AHC rejected Hyperion's proposed changes and negotiations ended.  On September 30, 2009, Relator AHC filed its *qui tam* action.  According to Hyperion, AHC's counsel also repudiated its settlement offer on that same day.[36]

On October 1, 2009, Hyperion filed a Motion to Compel Settlement, maintaining that it had accepted the counteroffer in the September 25 letter.  On October 27, 2009, the bankruptcy court found that the letter constituted a counteroffer that had been accepted and granted the motion to compel enforcement of the settlement.

Defendants have not argued that the terms of the September 25 letter would constitute a release of AHC's right to file a *qui tam* action.  The most relevant part of the letter indicated that, if the offer was accepted, "[a]ll claims between the parties will be dismissed with prejudice. . . . All the litigation goes away."  It should be noted that these two sentences appear to refer to the claims between the parties which had already been filed, and the litigation between the parties

---

[36] *See* Order Granting Motion to Compel Settlement, Docket No. 68, Ex. 1, at 14 of 48 ("AHC, however, claims that the Debtor proposed changes to the Settlement Proposal as to the timing of certain events and these changes amounted to a counteroffer that AHC rejected on Wednesday evening, September 30, 2009.").

that had already commenced.  AHC did not file its *qui tam* action until September 30, 2009, five

days after AHC's counsel sent this letter.  A claim cannot be "dismiss[ed]" if it has not been filed

with a court.[37]   In the same way, litigation cannot "go away" if it has not commenced.[38]

Therefore, the language could not apply to the *qui tam* action.

After the bankruptcy court's order and the filing of the *qui tam* action, the parties entered

into further negotiations and agreed to additional terms beyond those of the September 25

letter.[39]  The result was the proposed settlement, which included release terms.  The release term

stated in relevant part:

> 8.  Further, upon receipt and clearance of the Second Settlement Payment, AHC .
> . . hereby release and discharge, the Debtor, HP, AltaCare and Mittleider and its
> related companies and entities, incorporations, and its employees, servants, agents
> . . . from all the Claims, which AHC ever had or now has, whether known or
> unknown and whether derivative or otherwise, out of all the Claims asserted in the
> Bankruptcy Case, or that have been asserted by AHC against the Debtor, HP,
> AltaCare and Mittleider, excepting any obligations arising under this Settlement
> Agreement.

Settlement Agreement, Docket No. 68, Ex. 1 at p. 27-28 of 48.  The bankruptcy court approved

the settlement, including the release term, on January 7, 2010.

Defendants argue that this language constitutes a "comprehensive release" which

discharged them from "all the Claims, which AHC ever had or now has, whether known or

unknown and whether derivative or otherwise . . . ."  They contend that the *qui tam* claim derives

from the claims asserted in the bankruptcy action, specifically the claim that Hyperion provided

"inadequate care, staffing, and supervision to Oxford facility residents."  Docket No. 69, at 7.

The Relator, however, refers to another part of the settlement agreement which limits the

---

[37] *See Black's Law Dictionary* 282 (9th ed.) (defining "claim" as "[a] demand for money, property, or a legal
remedy to which one asserts a right; esp., the part of a complaint in the civil action specifying what relief the
plaintiff asks for.").

[38] *See id.* at 1017 (defining "litigation" as "[t]he process of carrying on a lawsuit" or "[a] lawsuit itself.").

[39] The record is unclear as to the date that the parties entered into the second settlement, which both parties agree
included release terms.  It is clear that it was between October 27, 2009, and January 7, 2010.

definition of the term "Claim" in the release paragraph.  The Settlement Agreement specifically defined the term "Claim" as follows: "WHEREAS, the claims and causes of action alleged and generally described in the preceding paragraphs herein between Hyperion, AHC, AltaCare, Mittleider and HP are referred to collectively herein as the 'Claims' . . ."  Docket No. 68, Ex. 1, at 23 of 48.  According to the Relator, the release was narrow and limited to the bankruptcy disputes enumerated in the Settlement Agreement in the preceding paragraphs of the document.  In summary, these claims included "matters [that] were filed and are pending in the Bankruptcy Court in Hyperion's Bankruptcy Case," *id.* at 21 of 48, including motions related to Hyperion's failure to pay rent; motions for AHC to assume the unexpired lease and to reject the AltaCare management contract and require disgorgement of fees; a motion to deem the lease agreement rejected; AHC's proof of claim; and other procedural motions.

In the cases on which Defendants have relied, courts have enforced broad, global releases by relators of their claims against a *qui tam* defendant.  In *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 600 F.3d 319, 324 (4th Cir. 2010), the court enforced a release signed by an employee as part of a severance package which stated that "Employee . . . knowingly and voluntarily releases and forever discharges [Purdue] of and from any and all liability to Employee for actions or causes of action, suits, claims . . . whatsoever in law or equity, which Employee . . . ever had, may now have or hereafter can, shall or may have against [Purdue] as of the date of the execution of this Agreement . . . for, upon, or by reason of any matter, cause or thing whatsoever."  Similarly, in *United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009), the release at issue included "any and all claims [Ritchie] might have arising under federal, state or local law."  Unlike the releases in *Radcliffe* and *Ritchie*, the release and settlement at issue in this case are limited to the terms of the agreement –

the bankruptcy disputes listed on pages 1-3 of the agreement – and do not apply to AHC's *qui*

*tam* action.  The Relator also does well to point out that none of these "Claims" is broad enough

to encompass the claims of fraud upon the United States at issue in this case, and which are at the

heart of a *qui tam* action.

### b) Eviction Settlement

After the bankruptcy settlement, AHC alleges that Hyperion failed to abide by the

requirements regarding rent payments and the terms of eviction.  On May 18, 2010, AHC filed a

second suit against Hyperion and Altacare, seeking damages and to remove Hyperion from the

Oxford facility.  The parties reached a settlement at a settlement conference on February 16,

2012.  Hyperion's counsel announced the settlement before Judge Keith Starrett and included the

following:

> MR. MAY: [. . . .] Defendant Hyperion will retain any and all liability for all
> claims that have arisen or that might arise from the operation of the facility in
> Lumberton, including, but not limited to, matters that are related to employee
> benefits and/or employer-related claims and *any and all Medicare and Medicaid
> liabilities, whether known or unknown*, until the change of ownership and
> operation of the facility occurs.
>
> In conjunction herewith, plaintiffs and defendants agree that each shall indemnify
> and hold the other harmless from any claims that arise or occur during the period
> of time that each party operates or owns the facility.

Transcript of In-Chambers Settlement Agrmt., Docket No. 68, Ex. 3, at 4-5 (emphasis added).

The terms of the Eviction Settlement included a *mutual* release, but none of the terms indicate a

global release, and the Defendant has not pointed to any such terms in this agreement.  *See id.* at

5 ("plaintiffs and defendants agree that each shall indemnify and hold the other harmless").  In

fact, Hyperion's counsel announced that Hyperion expressly retained "any and all liability for all

claims that have arisen or that might arise from the operation of the facility in Lumberton,

including, but not limited to . . . *Medicare and Medicaid liabilities*, whether known or unknown"

during Hyperion's operation of the facility. *Id.* (emphasis added). The specific reference to "Medicare and Medicaid liabilities" is sufficient to place liability for all claims involving Medicare and Medicaid squarely with Hyperion. Based on the plain language of the release, these claims would include, but not be limited to, overpayment and reimbursement as well as liability for fraud against these programs, precisely what this *qui tam* action alleges.

According to AHC, the parties then exchanged release drafts. Both versions contained mutual releases, in which they agreed to "mutually release, hold harmless and discharge each other," but they differed on the claims to which the release applied. The Defendants tendered a version of the release that was mutual and included a broad, global release of all claims.[40] AHC states that it declined to sign this release. Instead, AHC tendered a release version that was mutual, but not global. AHC's release narrowly applied to claims asserted in the federal district court action which culminated in the settlement order dated February 16, 2012.[41] AHC states that Hyperion declined to sign AHC's release and insisted upon its global version. In a later hearing, Judge Starrett held that the settlement as detailed in the February 16 hearing transcript remained in effect. None of the parties had signed a release as June 3, 2013, the date on which AHC filed its response to the Defendants' motion to dismiss. This lack of accord between the parties indicates that AHC specifically intended to avoid entering into a broad, global release that could encompass its *qui tam* action, and that the Relator has not entered into a release that

---

[40] *See* Mutual Release With Covenants, Docket No. 68, Ex. 8, at 3 of 5 ("Def.'s Release") (indicating, *inter alia*, that "all parties shall be as free of liability in the premises as if the aforesaid Lease Agreement has never occurred" and that the agreement "shall apply to all unknown and unanticipated claims resulting from the Lease Agreement, as well as to those now disclosed for which any claim might or could be made against the Releasees herein.").

[41] *See* AHC Mutual Release, Docket No. 77, Ex. 2 at 1 of 5 (applying release to "claims asserted in the Complaint, Amended Complaint and Counter-Complaint filed in Civil Action No. 2:10cv123-KS-MTP in the United States District Court, Southern District of Mississippi as set forth by the Court in its Settlement Order dated February 16, 2012"); *cf.* Def.'s Release, at 2 of 5 (applying release to "all claims and demands heretofore made or that ever shall be made against each other herein in any way growing out of the Lease Agreement of October 5, 2005").

encompassed its *qui tam* action.   AHC's right to file this *qui tam* action was never released.
Therefore, the motion to dismiss for lack of standing is denied.

### 2. *Public Disclosure Bar*

Defendants have argued that this Court lacks subject matter jurisdiction over the
Relator's *qui tam* action under the FCA because the allegations in the complaint are based upon
previously disclosed information.   The Relator's allegations broadly include three categories of
claims: (i) quality of care issues at Oxford, (ii) quality of care issues at other Hyperion-related
facilities, and (iii) certain Hyperion cost reports which contained allegedly false statements.   The
Defendants allege that the Government was already aware of the information on which its
allegations were based well before the Relator filed its complaint.   The Court agrees.

The FCA limits a court's jurisdiction over *qui tam* actions by what is referred to as the
public disclosure bar:

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or
> administrative hearing, in a congressional, administrative, or Government
> Accounting Office report, hearing, audit, or investigation, or from the news
> media, unless the action is brought by the Attorney General or the person bringing
> the action is an original source of the information.[42]

---

[42] The Relator has argued that both the versions of the public disclosure bar in the FCA before and after the Patient
Protection and Affordable Care Act ("PPACA" or "ACA") must be considered because the Defendants engaged in
"long-running fraudulent conduct" which occurred both before and after the effect date of the PPACA's amendment
to the public disclosure bar, from late 2005 to spring 2012.  Docket No. 78, at 12.  In the Relator's view, the
Defendants are not entitled to "rely on a version of a defense that was not in effect at the time when they engaged in
prohibited conduct." *Id.*

The pre-PPACA FCA was originally signed into law in 1986.  The public disclosure bar provision was
amended by the PPACA, Pub. L. 111–148, 124 Stat. 119, which was signed into law on March 23, 2010.  The
PPACA amended the statute to currently read:

> The court *shall dismiss* an action or claim under this section, unless opposed by the Government,
> if *substantially the same* allegations or transactions as alleged in the action or claim were publicly
> disclosed (i) in a *Federal* criminal, civil, or administrative hearing in which the Government or its
> agent is a party; (ii) in a congressional, Government Accountability Office, or other *Federal*
> report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought
> by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (Supp. 2011) (emphasis added).  For the Relator, this version of the statute would allow
the Court to consider reports, audits and investigations from the Mississippi State Department of Health, on which it

This jurisdictional inquiry requires courts to consider three questions: "(1) whether there has been a 'public disclosure' of allegations or transactions, (2) whether the *qui tam* action is 'based upon' such publicly disclosed allegations, and (3) if so, whether the relator is the 'original source' of the information." *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011). "An FCA *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transaction[s]." *Fed. Recovery Servs. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 176, 179-80 (5th Cir. 2004). Furthermore, the "Fifth Circuit has defined 'based upon' to encompass those situations where the relator's allegations are 'substantially similar to' or 'supported by' the publicly disclosed allegations or transactions, even if the relator was not aware of the public disclosure." *United States ex rel. Fried v. Hudson Indep. Sch. Dist.*, No. 9:05-CV-245, 2007 WL 3217528, at *4 (E.D. Tex. Oct. 26, 2007) (citing *United States ex rel. McKenzie v. Bell South Telecomms., Inc.*, 123 F.3d 935, 940 (5th Cir. 1997), *cert. denied*, 522 U.S. 1077 (1998)). Thus, if there is a public disclosure upon which relator's *qui tam* action is based, and the relator is not an original source of the information in the complaint, a court must dismiss relator's complaint for lack of jurisdiction. *See, e.g.*, *Jamison*, 649 F.3d at 332.

---

has heavily relied for most of its allegations. As the Defendants have indicated, the Fifth Circuit has refused to apply the amended version of the FCA to cases pending prior to the PPACA's enactment. *See Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 292 n.11 (5th Cir. 2012) ("This suit has been pending since 2006 and the [ACA amended] text is not retroactively applicable.") (citation omitted); *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.6 (5th Cir. 2011) ("The [ACA] amendments do not apply retroactively to suits pending at the time they became effective.") (citation omitted). In analyzing the amendment, the Supreme Court has indicated that retroactivity would be "necessary for [the PPACA amendment's] application to pending cases" and declined to presume retroactivity where it was not indicated in the language of the PPACA amendment. *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010) (citation omitted); *see also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948 (1997) (declining to apply an amended version of the FCA to alleged conduct pre-dating the 1986 amendment at issue where the *qui tam* action was filed after the amendment became effective)). In this case, Relator filed its *qui tam* action under seal on September 30, 2009 – before the PPACA amendment. Given that the PPACA amendment does not have retroactive effect and was not in place when the action was filed, the Court will apply only the pre-PPACA version of the public disclosure bar.

### a) Allegations Regarding Oxford

In Count I of its Second Amended Complaint, AHC alleges that Hyperion submitted false claims for payment in connection with worthless services provided at Oxford.  *See* SAC, ¶¶ 34-64; *see id.* ¶ 53.  In sum, the Relator alleged, "[T]he services purportedly provided were worthless in that they were not provided or were deficient, inadequate, substandard, . . . did not promote the maintenance or enhancement of the quality of life of the residents, and were of a quality that failed to meet professionally recognized standards of health."  *See id.* ¶ 54.  To support its allegations, AHC has pointed to personal injury lawsuits in Mississippi state court involving allegations of negligence brought by residents of Oxford against the facility, its physicians, and related entities and individuals.  *See* SAC, ¶ 50 (alleging that "[o]ne resident sued AHC for injuries due to inadequate staffing [and] substandard care"); *see id.*, Ex. F (attaching complaints and other documents filed with state courts in three pre-September 2009 personal injury lawsuits involving Oxford).  Quality-of-care issues at Oxford were also at issue in the related bankruptcy proceedings and were discussed in documents on file with the bankruptcy court.  *See* Docket No. 68, Ex. 7 at pp. 3-9.  AHC also references and attaches to its SAC a series of Mississippi State Department of Health ("MSDH") surveys of Oxford and related correspondence from MSDH.  *See* SAC, ¶¶ 37, 39; Exs. B, C.

Documents filed in personal injury lawsuits and other information  on file with courts are public disclosures.  "Any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for the purposes of [the FCA]. . . . This includes civil complaints."  *Reagan*, 384 F.3d at 174 (finding state court lawsuit was a public disclosure); *see also United States ex rel. Hartwig v. Medtronic, Inc.*, No. 3:11CV413-CWR-LRA, 2014 WL 1324339, at *9 (S.D. Miss. Mar. 31, 2014).  The

complaints attached to the SAC at Exhibit F, along with at least one filing from the related bankruptcy proceedings, are public disclosures.  Audits or investigations performed by state agencies are also public disclosures under the FCA and trigger the bar.  *See Hays v. Hoffman*, 325 F.3d 982, 986-87, 994 (8th Cir. 2003) (finding that compliance audit performed by Medicaid agency was a public disclosure); *Stennett v. Premier Rehab., LLC*, 479 F. App'x 631, 634 (5th Cir. 2012) (citing *Graham*, 130 S. Ct. 1396, 1400 (2010)) (unpublished).  Thus, MSDH reports are public disclosures.  AHC also point to a notice that the MSDH issued an "Immediate Jeopardy" notice against Oxford when it was under Hyperion's supervision.  SAC, ¶ 43, Ex. E-1. That notice was released in the *Hattiesburg American*, a local newspaper near the facility.  The FCA is clear that newspaper publication is a form of public disclosure.  *See* 31 U.S.C. § 3730(e)(4)(A).  The Defendants have also demonstrated that the Relator's worthless services allegations regarding Oxford are substantially similar to these documents.  *See* Docket No. 69, at 13 (chart comparing Relator's worthless services allegations regarding Oxford alongside various public disclosures in documents attached to SAC).

> b)  *Allegations Regarding "Nationwide Scheme"*

In Counts I, and III through VI, the Relator alleges a "nationwide pattern" of conduct, including similar worthless service claims, regarding other entities allegedly affiliated with the Defendants.  *See* SAC, ¶ 59; *see also id.* ¶¶ 111-17 (alleging various schemes involving related entities that impact resident care and result in submission of false claims); *id.* ¶ 114 (summarizing cases to support alleged "landlord/tenant" scheme); *id.* ¶ 117 (same with respect to alleged "vendor scam").  The Defendants contend that AHC relies on publicly disclosed information to support these allegations, which triggers the FCA bar.

AHC references and attaches to its SAC news stories that it claims support its allegation

of a nationwide scheme to defraud government payors.  *See* SAC, ¶ 59-64 (describing incidents involving purportedly related facilities in Massachusetts, Tennessee and Connecticut); *see id.* ¶ 60, Ex. K (alleging quality of care issues at Massachusetts facility and attaching December 29, 2006 *Nursing Home Litigation Reporter* article regarding same); *see id.* ¶ 61, Ex. H (alleging similar conduct at Tennessee facility and  attaching September 29, 2009 Bristol *Herald Courier* article).  Indeed, these news stories are public disclosures.  *See, e.g.*, *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (noting that allegations or transactions at issue had been disclosed in "trade publications and on the internet" prior to relator's suit).  Similar to the claims in Oxford, the Defendants have established that AHC's nationwide allegations are substantially similar to public disclosures.  *See* Docket No. 69, at 15-16 (chart comparing Relator's nationwide worthless services allegations alongside various public disclosures in documents attached to SAC).

### c) *Allegations Regarding Failure to Disclose Clark's Appointment*

In Counts IV through VI of the SAC, Academy alleges that Hyperion submitted false claims when it filed its cost reports (i) with  inaccurate or otherwise misleading information or (ii) without making certain required disclosures.  SAC, ¶ 89-110.  Specifically, the Relator alleges that Hyperion: failed to disclose the appointment Dr. Harry McD. Clark, an excluded individual, and related ownership  information, *see id.* ¶¶ 97, 101; and failed to make disclosures regarding Hyperion's "actual officers and directors," *see id.* ¶¶ 109-10.  To support these allegations, AHC makes allegations concerning Dr. Clark's exclusion and references (and attaches to the SAC) corporate filings.  *See, e.g.*, SAC, ¶¶ 89-97, 102 & Ex. N.

Dr. Clark's exclusion and the financial information that AHC has relied upon are public disclosures.  Apparently, AHC has relied on at least one document disclosed in the previous

bankruptcy litigation between the parties.  *See* SAC, Ex. N (alleged Hyperion monthly operating report with filing stamp bearing case number of *In re Hyperion Foundation, Inc.* bankruptcy proceedings (No. 08-51288) and filing date of August 31, 2009).  The release of this document in the bankruptcy litigation triggers the public disclosure bar.  *See Hartwig*, 2014 WL 1324339, at *9; *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1159-60 (3d Cir. 1991) (concluding discovery material, even though not on file with court, triggered bar).

Dr. Clark's exclusion by the U.S. Department of Health and Human Services Office of the Inspector General ("HHS-OIG") was published in the Federal Register.[43]  This record, indeed published by the federal government itself, certainly constitutes a public disclosure.  *See United States ex rel. Conrad v Abbott Labs., Inc.*, No. 02-11738, 2013 WL 682740, at *6 (D. Mass. Feb. 25, 2013) (concluding that certain Federal Register notices regarding prescription drug approval process triggered FCA bar).  Additionally, Dr. Clark's exclusion was publicly disclosed because it was addressed in prior civil litigation, as referenced in the Relator's complaint.  *See* SAC, ¶ 56.  Dr. Clark was deposed on August 9, 2009, in connection with the related Hyperion bankruptcy proceedings and testified that he was convicted of one count of obstruction of justice in a Medicare fraud case.  *See* Docket No. 68, Ex. 10 at 88:5-90:16 (Testimony of Harry Clark).  Dr. Clark's testimony serves as a public disclosure of AHC's cost report-related allegations.

In rebuttal to each of Defendants' arguments about each type of public disclosure, the Relator does not argue that its allegations are not based on publicly disclosed information.  Rather, it argues that "none of [the materials that the Defendants have cited] allege fraud, or

---

[43] *See* Def's MTD, Docket No. 68, Ex. 9 (HHS-OIG Program Exclusions Not., 70 Fed. Reg. 61,136, 61,136 (Oct. 20, 2005)).

taken together, contain information that would expose [Defendants'] failures as being the result of the broad scheme to commit fraud that is alleged in the *qui tam*."  Docket No. 78, at 16.  The Relator's argument is unavailing; each component of the alleged fraudulent conduct need not be publicly disclosed to trigger the statutory bar.  In analyzing the "based upon" prong of the public disclosure bar, the Fifth Circuit has held that "if a *qui tam* action is even *partly* based upon public allegations or transactions then the jurisdictional bar applies."  *United States ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (emphasis added and internal quotations marks and citation omitted).  In *Fried, t*he Fifth Circuit rejected an argument similar to the Relator's argument here, ruling that "specific" allegations of fraud need not be disclosed for the bar to apply.  *See id.*; *see also United States ex rel. Ward v. Commercial Metals Co.*, No. C-05-56, 2007 WL 1390612, at *6 (S.D. Tex. May 9, 2007) ("[C]ourts have held that the *precise allegation of fraud* (or the fact that the fraud might trigger a cause of action under the [FCA]) *need not be publicly disclosed* if the essential facts or transaction on which it is based has been disclosed.") (emphasis added).[44]  Thus, AHC's FCA claims are substantially similar to public disclosures, and they are based upon such disclosures for the purposes of public disclosure bar.

### d)  Whether Academy Is An Original Source

---

[44] AHC has urged this Court to apply the X + Y = Z formulation, which some courts within the Fifth Circuit have used when conducting a public disclosure bar inquiry.  *See, e.g.*, *United States ex rel. Lockey v. City of Dallas, Tex.*, 3:11-CV-354-O, 2013 WL 268371, at *7 (N.D. Tex. Jan. 23, 2013); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 519 (N.D. Tex. 2012).  Under this formulation, developed by the D.C. Circuit, "if X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed."  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994).  AHC argues that no public materials "factually disclose an X plus Y that would equal 'Z,' allowing anyone to study them and see that a fraudulent scheme was underway."  AHC Reply, Docket No. 78, at 16.  To the contrary, the public disclosures attached to the SAC could lead one to "infer" fraud, in that they indicate allegations regarding care provided at Oxford and worthless services.  These elements would suggest that the facility was not in compliance with Medicaid or Medicare regulations, and that they may be falsely certifying compliance to receive payment from the government – the heart of the Relator's claim.  Even under this test, the public disclosure bar is due to be applied as to Relator's Oxford allegations.

Given that the Relator's allegations are based on public disclosures, the Court must determine if AHC is the original source of the information.  An "original source" is an individual who (1) has direct and independent knowledge of the information on which the allegations are based and (2) has voluntarily provided the information to the Government before filing an action under this section which is based on the information.  *See* 31 U.S.C. § 3730(e)(4)(B); *United States ex rel. Reagan v. E. Texas Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 177 (5th Cir. 2004) (citation omitted).  Only the first part of the test is at issue here because there is no dispute regarding whether the Relator provided the information to the Government before filing this action.

In *Rockwell International Corp. v. United States*, 549 U.S. 457, 470-72 (2007), the Supreme Court clarified that relators need not have direct and independent knowledge of the information underlying the publicly disclosed allegations to qualify as original sources, but instead must have direct and independent knowledge of "the information upon which the relators' allegations are based."  Therefore, a relator's knowledge must therefore be firsthand; for a relator to have "direct" knowledge, it must have "knowledge derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others."  *Laird v. Lockheed Martin Eng'g and Sci. Servs. Col.*, 336 F.3d 346, 355 (5th Cir. 2003), *abrogated on other grounds*, *Rockwell*, 549 U.S. at 472.  A relator's "knowledge is considered 'independent' if it is not derived from the public disclosure."  *Reagan*, 384 F.3d at 177.  With this "direct and independent knowledge" requirement, Congress intended "to encourage *qui tam* suits brought by insiders, such as employees who come across information of fraud in the course of their employment."  *Laird*, 336 F.3d at 355-56 (internal quotation marks

omitted); *United States ex rel. Lam v. Tenet Healthcare Corp.*, 287 F. App'x 396, 400 (5th Cir. 2008) (unpublished).

Relators found to have direct and independent knowledge are those who actually viewed source documents or viewed firsthand the fraudulent activity that is the basis for their *qui tam* action. *Lam*, 287 F. App'x at 400. However, the relator must do more than "discover through investigation or experience what the public already knew. Instead, the investigation or experience of the relator either must translate into some additional compelling fact, or must demonstrate a new and undisclosed relationship between disclosed facts, that puts a government agency 'on the trail' of fraud, where that fraud might otherwise go unnoticed." *Reagan*, 384 F.3d at 179.

In this case, the Relator AHC had entered into a lease agreement with Hyperion to run the Oxford facility. AHC became concerned when Hyperion breached the lease agreement by failing to pay rent. According to the Relator, "The breach of the Lease Agreement prompted AHC to conduct an investigation into whether Hyperion as a tenant and operator of the Facility was actually providing the level of care essential to maintaining the Facility and to properly provide for its residents as required by statute and regulation. Upon its initial investigation, AHC determined that defendants could not or would not provide the requisite level of care for the residents." SAC, Docket No. 7, ¶ 19. AHC alleges that it learned that Defendants have engaged in "fraudulent conduct" through its "actual business dealings with the Defendants." *Id.* ¶ 27.

AHC did indeed utilize its own resources to investigate the conditions at Oxford which support their allegations. In the Complaint, AHC indicates numerous evaluations of Oxford

conducted "at AHC's direction."[45]   The problem is that this information had already been publicly disclosed.  AHC conducted a September 2008 evaluation in which it identified a lack of proper administration and staffing at Oxford; equipment and furniture either inoperative and/or in poor shape; and showers in poor condition.  *Id.* ¶ 36.  The evaluation referenced an Online Survey Certification and Reporting ("OSCAR") system report compiled along with the September 2008 evaluation that indicates a history of Life Safety Code violations and citations for deficiencies that exceeds the state average.  *See* SAC, Ex. A. The OSCAR system is maintained by the Centers for Medicare and Medicaid Services ("CMS"), and contains data collected by surveyors from CMS.[46]  Thus, this information is not "independent" because it is derived from a public disclosure.  *Reagan*, 384 F.3d at 177.  The results of this survey also indicate that the Mississippi State Department of Health ("MSDH") already knew about the substandard care at Oxford.  A March 2009 evaluation determined that similar conditions still existed, *see* SAC, Ex. A-1 – but the Relator admits that an investigation from the MSDH in February 2009 uncovered similar conditions.  *See* SAC, Ex. B.  AHC also alleges "further evidence" of the "overall lack of care" at Oxford, including: a) an account of patients who were transferred to other facilities in January 2011 and the very poor hygiene and health problems that afflicted them when they arrived at the new facility, SAC, ¶ 47; b) a claim that local physicians complain about Oxford's status and refuse to refer patients to the facility, *id.*; c) the security system ripped from the wall in January 2011 which left a "large unrepaired hole" and a policy

---

[45] It appears that AHC hired Kay Wilkes Consulting to conduct evaluations of the facility on its behalf to determine whether Hyperion was in compliance with its lease agreement and with licensing and certification requirements of the Mississippi State Department of Health.  The September 2008 evaluation included Kay Wilkes, RN, and Bob Wilkes, a videographer.  *See* SAC, Docket No. 7, Ex. A.

[46] *See*   *What   is   OSCAR   Data?*,   Am.   Health   Care   Ass'n., http://www.ahcancal.org/research_data/oscar_data/Pages/WhatisOSCARData.aspx (last visited July 7, 2014); *Nursing Home Quality Initiative*, Ctrs. for Medicare and Medicaid Svcs., http://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/index.html (last modified Apr. 4, 2014, 9:26 AM).

which requires staff to stand guard at the door to prevent patients from leaving unauthorized, *id.* ¶ 48; and d) an anecdote about a patient whose family told AHC that "their resident family member suffered from persistent pressure ulcer that was not being properly treated," *id.* ¶ 50. AHC does not indicate the source of this information and whether it came from public disclosures or from its direct and independent knowledge.   "Collateral research and investigations do not establish direct and independent knowledge of the information on which the allegations are based." *United States ex rel. Richardson v. E-Systems, Inc.*, No. 3:90-CV-0607, 1999 WL 324666, at *3 (N.D. Tex. May 18, 1999) (citing *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)); *see also Fed. Recovery Servs.*, 72 F.3d 447, 451-52 (5th Cir. 1995).

AHC found similar problems that the MSDH observed in its investigations, and that were disclosed in lawsuits and in the bankruptcy action.   As the Fifth Circuit established in *Reagan*, it is insufficient that AHC has only "discover[ed] through investigation or experience what the public already knew."  384 F.3d at 179.  They have not provided "additional compelling fact[s]" or brought to light a "new and undisclosed relationship between disclosed facts." *Id.*  Even if AHC had not conducted its investigations, essentially the same information would already be in the public domain.  AHC has not brought substantially new information to the table.  As a result, it cannot be said to be an "original source" for claims involving worthless services at Oxford.

Additionally, AHC has not demonstrated that it is an original source for its remaining allegations, which include the Defendants' nationwide pattern of conduct, failure to disclose Dr. Clark's status as an officer, and Hyperion's failure to make certain disclosures on Medicare and Medicaid cost reports are based on public disclosures and AHC has not provided any information

for which it has "direct and independent knowledge" on these counts.  Therefore, 31 U.S.C. §
3730(e)(4) bars AHC from pursuing this *qui tam* litigation.

The Court makes it clear, however, that this dismissal under the public disclosure bar is
without prejudice to the United States.  The United States has intervened in the claims against
Hyperion, AltaCare, LTCS and Douglas Mittleider for violating the False Claims Act and
common law in connection with the operation of Oxford.   While it has declined to intervene in
the remainder of the Complaint, it retains a strong interest in these aspects of the *qui tam* action.
The United States remains the real party in interest entitled to the bulk of any recovery and
retains important rights with respect to the future conduct of the litigation by Relator.  *See* 28
U.S.C. § 3730(c) and (d); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 n.10 (5th Cir.
2001).  To that end, the United States has filed a Statement of Interest, Docket No. 83, which the
Court has considered in resolving the Relator's remaining issues.

### 3. *Meeting the Pleading Standards for Rules 12(b)(6), 9(b), and 8(a)*

In its response to Defendants' motion to dismiss, AHC conceded that the worthless
services claims in which the Government has intervened (Count I) have been superseded by the
Government's Complaint in Intervention.[47]  It also conceded that its claim under the Mississippi
Vulnerable Persons Act (Count II) should be dismissed because the statute does not grant an
express or implied private right of action for enforcement.  Given these concessions, the Court
will turn to the other allegations for which the Defendants contend that the Relator has failed to
properly plead its claims.  The Court will also address the Defendants' argument that the
Government has also failed to plead fraud with particularity.

---

[47] The Government has intervened with regard to AHC's claims against defendants Hyperion, AltaCare, LTCS, and
Douglas K. Mittleider.  AHC is correct in its assertion that its worthless services claims against the other defendants
against whom the Government has not intervened remain pending; they have been addressed in this opinion.   The
Court also concurs that AHC has the right to participate as a party in the worthless service claims lodged by the
United States against the intervention defendants.  *United States ex rel. Magee v. Lockheed Martin Corp.*, No.
1:09CV324-HSO-JMR, 2010 WL 972214, at *3 (S.D. Miss. March 12, 2010).

Under Rule 8(a), a party asserting a claim must include (1) the grounds for the court's jurisdiction; (2) a statement of a claim showing the pleader is entitled to relief; and (3) a demand for relief.  *See* Fed. R. Civ. P. 8(a).  To prove a conspiracy actionable under the FCA, a relator "must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (internal quotation marks omitted).  Under this standard, a relator must meet the Rule 9(b) pleading standard for FCA claims and its complaint may survive, even "if it does not include the details of an actually submitted false claim . . . by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Id.* at 190.  In *Grubbs*, the court ruled that allegations of a scheme to submit false claims coupled with specific details such as "dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into," would satisfy Rule 9(b).  *Id.* at 190-91.

### a) Conspiracy Claims Regarding Oxford (Count III)

In Count III of the Complaint, the Relator asserts that the Defendants "conspired" to defraud Medicare and Medicaid programs.  *See* SAC, ¶¶ 77-78, 83-88.  The Defendants argue that this claim fails as a matter of law because the Relator has failed "to allege any facts . . . that could establish" the required elements, and has thus failed to satisfy Rule 8(a).[48]  The Court disagrees.

---

[48] Defendants argue that the Relator has made "unstructured assertions" of a conspiracy to defraud "federal health care programs, residents, landlords, vendors and creditors."  Docket No. 69, at 21.  Under Count III, the Complaint states that the Defendants conspired to defraud "Medicare and Medicaid programs"; the allegations at ¶¶ 111-117 indicate allegations of fraud against vendors, residents, landlords, and creditors at facilities nationwide.  The Court will address the actual language of Count III and consider the other allegations in addressing the "nationwide scheme" allegations.

Contrary to the Defendants' assertion, the allegations in Count III as to Hyperion and Oxford are very specific and do allege acts in furtherance of the conspiracy that indicate agreement and participation between the Defendants.   The Relator alleges that "[u]pon information and belief, Relator asserts that Douglas Mittleider and all other Defendants have planned and implemented a broad scheme to defraud Medicare and Medicaid by siphoning money to various entities owned and controlled by him through Hyperion from the Facility." SAC, ¶ 72.  The Relator alleges that Douglas Mittleider installed his wife, Julie Mittleider, as a "figurehead officer and director of Hyperion" and later installed Harry Clark in the same position.  However, AHC states that it had no dealings with any person other than Douglas Mittleider during the term of the Oxford lease agreement.  *Id.* ¶ 74.  According to the Complaint, Douglas Mittleider was CEO, CFO, and secretary of AltaCare.  AltaCare served as the manager/accountant of Hyperion and was among its creditors.  The Relator has provided a copy of the Georgia Secretary of State business information records which indicate that Douglas Mittleider also is the CEO, CFO, and secretary of other corporations which are defendants in this action, including HP/Ancillaries, Inc., LTCS, and HP/Management Group, Inc.  *See id.* ¶ 79; Ex. L.  The Relator has attached to its Complaint Hyperion's Medicaid cost reports and monthly operating reports, which indicate that, while Hyperion was in bankruptcy, it claimed and/or paid large amounts in fees and "cash transfers" to other Mittleider companies for services allegedly performed at Oxford and for which Medicare and Medicaid were billed.[49]

---

[49] Hyperion's Medicaid cost report for fiscal year 2008 shows that Hyperion claimed costs of $358,993 for AltaCare's  management fees and accounting fees.  SAC, ¶ 80; Ex. M,  pp. 9, 14.  The Relator alleges that, "upon information and belief, Hyperion continues to pay AltaCare $2,732.00 for accounting fees and $27,089.00 for management fees every month." *Id.*; *see, e.g.*, Ex. G (Monthly Operating Report).  According to the Complaint, "Hyperion also claimed $1,608.00 in costs to HP/Ancillaries, Inc., another of Doug Mittleider's companies, on the 2008 Medicaid cost report." *Id.*; Ex. M, pp. 9, 14.  LTCS received $672,300 in "cash transfers" from Hyperion in May, June, and July 2009 alone.  *Id.*, ¶ 81, Ex. N (Monthly Operating Reports).  Sentry Healthcare Acquirors, Inc. ("Sentry") is owned by Julie Mittleider.  Sentry received $50,000 in "cash transfers" from Hyperion in June 2009

The Relator also describes an incident which suggests acts in furtherance of a conspiracy between the Defendants.  Hyperion promised to pay rent for the Oxford facility as part of the bankruptcy settlement.  The terms of the settlement required that Hyperion make these payments by wire transfer into AHC's account.  Hyperion paid on the due date with checks that it paid to a nursing school affiliated with AHC, but which was not part of the bankruptcy proceeding or settlement agreement, in violation of the settlement.  These checks would bounce and would be followed by late wire transfers of funds into AHC's account from other Mittleider companies who were not the lessee.  *See* SAC, ¶¶ 83-88.

These allegations and the attachments to the Complaint together allege that Douglas Mittleider and his affiliates own and operate the other Defendant corporations.  These companies allegedly contracted with Hyperion to provide a variety of services to Oxford.  Hyperion billed Medicaid and Medicare for these services, and the proceeds were diverted to these companies, essentially to keep the money in the family of Mittleider companies, and thus unjustly enrich Douglas Mittleider and his affiliates at the expense of the federal government and the residents at Oxford.  The Relator has provided details that are more than sufficient to "lead to a strong inference" that false claims were submitted to the Government for payment.  *Grubbs*, 565 F.3d at 193.  As for the claim of conspiracy, the Complaint has also sufficiently alleged "the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government]."  The Complaint also alleges many "act[s] performed in furtherance of that agreement."  *Id.*

*b) Nationwide Scheme (Allegations ¶ 111-117)*

---

alone. *Id.*, ¶ 82; Ex. N.  Based on the record and the Defendants' pleadings, it is unclear what services these entities allegedly provided in exchange for compensation.

The Relator has also alleged that the Defendants have used similar schemes to defraud "federal health care programs, residents, landlords, vendors, and creditors" through the use of nursing homes around the country.  The extent to which the Relator's allegations meet the requirements of Rule 9(b) and the FCA, however, ends at Oxford's doorstep and does not extend to this scheme.  In its Statement of Interest, the Government argues compellingly that the Relator has not adequately plead other FCA violations committed by the Defendants at any other nursing home other than Oxford.  Docket No. 83.

An FCA complaint cannot survive a motion to dismiss without providing particular details to describe the "who, what, when, where, and how" of the fraud.  *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997).  The standard in *Grubbs* is indeed relaxed, but not so relaxed that it allows "suggestive or conclusory allegations" to move forward.  *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 903 F. Supp. 2d 473, 484-85 (E.D. Tex. 2011), *rev'd on other grounds*, 727 F.3d 343 (5th Cir. 2013).  Other district courts in this circuit, following *Grubbs*, have set out minimum levels of specificity required to support allegations of wrongdoing in similar contexts.  *See United States ex rel. Woods v. SouthernCare, Inc.*, No. 3:09-cv-00313-CWR-LRA, 2013 WL 1339375, at *5-*6 (S.D. Miss. 2013) (relator's non-specific allegation of company-wide fraud, beyond the defendants' conduct at four Mississippi offices about which relator had actual knowledge, did not satisfy Rule 9(b)); *United States ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, No. 2:08cv0371, 2012 WL 1866586, at *4 (W.D. La. 2012) (*Grubbs* "does not absolve the relator of having to plead any specific facts of a false claim"; dismissing *qui tam* action which did "not identify any specific physicians, patients, services or claims involved in the alleged scheme").

The section of the Complaint alleging a "Nationwide Pattern of Conduct," at ¶¶ 59-64, states that the events at Oxford are "not an isolated occurrence," *id.* ¶ 59, but sets forth no other such occurrence with the specificity needed to satisfy Rule 9(b).  The Complaint alleges abuse and neglect at a nursing home in Massachusetts, a resident lawsuit at a Tennessee nursing home, and financial difficulties and labor problems at a nursing home in Connecticut – all of which are owned and operated by Mittleider companies.  The allegations, however, lack particular details about the actual operation of these facilities, the Defendants' participation in them, and the Defendants' knowledge of them.   As the Government has argued, "Fundamentally, the [Complaint] does not provide sufficient details, either directly or enough to raise a strong inference, about the basic who, what, where, when or why of FCA violations at any nursing home other than Oxford."[50]  Docket No. 83, at 8.  *See also Thompson*, 125 F.3d at 903.  Thus, the Defendants' motion to dismiss is granted as to the allegations regarding a nationwide pattern of conduct.[51]

### c)   Government's Complaint in Intervention

Defendants argue that the USA Complaint also fails to meet the heightened pleading standards of Rule 9(b) because it does not allege the details of any particular claim submitted to

---

[50] The Government has also raised an important policy principle which undergirds the requirement that relators provide more than speculative allegations to avoid dismissal of their claims.  The FCA includes what has been called the "first-to-file" provision, which states: "When a person brings a [*qui tam*] action, no person other than the Government may . . . bring a related action based on the facts underlying the pending action."  31 U.S.C. § 3730(b)(5).   A relator who files speculative allegations and invokes this provision could prevent other more knowledgeable relators from filing suit.  *See Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 973 (6th Cir. 2005) (heightened pleading requirement of Rule 9(b) in FCA cases "deters would-be relators from making overly broad allegations that fail to adequately alert the government to possible fraud in an effort to preclude future relators from sharing in any bounty eventually recovered.") (internal quotation marks omitted).

[51] To be sure, this determination is not to suggest that FCA violations may not have occurred at nursing homes other than Oxford that are affiliated with Defendants, or that Defendants may not be liable for such conduct.  It does recognize, however, that the Relator did not allege FCA violations – other than at Oxford – in more than a conclusory fashion.  Relator's allegations did not allow the United States meaningfully to investigate, no less sue, Defendants under the FCA.  They do not, therefore, entitle the Relator to stake a claim to share in any FCA recovery the United States might ever obtain resulting from Defendants' conduct at other nursing homes.  *See United States ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F. Supp. 1010, 1021 (E.D. Va. 1995) (FCA "is not designed to have the government function as a sort of free private investigator to help persons achieve *qui tam* relator status and the resulting opportunity of financial gain.").

the Government or "*specific* details regarding who submitted the alleged false claims, what the alleged false claims contained, when the alleged false claims were submitted to the Government, or where the alleged false claims were executed."   Docket No. 86, at 11.   In particular, the Defendants argue that the USA Complaint alleges only "allegedly deficient" services for seven residents.   However, the USA Complaint alleges that these descriptions were "only examples" of worthless services to Oxford residents from October 5, 2005 through at least May 1, 2012.   USA Compl., ¶ 243.

The Defendants argue for a threshold that exceeds the requirement for pleading evidence of fraud in this context – one in which the conduct is allegedly long-term and systemic.   As the Sixth Circuit explained in *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493 (6th Cir. 2007):

> There are . . . valid reasons for not requiring [an FCA complaint] to plead every specific instance of fraud where the . . . allegations encompass many allegedly false claims over a substantial period of time. . . . These reasons primarily advance the goal of logistical efficiency.   Where the allegations in a . . . complaint are complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.

*Id.* at 509 (internal quotation marks and citations omitted).   "[I]t has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied."   *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206–07 (E.D. Tex. 1998) (collecting cases supporting this proposition); *see also United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 821 (E.D. Tex. 2008) ("[S]ome district courts in the Fifth Circuit have also relaxed Rule 9(b)'s pleading standard where the alleged fraud occurred over an extended period of time and consists of numerous acts.") (collecting cases).   As the court in *Johnson* recognized, "To approach the issue otherwise would allow the more sophisticated to escape liability under a False Claims case due to the complexity

of their scheme and their deviousness in escaping detection."  183 F.R.D. at 207.  The fraud

alleged by the Government consists of a scheme that occurred over the course of several years

and involved numerous acts.  The Government has also alleged specific and horrifying details

about the services, or lack thereof, allegedly provided to the residents at Oxford, and specific

amounts that Medicare and Medicaid paid on behalf of each of these residents – all of which

provide reliable indicia that false claims were submitted, and that the Government has more

information about these claims and many others.  Given these circumstances and the case law,

the Government has provided the Court with ample reason to find that it has met the Rule 9(b)

pleading requirement.

### 4.  *Alter Ego Theory of Liability Against Non-Hyperion Defendants*

The Relator AHC has alleged that the Defendants are "the alter ego of Defendant

Mittleider and/or each other, and the other individuals and entities unknown to AHC."  SAC, ¶

17.  According to the Defendants, the Relator attempts to apply the doctrine of piercing the

corporate veil by asserting that Douglas Mittleider "exercises such control over the business and

operations of these entities that this Court should disregard the corporate formalities of separate

existence."  *Id.*  Defendants argue that AHC has failed to state a claim or plead with particularity

the allegation that the non-Hyperion Defendants are alter egos of Hyperion.  As a result, they

argue that all Defendants except Hyperion should be dismissed.

The Defendant raised this argument against both the Relator and the Government, but the

Government contends that it has not pled a theory of liability that requires piercing the corporate

veil or a determination of whether the Defendants are alter egos to state a claim under the FCA

or common law.  The Court agrees that this issue falls within a garden variety FCA claim. The

FCA expressly provides that a person is liable, assuming all other elements are met, for

knowingly causing false claims or statements to be made to the United States.  31 U.S.C. §
3729(a)(1)(A) and (B).  Even though Hyperion, and not AltaCare, LTCS or Mittleider, submitted
the false claims at issue to Medicare and Medicaid, the Government's allegations have stated a
claim that the other Defendants may be still liable for causing Hyperion to do so.  *United States
ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("The FCA applies
to anyone who knowingly assists in causing the government to pay claims grounded in fraud,
without regard to whether that person has direct contractual relations with the government.")
(internal quotations and citations omitted).  The motion to dismiss the non-Hyperion defendants
is denied.[52]

### 5. *Failure to Disclose Clark's Interest (Count V)*

In Count V of the SAC, the Relator alleges that, because Hyperion "has an affirmative
obligation under federal and state law to disclose all persons who have an ownership, financial,
or control interest in it," Hyperion violated the FCA when it allegedly failed to disclose
"information about Mr. Clark's control interest and his exclusion status to Medicare or
Medicaid."  SAC, ¶¶ 98-101.  AHC also alleges that Hyperion breached a duty under federal and
state law to disclose that Dr. Harry Clark was its "sole officer and director on its 2008 report
filed May 26, 2009."  SAC, ¶¶ 103-09.  AHC alleges that the disclosure statutes and regulations
that Hyperion violated are conditions of payment, while Defendants argue that they are
conditions of participation which cannot form the basis of a claim under the FCA.

The FCA imposes liability, among other grounds, on anyone who "knowingly presents,

---

[52] The Relator has presented arguments asserting that the Defendants are alter egos of each other and that they
engaged in a conspiracy.  Although Relator argues that it matters whether one company is an alter ego of the other,
the simple fact is that, under the FCA, an entity is liable for knowingly submitting false claims or causing false
claims to be submitted.  If an entity participated in any way, they can be held liable.  This is the argument of the
United States and this is a more direct path to stating a claim.  Thus, the Court declines to journey down the rabbit
hole of "piercing the corporate veil" and has instead adopted the Government's arguments.  The non-Hyperion
Defendants will not be dismissed because they participated in the scheme.

or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C.

§ 3729(a)(1)(A).   "[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."  *United States ex rel. Thompson v. Columbia Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).  In *Thompson*, the Fifth Circuit noted that the Ninth Circuit in *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996), interpreted the scope of the FCA in line with the Fifth Circuit and that it "concluded that false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit."  *Id.* at 902.  The Defendants have focused their arguments on the distinction between "implied certification" and "express certification" theories of FCA liability.  Docket No. 67, at 7.  In this framework, a theory of liability based on an express certification that is knowingly false (and material to payment) is "straightforward," according to the Defendants; a claim containing such a certification can readily be described as false.  However, some courts have held that a facially truthful claim may be considered false if the claimant "violates its continuing duty to comply with the regulations on which payment is conditioned."  *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011).   In such cases, FCA liability is based on the notion that even though the certification does not explicitly mention regulatory compliance, it is deemed to include an "implied certification" of compliance with a particular regulation on which payment is conditioned.  *Id.*; *see also United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 269 (5th Cir. 2010) ("[A] false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance.")

The Medicare and Medicaid regulations make a distinction between Conditions of Participation and Conditions of Payment. For a skilled nursing facility (SNF), Conditions of Participation are the "requirements that an institution must meet in order to qualify to participate as a SNF in the Medicare program, and as a nursing facility in the Medicaid program." 42 C.F.R. § 483.1 (2011). In other words, "Conditions of Participation are quality of care standards directed towards an entity's continued ability to participate in the Medicare program rather than a prerequisite to a particular payment." *United States ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 978 (W.D. Tenn. 2007). Therefore, violations of a Condition of Participation do not necessarily give rise to an implied certification claim.

The Defendants have done well to point out that the Fifth Circuit has never recognized an implied certification theory of liability under the FCA, but the Fifth Circuit has explained that, if such a theory were viable, the government could succeed under such a theory only if it established that the defendant impliedly certified compliance with a condition of payment. *See United States ex rel. Willard v. Humana Health Plan of Tex.*, 336 F.3d 375, 381-83 (5th Cir. 2003).

The Relator has alleged that Hyperion falsely certified compliance with applicable regulations based on the failure to truthfully disclose its officers and directors in its cost reports. The Government has raised a similar claim based on Hyperion's certification that it was in compliance with regulations governing skilled nursing homes generally. The Court will address each argument in turn.

### a) Relator

Medicaid claims for payment by a nursing home involve a two-part process – first, cost reporting, and second, billing. The Medicaid program uses cost reports submitted each year by

the nursing home.  The Medicaid program uses these cost reports to determine the prospective per diem rates an entity will be paid two years subsequent to the cost report for services to Medicaid-eligible residents.  A cost report is, therefore, a claim of entitlement to a particular per diem rate.  A nursing home then bills for services to each resident at the per diem rate calculated by Medicaid based on the cost report.  *See* Mississippi Medicaid State Plan, Attachment 4.19-D.[53]  Cost reports require certification of truthfulness of all information contained therein, including disclosure of all the owners, officers, and/or directors.  *See* SAC, Docket No. 7, Ex. M at Form 2 and Form 15, p. 2; Exh. R; Exh. R-1.  The 2008 cost report filed on May 26, 2009, with the Mississippi Division of Medicaid listed only Julie Mittleider as the director of Hyperion. She had, in fact, been removed as of July 29, 2008.  Dr. Harry Clark was then appointed president and sole officer and held that position from that date until March 25, 2011.  Dr. Clark is an individual excluded from participation in federal health care programs.[54]  Rather than disclose Dr. Clark's position, the 2009 cost report did not list that Hyperion had any officers.

Truthful disclosure of persons with a control interest in an entity participating in federal health care programs is a condition of payment.  Indeed, if an excluded individual has a control interest in the program, the government will not render payment: "No *payment* will be made by Medicare, Medicaid or any of the other Federal health care programs for any item or service furnished, on or after the effective date of the notice period, by an excluded individual or entity or at the medical direction . . . of a physician or other authorized individual who is excluded when the person furnishing such item or service knew or had reason to know of the exclusion."

---

[53] *Mississippi Medicaid State Plan*, Miss. Div. of Medicaid, https://www.medicaid.ms.gov/about/state-plan/ (click "4.19-D Guide Lines for the Reimbursement for Medical Assistance Recipients of Long Term Care Facilities") (last visited June 5, 2014).

[54] *See* Docket No. 68, Ex. 9 ("HHS-OIG Program Exclusions Not., 70 Fed. Reg. 61,136 (Oct. 20, 2005)").

42 C.F.R. §1001.1901(b)(1) (emphasis added).[55]  Furthermore, "an excluded individual or entity that submits, or causes to be submitted, claims for items or services furnished during the exclusion period is subject to civil money penalty liability under section 1128A(a)(1)(D) of the Act . . . ." 42 C.F.R. §1001.1901(b)(3).  The Defendants argue that the government does not condition payment of Medicare or Medicaid claims on whether the entity has disclosed "all persons who have an ownership, financial, or control interest in the entity."  Docket No. 69, at 24.  The regulation above makes it clear that the government conditions payment on whether the claim is made by an "excluded individual" – and the claims issued by Hyperion under Dr. Clark's tenure fall within that category.  Contrary to the Defendants' characterization of the certification as "implied," the Relator has stated an express, false certification claim based on concealment of Clark's status with Hyperion.

In *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), the Fifth Circuit considered an allegation that the defendants had falsely certified that the Medicaid services identified in the hospital annual cost reports complied with the laws and regulations dealing with the provision of healthcare services.  The Fifth Circuit remanded the issue for the district court to consider whether the certification was a "prerequisite for obtaining a government benefit."  *Id.* at 902.  The form at issue in *Thompson* included nearly identical language as the cost reports at issue here.[56]  On remand, the district court found the importance of recognizing the certifications in cost reports as part of the fight against fraud:

---

[55] *See, e.g.*, *United States v. Adoh*, 496 F. App'x 731, 732 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1480 (2013) (finding that "Section 1320a–7(a)(3) bars an individual convicted of a health care fraud felony from being paid by a federally funded health program for providing products or services" and liability may arise from participation in "providing any Medicare services.").

[56] *See Thompson*, 20 F. Supp. 2d at 1041.  Arguing in favor of finding that false certifications in a Medicare cost report constitute a false claim, the United States filed an *amicus curiae* brief and submitted a declaration and a copy of the cost report at issue.  According to the district court, "the certification provision in the Hospital Cost Report requires the responsible provider official to certify, in pertinent part, that 'to the best of my knowledge and belief, [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the

> The cost report and certification process is a self-policing mechanism that is critical to the national effort to prevent and remedy fraud and abuse in the public health care financing system, since the government can review only a small fraction of the claims submitted and therefore must rely on them.

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1042 (S.D. Tex. 1998).  There is no merit in the Defendants' allegation that the cost reports do not contain an express, false certification because Form 2 for the cost report warns that knowingly providing false information on the cost report "may be punishable by fine and/or imprisonment under state and federal law."[57]   Numerous courts have also held that allegations referring to the same forms are sufficient to plead certification as required for FCA liability.[58]   The Government conditioned payment upon these certifications.  Thus, Relator has stated a claim under the FCA.

### b) Government

Defendants argue that the statutes and regulations cited in the Complaint in Intervention, which Defendants allegedly violated by providing grossly deficient, materially substandard, worthless services to Oxford residents, are "conditions of participation" and thus have no bearing upon defendants' right to payment by the United States.  "When . . . the express certification does not state that compliance is a prerequisite to payment, we must look to the underlying statutes to surmise if they make the certification a condition of payment."  *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1218 (10th Cir. 2008) (citing *United*

---

provider in accordance with applicable instructions, except as noted.'  That form also states that 'intentional misrepresentation of any information contained in this cost report may be punishable by fine and/or imprisonment under federal law.'"  *Id.* (citation omitted); *cf. infra*, n.64

[57]  *See* Ex. M at Form 2 ("INTENTIONAL MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY FINE AND/OR IMPRISONMENT UNDER STATE OR FEDERAL LAW.  This Cost Report is submitted as a part of the request by this Long-Term Care Provider for reimbursement under the Mississippi Medicaid Program.  I HEREBY CERTIFY that I have examined the contents of the accompany cost report to the State of Mississippi, Office of the Governor, Division of Medicaid for the period stated above and certify to the best of my knowledge and belief that the said contents are true and correct statements prepared from the books and records of this facility in accordance with applicable instructions.")

[58]  *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654 (S.D. Tex. 2013); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 n.6 (5th Cir. 2004); *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139 (S.D. Ohio Dec. 18, 2008)).

*States v. Southland Mgm't Corp.*, 288 F.3d 665, 679 (5th Cir. 2002); *cf. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999)).

The statutes and regulations governing skilled nursing facilities such as Oxford set forth essential obligations that the United States expects a nursing facility to meet to obtain reimbursement under the Medicare and Medicaid programs. *See United States ex rel. Aranda v. Comm. Psych. Ctrs. of Okla., Inc.*, 945 F. Supp. 1485, 1488, (W.D. Okla. 1996) (declining to dismiss FCA complaint alleging violations of Medicaid quality of care statutes and regulations, ruling that FCA claims can stand "against a provider of substandard health care services under appropriate circumstances"). The USA Complaint alleges that, to qualify for participation in and receive payment from Medicare and Medicaid, nursing facilities must meet certain standards set out in the regulations implementing the Nursing Home Reform Act ("NHRA").[59] The NHRA explicitly states that violations of its provisions can be material to the United States' decision to pay a nursing facility, expressly permitting the denial of payment for such violations:

> The Secretary [of the United States Department of Health and Human Services] may take the following actions with respect to a finding that a facility has not met an applicable requirement:
>
>> (i) Denial of payment - The Secretary *may deny any further payments* under this subchapter with respect to all individuals entitled to benefits under this subchapter in the facility or with respect to such individuals admitted to the facility after the effective date of the finding.

---

[59] The standards alleged are as follows: (a) provide a proper level of care to prevent and treat pressure sores, 42 C.F.R. § 483.25(c); (b) provide adequate nutrition, 42 C.F.R. § 483.25(i); (c) maintain adequate hydration, 42 C.F.R. § 483.25(j); (d) ensure that residents are able, to the best of their abilities, to engage in such basic activities of daily life as bathe, dress and groom themselves, transfer and ambulate, use the toilet, eat and speak or otherwise communicate, 42 C.F.R. § 483.25(a); (e) ensure that residents receive their proper medications, 42 C.F.R. § 483.25(m); (f) avoid the use of unnecessary drugs, including unnecessary antipsychotic drugs, 42 C.F.R. § 483.25(l); (g) prevent avoidable accidents, 42 C.F.R. § 483.25(h); and (h) manage urinary incontinence, especially in a manner so as to prevent infection, 42 C.F.R. § 483.25(d). The USA Complaint also alleges a violation of the rules which require that nursing facilities maintain sufficient nursing staff "to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care." 42 C.F.R. § 483.30. *See* USA Compl., ¶¶ 40-50.

42 U.S.C. § 1395i-3(h)(2)(B)(I) (emphasis added).  Indeed, the NHRA further provides that if a facility remains out of compliance with any of these conditions of participation within three months after having been found to be out of compliance, the Secretary *must* deny payment for new patients.  *See* 42 U.S.C. § 1395i-3(h)(2)(D).  Thus, Sections 1395i(b), (c) and (d) of the statute and their corresponding regulations are therefore conditions material to payment.[60]  The Government's allegations are sufficient to state a claim and dismissal is not appropriate at this stage of the proceedings.[61]

### 6. Civil Monetary Penalties (Count IV)

In Count IV of the SAC, the Relator cites statutes and regulations concerning OIG exclusion and Civil Monetary Penalty ("CMP") authority, including 42 U.S.C. 1320a-7(b)(8) (exclusion authority), 42 C.F.R. § 1003.103 (CMP amounts), and 42 C.F.R. § 1001.1901(b)(1) (no payment for any item or service furnished by an excluded individual or entity), and alleges that Dr. Clark has been excluded.  *See* SAC, ¶¶ 90-94.  The Relator then alleges that "Hyperion is subject to exclusion and/or civil money penalties" under various authorities for allegedly employing Dr. Clark when he was excluded from participating in federal healthcare programs, SAC, ¶ 96, and that Hyperion has knowingly submitted false claims under the direction of Dr.

---

[60] The Defendants have argued that the Government alleges that they violated the FCA by impliedly certifying compliance with federal regulations governing skilled nursing facilities.  An implied certification theory does not apply here because the Government has not alleged it and the Relator and the Government have both established that either the certifications or the underlying statutes or regulations for the certification make the requirements material to payment and not simply conditions of participation.  Indeed, as the Fifth Circuit has recognized, "not all statutory, regulatory, or contractual violations necessarily give rise to liability under the FCA.  However, once a claimant has made a certification of compliance with a statutory or regulatory provision or a provision of a contract mandated by statute or regulation, the claimant is subject to liability under the Act for submitting a false claim if that certification of compliance is known by the claimant to be false."  *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 680 (5th Cir. 2002), *aff'd on reh'g en banc*, 326 F.3d 669 (5th Cir. 2003).

[61] Defendants argue that the statements they made, or caused to be made, to Medicare and Medicaid in Provider Agreements, EDI Enrollment forms, claims forms, cost reports, Health Insurance Benefit Agreement forms, and MDC forms, *see* USA Compl., ¶¶ 23-36, can never be the bases for FCA liability.  To the extent that these statements were, as alleged, knowingly false with respect to the specific laws and regulations that defendants knowingly violated, the Government has stated a claim under 31 U.S.C. § 3729(a)(1)(B) against the Defendants for false statements material to Defendants' false claims.

Clark, *id.* at ¶ 95.  Defendants argue that this claim fails as a matter of law because AHC does not have a private right of action to enforce these provisions either directly or through the FCA.

The Court agrees with Defendants that Relator cannot state a cause of action under the False Claim Act based on the Civil Monetary Penalties Law or the Federal Health Care Fraud Statute, 42 U.S.C. § 1320a-7b.  In *United States ex rel. Gonzalez v. Fresenius Medical Care of North America*, No. 07-247, 2010 WL 1645969, at *8 (W.D. Tex. Jan. 21 2010), the court rejected the relator's argument that it could escape the fact that "no private right of action exists under the [Civil Monetary Penalties Law] couching its claims within the context of the False Claims Act."  *Id.* (internal quotation marks omitted).  As the court explained, "Relator does not cite, and the Court has not found, any case in which a relator in a *qui tam* action has successfully built a False Claims Act suit upon violations of the Civil Monetary Penalties Law or the Federal Health Care Statute."  *Id.  See also United States ex rel. Grayson v. Genoa Healthcare*, No. C09-506Z, 2011 WL 2670079, at *5 (W.D. Wash. July 6, 2011) (dismissing a similar claim on similar grounds).

On rebuttal, the Relator has argued that the amendments in the PPACA resulted in attaching liability under the FCA to violations of the Federal Health Care Fraud Statute.[62]  However, the Fifth Circuit has noted that the ACA amendments do not apply retroactively where the relator's claims were pending before the law was enacted in 2010.[63]  Each of the provisions that the Relator cites limits enforcement to an administrative agency and does not provide a private right of action for a third party.[64]  The Department of Justice has not sought recovery

---

[62] *See* 42 U.S.C. §1320a-7b [section 1128B(g)] ("In addition to the penalties provided for in this section or section 1128A, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code.").

[63] *See* n.42, *supra* (stating that amendments to FCA contained in the Affordable Care Act do not apply retroactively).

[64] *See* 42 U.S.C. § 1320a-7(b)(8) (providing, in relevant part, that "[t]he *Secretary* [of Health and Human Services ("HHS")] may exclude [listed categories of] individuals and entities from participation in any Federal health care

under these provisions, nor has it alleged a right to do so.  Therefore, the Court grants the Defendants' motion to dismiss Count IV for failure to state a claim.

### B.  Motion to Dismiss Eisele Affidavit

The Relator filed a response to the Defendant's Motion to Dismiss the Relator's Complaint to which the Relator "attache[d] and incorporate[d]" the "Affidavit of Melvin Eisele, AHC Board of Directors" ("the Eisele Affidavit").  Docket No. 77, at 3 (Eisele Affidavit attached at Exhibit 1).  The Defendant argues that the Court should strike the Eisele Affidavit because the Relator attempts to use the factual allegations contained in the affidavit to amend its Complaint.  The Court agrees.

"It is well-established that, in deciding whether to grant a motion to dismiss, a district court may not 'go outside the complaint.'"  *Gines v. D. R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012) (citation omitted).  Indeed, it is an "axiomatic rule that a plaintiff may not amend his complaint in his response brief."  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011); *see also Skidmore Energy, Inc. v. KPMG LLP*, No. 03-2148, 2004 WL 3019097, at *5 (N.D. Tex.  Dec. 28, 2004) ("[I]t is well established  that . . . Plaintiffs may not amend their Complaint through briefs submitted in response to [a] motion to dismiss.").  In response to this authority cited by the Defendant, the Relator argues that it asserted the facts in the Affidavit in opposition to Defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).[65]  Rule 12(b)(1) provides an exception to the

---

program") (emphasis added); 42 C.F.R. § 1001.1901(b)(1) (not allowing payment under Medicaid or Medicare to excluded individuals, citing 42 U.S.C. § 1320a-7 as authority); 42 C.F.R. § 1003.103 (providing that "the *OIG* [*Office of the Inspector General of HHS*] may impose a penalty" for violations of certain health care regulations) (emphasis added).

[65] The Defendants have moved to dismiss the Relator's Complaint pursuant to Rules 12(b)(1) (for lack of subject matter jurisdiction); Rule 12(b)(6) (failure to state a claim upon which relief can be granted); Rule 8(a) (failure to state a claim for relief); and Rule 9(b) (failure to plead fraud with particularity).  Docket No. 67.  Apparently, the Relator has conceded that the Court need not consider the Eisele Affidavit in connection with the Defendants' arguments dismissal under Rules 8, 9, and 12(b)(1).

general rule which limits a court to the four corners of a complaint when it considers a motion to dismiss.

Under Rule 12(b)(1), "[c]ourts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Hous.*, 907 F. Supp. 2d 846, 848-49 (S.D. Tex. 2012) (citing *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986)). There are two ways to use a Rule 12(b)(1) motion to attack a complaint: a "facial attack" and a "factual attack." "A facial attack requires the court merely to decide if the plaintiff has correctly alleged a basis for subject matter jurisdiction." *Rodriguez v. Tex. Comm'n of Arts*, 992 F. Supp. 876, 878 (N.D. Tex. 1998), *aff'd sub nom. Rodriguez v. Tex. Comm'n on the Arts*, 199 F.3d 279 (5th Cir. 2000) (citation omitted). "A facial attack is valid if, from the face of the pleadings, the court can determine that it lacks subject matter jurisdiction. For the purposes of the motion, the allegations in the complaint are taken as true." *Id.* (*citing Saraw P'ship v. United States*, 67 F.3d 567, 569 (5th Cir. 1995)). By contrast, a factual attack occurs where the defendant has "challenged the facts that formed the basis for the plaintiff's claim of subject matter jurisdiction . . ." *Id.* at 879. A factual attack challenges the existence of subject matter jurisdiction by looking beyond the pleadings. In reviewing a factual attack the court may consider matters outside the pleadings, such as testimony and affidavits. *Id.* If a defendant has posed a facial challenge to the complaint, the court considers the allegations in the complaint and documents that are judicially noticed. By contrast, if a defendant has posed a factual challenge, the court will *not* presume that the contested factual allegations in the complaint are true, and it may consider other extrinsic evidence. The pleader, the author of the

complaint, may also "establish the actual existence of subject matter jurisdiction through extra-pleading material."  5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (3d ed.);  *McDaniel*, 899 F. Supp. at 307.

In this case, the Relator has argued that the Defendants have asserted a factual challenge to subject matter jurisdiction because the Defendants attached ten exhibits to the motion to dismiss, "all of which were outside of the Complaint."  Docket No. 90, at 6.  In fairness, the Relator contends, the Court should consider the Eisele Affidavit, which it attached to its reply to the Defendants' motion to dismiss.  However, the pleadings indicate that the Defendants' challenge is facial; the Defendants' Motion to Dismiss cites to and relies upon the complaint and the documents attached to the Complaint.  Although the Defendants have attached other documents, including nine court filings from the Southern District of Mississippi and an entry in the Federal Register, they are all matters of public record subject to judicial notice.[66]  *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978) (permitting judicial notice of a court's own records); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of  citation, may be cited by volume and page number.").  Even when a defendant attaches documents to its motion to dismiss, "the Court can take judicial notice of [these documents] without transforming the Motion to Dismiss into a factual attack."  *In re Parkway Sales & Leasing, Inc.*, 411 B.R. 337, 343 (Bankr. E.D. Tex. 2009).  The Fifth Circuit has compared and analogized facial attacks under Rule 12(b)(1) to motions to dismiss for failure to state a claim under Rule 12(b)(6).  *Id.* (citing *Williamson v.*

---

[66] The Defendants have challenged the Court's subject matter jurisdiction over the Relator's FCA claims for two reasons: 1) the Relator allegedly released its FCA claims in the underlying bankruptcy and eviction proceedings; and 2) the Relator's claims are public upon public disclosures.  To support the release argument, the Defendants referenced the FCA claims asserted in the Complaint and eight publicly available filings maintained in the records of the U.S. District Court for the Southern District of Mississippi.  To support the public disclosure argument, the Defendants relied on documents attached to the Complaint, a Federal Register entry, and a record on the docket of the bankruptcy court for this federal judicial district.

*Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)).  In a motion to dismiss for failure to state a claim, a court may "consider matters of which [it] may take judicial notice," *Sifuentes–Barraza v. Garcia*, 252 F. Supp. 2d 354 (W.D. Tex. 2003) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996)), and matters of public record without converting the motion into a motion for summary judgment.[67]  *Id.* (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

Because the Defendants have only referenced the Complaint, documents attached to it, and judicially noticeable sources, the Court will resolve the motion without reference to extrinsic evidence, such as the Eisele Affidavit.  The Defendants have remained within the lines and the Relator must do the same.  The Defendants' motion to strike the Eisele Affidavit is hereby granted.

### C.  Leave to Amend Complaint

The Relator has filed a motion for leave to amend its second amended complaint.   In general, district courts may "freely give leave" to amend when "justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Fifth Circuit has ruled that "[d]enial of leave to amend may be warranted" in many cases, including for "repeated failure to cure deficiencies" or "futility of a proposed amendment."  *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010).  A district court does not abuse its discretion when it denies a motion for leave to amend

---

[67] The Relator has also argued that the Defendants' motion to dismiss under Rule 12(b)(1) should be properly treated as a motion for summary judgment since the FCA jurisdictional bar is "necessarily intertwined with the merits."  *See United States ex rel. Reagan v. East Tex. Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 173 (5th Cir. 2004).  Although the Fifth Circuit has recognized that a challenge under the FCA's public disclosure bar can be treated as a motion for summary judgment, *see United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 (5th Cir. 2011), it has never ruled that it must be treated as such.  A district court is required to treat a motion to dismiss asserting a public disclosure challenge as a motion for summary judgment only if the defendants present facts outside the pleadings that are not subject to judicial notice.  *See Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 n.1 (l0th  Cir. 2004) ("We decline to recharacterize the defendants' [12(b)(l)]  motion as a summary judgment motion because we need consider only the allegations in [the relator's] complaint and those in the prior . . . action.").

after the plaintiff has had two previous opportunities to amend its complaint.  *See Hermann Holdings Ltd. v. Lucent Tech., Inc.*, 302 F.3d 552, 566-67 (5th Cir. 2002).  Indeed, a plaintiff has been given "ample opportunity to plead" its claims when it has already filed an original complaint alleging variations of the same claims.  *See id.* at 567.

In this case, the Relator has filed an original complaint and two amended complaints asserting variations of the same claims.  The Relator has had "ample opportunity to plead," and at this stage, further amendments would be futile.  The Court denies the Relator's motion for leave to amend.

### D.  Remaining Issues - Government's Complaint in Intervention

The Government has made up for what the Relator's complaint lacked.  The allegations reveal which residents or representative residents of which nursing homes were affected, and whether such services were even reimbursed by Medicare or Medicaid.  It provides specific allegations about the care of any residents or representative residents and resulting claims to the Government for worthless services.

#### 1.  *Worthless Services Claims*

The USA Complaint alleges that, from October 5, 2005 through at least May 1, 2012, defendants made or caused to be made false or fraudulent claims and statements to Medicaid and Medicare for nursing home services purportedly provided to residents of the Oxford facility. which services were in fact non-existent, grossly deficient, materially substandard and/or worthless.  The USA Complaint further alleges that defendants' knowing misconduct caused significant physical and mental harm to vulnerable, elderly, disabled and low-income residents at Oxford, and resulted in significant damage to the United States.  Together, these allegations comprise the Government's worthless services claim.  Defendants argue that the FCA sets a high

bar for pleading a worthless services theory in the nursing home context because skilled nursing facilities submit claims on a per diem basis – not for individual services, but for a predetermined daily rate that encompasses all room, board, and other services for each SNF resident.   The Defendants contend that, in this context, the United States must plead that the "entire bundle of billed-for services had *no value* to the Government" to prevail on a worthless services theory. Docket No. 67, at 5.  The Government has the argument that best comports with the case law.

The Supreme Court has observed that, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the government.'"  *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (citation omitted).  The legislative history of the FCA indicates that recovery from persons who knowingly provide substandard and deficient products to the United States was a driving force behind enactment of the FCA.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958) (impetus for the FCA was sales of "provisions and munitions to the War Department [during the Civil War]" of "nonexistent or *worthless* goods") (citing H.R. Rep. No. 2, pt. 2, (1862)) (emphasis added).   "*Defective* products were one of Congress's primary concerns when it first enacted the statute in 1863."  Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 4:28 (2d ed. 2010) (citing Cong. Globe, 37th Cong., 3d Sess. 955 (1863)) (emphasis added).

Contrary to the Defendants' assertion, courts have recognized that worthless services claims under the FCA are not, as a legal matter, limited to instances where no services at all are provided.   A service can be worthless because of its deficient nature even if the service was provided.   In *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2011), the Second Circuit explained that "[i]n a worthless services claim, the performance of the service is so deficient that for all

practical purposes it is the equivalent of no performance at all."  In the nursing home context, the worthless services theory of FCA liability was well-articulated by the court in *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1155-56 (W.D. Mo. 2000).  In that case, the complaint alleged that nursing home patients developed pressure sores, incurred weight loss, and suffered unnecessary pain because the defendant knowingly provided inadequate staffing and grossly substandard care, but nonetheless billed the government for these purported services. The court denied both the defendant's motion to dismiss and its subsequent motion for summary judgment, stating:

> NHC agreed to provide "the quality of care which promotes the maintenance and enhancement of the quality of life."  At some very blurry point, a provider of care can cease to maintain this standard by failing to perform the minimum necessary care activities required to promote the patient's quality of life.  When the provider reaches that point, and still presents claims for reimbursement to Medicare, the provider has simply committed fraud against the United States.

*United States v. NHC Healthcare Corp.*, 163 F. Supp. 2d 1051, 1055-56 (W.D. Mo. 2001).

In *United States ex rel. Absher v. Momence Meadows Nursing Center*, No. 2:04-cv-00289-HAB-DGB (C.D. Ill.), the court denied a motion for summary judgment made by the defendants, a 140-bed nursing home in rural Illinois and its principal.  *Id.* (Docket No. 76, Ex. 1, Order on Summary Judgment, Jan. 15, 2013).  Relators alleged, as the United States' Complaint does here, that the nursing home defendant billed Medicare and Medicaid over several years, on a per diem basis, for services that were so deficient as to be essentially worthless, including allegations that facility residents "routinely went without medical care and food, were left to lay in urine and feces-soaked beds, went without prescribed medications needed for their mental and physical well-being and pain relief, suffered from ongoing outbreaks of skin disorders and infection including scabies and painful bedsores, and otherwise suffered from substantial

neglect."  *Id.* at 1. The defendants argued that there was no FCA liability, as a matter of law, unless relator could prove that defendants provided "no services at all." *Id.* at 6.

Rejecting this argument and denying defendants' motion for summary judgment, the court reasoned as follows:

> The defendants argue that the relators' claim of substandard services cannot be equated to no services at all. This misapplies the case law.  In *Chesbrough* [*v. VAP*, 655 F.3d 461 (6th Cir. 2011)], radiology images were of such poor quality that they had limited to no diagnostic value.  *Chesbrough*, 655 F.3d at 465.  "A test known to be of 'no medical value,' that is billed to the government would constitute a claim for 'worthless services.'"  *Chesbrough*, 655 F.3d at 468 (quoting *Mikes*, 274 F.3d at 702-03).  The relators do not claim that no services were provided; they claim that the services were so deficient that they were worthless.
>
> The presentation of a worthless services claim must be knowing, or reckless with deliberate ignorance; negligence or innocent mistake is insufficient. *Mikes*, 274 F.3d at 703.
>
> One difficulty in proving a worthless services claim lies in the per diem billing system utilized by Medicare and Medicaid.  *See United States v. NHC Health Care Corp.*, 163 F. Supp. 2d 1051, 1055 (W.D. Mo. 2001). Under the system, nursing homes bill Medicare and Medicaid for overall care *per diem*, rather than for each individual service.  Therefore, occasional services not provided [footnote omitted] do not give rise to an FCA claim because the billing is the same whether or not the service is provided. . . . However, when the government pays the per diem rate for services that fall short of "the minimum necessary care activities required to promote the patient's quality of life," the facility may have crossed the "very blurry point" into worthless services.  *NHC*, 163 F. Supp. 2d at 1055-56. . . .  In this case, whether MMNC's services crossed into the "admittedly grey area" of worthless services is a factual determination.

*Id.  See also United States v. Houser*, No. 4:10-CR-012-HLM, 2011 WL 2118847, at *10 (N.D. Ga. May 23, 2011) (stating, in a criminal health care fraud case against nursing home owners, that "the overall conditions at the Facilities were so poor and the residents neglected to such a degree that any services provided were worthless. . . . Even where services are provided per diem, reasonable persons would know that supplying limited, or no, basic services would fail to comport with the very essence of the provider and benefit agreements, and that seeking reimbursement for such deficient services would constitute fraud.").

Defendants contend that the USA Complaint presents "conclusory" or "unsupported" allegations concerning the conditions and care at Oxford during their tenure; the control exercised by AltaCare, LTCS and Mittleider over Oxford's operations and budget; and the defendants' knowledge of the lack of resources and resulting harm to residents of Oxford.  To the contrary, the USA Complaint is replete with specific details and representative examples.  *See Factual Background*, *supra*, at II.B.  In other words, the allegations have crossed the proverbial "very blurry point" into worthless services.  A motion to dismiss is not the proper vehicle to resolve such factual disputes, any more than a motion for summary judgment was in *Absher*.  Docket No. 76, Ex. 1.  The determination of what constitutes worthless services is fact-specific and must be established on a case-by-case basis.  *See United States v. Villaspring Health Care Ctr.*, No. 3:11-43-DCR, 2011 WL 6337455, at *5 (E.D. Ky. Dec. 19, 2011).

Defendant rely mainly upon two cases[68] to argue that FCA liability for the provision of worthless services at a skilled nursing facility requires allegations that nothing in the bundle of nursing home services had any value whatsoever to the residents or the United States.  This argument raises problematic implications.  As the Government has indicated compellingly, "taken to its extreme, defendants' argument is that a nursing home is entitled to payment for

---

[68] The Defendants rely on *United States ex rel. Swan v. Covenant Care*, 279 F. Supp. 2d 1212 (E.D. Cal. 2002), and *United States ex rel. Sweeny v. ManorCare Health Servs., Inc.*, No. C03-5320RJB, 2005 WL 4030950 (W.D. Wash. Mar. 4, 2005).  These cases are not binding on this court and are not persuasive in this case because the facts are distinguishable.  Both *Swan* and *Sweeny* are *qui tam* actions in which the United States declined to intervene.  In *Swan*, the relator alleged that the defendant billed for worthless services and violated applicable regulations; the relator did not allege a nexus between the statutes and regulations that the defendant violated and payment by the government.  279 F. Supp. 2d at 1215.  On the worthless services claim, the court ruled that the defendant's neglect of residents was so severe as to be the equivalent of providing no services at all.  *See id.* at 1221.  Thus, *Swan* does not stand for the proposition that to sustain an FCA claim for worthless services the Government must allege that no services at all were provided.  The court granted the defendant's motion to dismiss the relator's FCA claim for worthless services based on allegations that the defendant nursing facility failed to administer certain dietary supplements and snacks.  *Sweeny*, 2005 WL 4030950, at *1.  The court gave relator at least one opportunity to amend her complaint, and thereafter, although denying leave further to amend, the court stated that it "takes no position on the viability of 'quality of care' or 'worthless services' as theories of recovery under the FCA in a nursing home setting under different facts.  Clearly, each case should be decided on a case to case basis."  *United States ex rel. Sweeny v. ManorCare Health Servs., Inc.*, No. C03-5320RJB (W.D. Wash.).  Order, Feb. 27, 2006, Docket No. 76, Ex. 2, at 9.  To be sure, the facts alleged in this case go far beyond not administering dietary supplements and snacks and make for a different case entirely.

doing nothing more than housing an elderly person and providing her with just enough bread and water for short-term survival, even in conditions of filth, mold and insect infestation; and even if it consistently provides her too little medication, or too much, or the wrong medication, contrary to her physician's orders; and even if it allows her to develop horrific pressure ulcers infected by feces and urine to the point that amputations are required; and even if it permits her to suffers falls and fractures; and even it allows her to asphyxiate on her own fluids due to inadequate resources to properly attend to her worsening condition.  This cannot be the case and it is not the law."  Docket No. 76, at 12.

The facts alleged in the Complaint, including the heinous examples of grossly deficient care suffered by the seven representative residents, USA Compl., ¶¶ 62-253, if taken as true, support the overall charge in the USA Complaint that Defendants had actual knowledge recklessly disregarded and/or remained in deliberate ignorance, of the truth or falsity of the claims and statements made to Medicaid and Medicare, and thus "knowingly" made or caused to be made to Medicaid and Medicare false or fraudulent claims and statements, within the meaning of the FCA, 31 U.S.C. § 3729(b).  They also create factual issues as to whether the services provided by defendant at Oxford were essentially worthless.  The Government's allegations more than meet the threshold pleading requirements of Rules 8 and 12(b)(6).  The motion to dismiss Count I of the USA Complaint is denied.

### 2. Payment By Mistake and Unjust Enrichment (Counts III and IV)

The Government has alleged that "Mittleider caused Hyperion to enter into Medicaid and Medicare Provider Agreements, to execute other documents necessary for Hyperion to participate in those programs, and to take such other steps and execute such other documents as were necessary for Hyperion to conduct business and receive payments as a Medicaid and

Medicare provider."  USA Compl., ¶ 23.  The Defendants have argued that the Court should dismiss Counts III and IV of the USA Complaint, which allege payment by mistake and unjust enrichment, because those claims sound in quasi-contract and the Medicaid and Medicare Provider Agreements are "express contracts."  Docket No. 67, at 10.

As other district courts in this circuit have determined, "Medicare Provider Agreements create statutory, not contractual, rights."  *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007); *see also Maximum Care Home Health Agency v. HCFA*,  No. 97–1451, 1998 WL 901642, at *5 (N.D. Tex. Apr. 14, 1998) ("[A] Medicare service provider agreement is not a contract in the traditional sense.  It is a statutory entitlement created by the Medicare Act.").  Thus, the Government's claims do not sound in contract, but arise out of federal common law claims arising out of statutory obligations and violations of the FCA.[69]  As a general proposition, "[t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid."  *United States v.*

---

[69] The Defendants have also argued that a statute of limitations precludes in part the Government's payment by mistake and unjust enrichment claims for claims submitted before February 28, 2007.  The Defendants rely on the six-year statute of limitations, which provides that "every action for money damages brought by the United States . . . which is founded upon any *contract* express or implied in law or fact, shall be barred unless the complaint is filed within six years of when the cause of action accrues."  28 U.S.C. § 2415(a) (emphasis added).  As the Court has clarified above, the Provider Agreements at issue create statutory, not contractual, rights; by definition, they are not contracts.  Thus, this argument fails.  Indeed, the FCA's relation back provision also preserves these common law claims. The FCA provides, in relevant part:

> "If the Government elects to intervene and proceed with an action brought under 3730(b), the Government may file its own complaint . . . to add any additional claims with respect to which the Government contends it is entitled to relief.  For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person."

31 U.S.C. § 3731(c).  The payment by mistake and unjust enrichment claims arise out of the same conduct set forth by the Relator and thus relate back to the date on which the Relator filed its *qui tam* complaint.  The Government may pursue claims accruing since September 30, 2003.  *See* 31 U.S.C. § 3731(b)(1) ("A civil action under section 3730 may not be brought more than 6 years after the date on which the violation . . . is committed").  Since these claims arise from the point at which Defendants first started to operate Oxford, in October 2005, they are not time-barred under the relevant statute.

*Medica–Rents Co.*, 285 F. Supp. 2d 742, 776 (N.D. Tex. 2003) (quoting *United States v. Wurts*, 303 U.S. 414, 415 (1938)).   To prevail on a claim for payment by mistake (also known as payment by mistake-of-fact), the Government must show that the Medicare program "made . . . payments under an erroneous belief which was material to the decision to pay . . ." *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970) (citing *Wurts*, 303 U.S. at 414).   As the Court has indicated above, the Defendants' cost reports to the Medicare and Medicaid programs contained express certifications of compliance with Medicare and Medicaid regulations.   To the extent that the Government alleges that these certifications were false and material to the Medicare program's decision to pay, the Government has stated a claim for payment by mistake.

To prevail on a claim for unjust enrichment under federal common law, the Government must show: "(1) [the Government] had a reasonable expectation of payment, (2) [Defendants] should reasonably have expected to pay, or (3) 'society's reasonable expectations of person and property would be defeated by nonpayment.'"   *Roberts*, 474 F. Supp. 2d at 820.   Taking the allegations of the USA Complaint as true at this stage of the litigation, the examples of claims submitted for seven residents in the worthless services allegations alone total $1,071,883.28. The Government has alleged that the Defendants have submitted claims for more than $30 million for worthless services at Oxford.   Assuming that the Government can produce sufficient evidence to support its allegations of widespread provision of worthless services, the amount of taxpayer dollars that have unjustly enriched the Defendants is breathtaking.   As a result, the Government has stated a claim of unjust enrichment which may move forward.   *See id.* ("Defendants received substantial Medicare reimbursements, totaling approximately $427,000, from their relationship with these physicians. Mrs. Davis also benefited from her affiliation . . . by drawing a generous salary.   As a result, Defendants were unjustly enriched.").

**V. CONCLUSION**

For the foregoing reasons, the Defendants' Motion to Dismiss the United States'

Complaint in Intervention is DENIED.  The Motion to Dismiss Academy's Second Amended

Complaint for Lack of Subject Matter Jurisdiction and Failure to State A Claim is GRANTED

IN PART and DENIED IN PART.  The Motion for Leave to Amend the Complaint is DENIED.

The Motion to Strike the Affidavit of Melvin Eisele is GRANTED.

**SO ORDERED**, this the 9th of July, 2014.

s/Carlton W. Reeves
_____
UNITED STATES DISTRICT JUDGE
